**Michael D. Markham**
1010 Front Street B101
Lahaina, Hawaii 96761
(558) 355-7896
MichaelMarkhamMD@gmail.com

February 28th, 2020

Re:  **Amended Complaint for Civil Cases  19-cv-6930 and 20-cv6039**

**Hon. Frank P. Geraci, Jr**
United States District Court Judge - Western District of New York
100 State Street
Rochester, New York 14614-1903

Dear Judge Geraci,

Please find enclosed Amended Complaints for Civil Cases 19-cv-6930 and 20-cv-6039 pursuant to Rule 15 (1)(b) of the Federal Rules of Civil Procedure. According to Rule 15 (1)(b), amending as a matter of course; a party may amend its pleading once as a matter of course up to 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b).

The Amended Complaints are identical to the originally filed complaints with the exception of the removal of items #1) and #2) requesting injunctive relief in Section IV **Relief.** Upon further reflection and counsel, the aforementioned requests of injunctive relief in the form of referral for criminal prosecution and parental rights are now removed as the plaintiff now believes they do nothing more than confuse the purely Constitutional claims he makes in Section III of his Statement of Claims. Thus the plaintiff believes his Amended Complaints are addition by subtraction.

Thank you for your kind and just consideration on this matter.

Yours in peace and justice,

**Michael D. Markham** *Pro se*

Enclosures

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

Michael D. Markham,

               Plaintiff,

        V.

Mark Bezinque, et.al.,
Matthew Rosenbaum, et.al.,

               Defendants.

*JURY TRIAL DEMANDED*

**CERTIFICATE OF SERVICE**

**19 - CV - 6930   &   20 - CV - 6039**

,

_____

# CERTIFICATE OF SERVICE

      **IT IS HEREBY CERTIFIED** that on March 5th, 2020, I served a true copy of Amended Complaints for Civil Cases 19-cv-6930 and 20-cv-6039 along with cover letter by U.S. Postal Service Priority Mail delivery to the Clerk of United States District Court - Western District of New York (Rochester) and by mailing the same in a Priority Mail sealed envelope, with postage pre-paid thereon, in an official depositiory of the U.S. Postal Service within the State of Hawaii addressed to those persons whose names are set forth on these two numbered pages.

     Timothy E. Ingersoll, Esq.
     Fero & Ingersoll, LLP
     2024 West Henrietta Rd., Ste. 3C
     Rochester, NY 14623

     Matthew Tracy, Esq.              *Attorney for Defandant:*
     45 Broadway, 32nd Floor         *Maureen A. Pineau*
     New York, NY 10006

     Nicolas B. Davis, Esq., of Counsel   *Attorney for Defendant:*
     28 E. Main St. Suite 1700        *Gregory J. Mott*
     Rochester, NY 14610

1

Gary M. Lavine, Assitant Attorney General of Counsel
NYS Office of the Attorney General
144 Exchange Boulavard, Suite 200          *for the Defendants:*
Rochester, NY 14614                        *Matthew A. Rosenbaum*
                                           *Kenneth R. Fisher*
                                           *Richard A. Dollinger*
                                           *Cynthia L. Snodgrass*


Frank A. Aloi, Esq.                        *Attorney for Defendants:*
P.O. Box 18186                             *Lisa B. Morris*
Rochester, NY 14618                        *Edward W. Riley*


Devin Lawton Palmer, Esq.                  *Attorney for Defendants:*
Boylan Code LLP                            *Mark Chauvin Bezinque*
145 Culver Road Suite 100                  *Sharon Kelly Sayers*
Rochester, NY 14620                        *Jennifer Speller*


Karen G. Felter, Esq.                      *Attorney for Defendant:*
Smith, Sovik, Kindrick & Sugnet PC         *David Coron*
250 S. Clinton Street Suite 600
Syracuse, NY 13202


Adam M. Clark, Esq.                        *Attorney for Defendant:*
Monroe County Department of Law            *Adam J. Bello*
39 W. Main Street
Rochester, NY 14614


Diane R.DeLong, *Pro se*
800 Winton Road N. Apt.#2
Rochester, NY 14609


Dated: March 5th, 2020

_____
Michael D. Markham, *Pro Se*
1010 Front Street, B101
Lahaina, Hawaii 96761
Telephone: (585) 355-7896
Email: MichaelMarkhamMD@gmail.com

2

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

# UNITED STATES DISTRICT COURT

for the

Western District of New York ⬇️

Second Division

| | | |
|---|---|---|
| Michael D Markham | ) | Case No. **1 9 CV 6 9 3 0** G̶ |
| | ) | |
| | ) | *(to be filled in by the Clerk's Office)* |
| | ) | |
| _____ | ) | |
| *Plaintiff(s)* | ) | |
| *(Write the full name of each plaintiff who is filing this complaint.* | ) | Jury Trial: *(check one)* ✔️ Yes ☐ No |
| *If the names of all the plaintiffs cannot fit in the space above,* | ) | |
| *please write "see attached" in the space and attach an additional* | ) | JURY TRIAL DEMANDED |
| *page with the full list of names.)* | ) | |
| -v- | ) | |
| Mark Chauvin Bezinque | ) | |
| Lisa B Morris | ) | |
| Edward W Riley | ) | |
| Kenneth R. Fisher | ) | |
| *Defendant(s)* | ) | |
| *(Write the full name of each defendant who is being sued. If the* | ) | |
| *names of all the defendants cannot fit in the space above, please* | ) | |
| *write "see attached" in the space and attach an additional page* | ) | |
| *with the full list of names.)* | ) | |

## AMENDED
## COMPLAINT FOR A CIVIL CASE

I.   **The Parties to This Complaint**

A.   **The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Michael D Markham |
| Street Address | 1010 Front Street B101 |
| City and County | Lahaina |
| State and Zip Code | Hawaii, 96761 |
| Telephone Number | 585 355 7896 |
| E-mail Address | MichaelMarkhamMD@gmail.com |

B.   **The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title *(if known)*.  Attach additional pages if needed.

**Defendant No. 1**

|  |  |
|---|---|
| Name | Mark Chauvin Bezinque |
| Job or Title *(if known)* | Attorney |
| Street Address | 45 Exchange Blvd. Suite 1000 |
| City and County | Rochester, County of Monroe |
| State and Zip Code | New York 14610 |
| Telephone Number | 585 325 5110 |
| E-mail Address *(if known)* | |

**Defendant No. 2**

|  |  |
|---|---|
| Name | Lisa B. Morris |
| Job or Title *(if known)* | Attorney |
| Street Address | 1577 W Ridge Rd #220 |
| City and County | Rochester, County of Monroe |
| State and Zip Code | New York 14610 |
| Telephone Number | 585 621 1930 |
| E-mail Address *(if known)* | Lisa@LisaMorris.com |

**Defendant No. 3**

|  |  |
|---|---|
| Name | Edward W. Riley |
| Job or Title *(if known)* | Attorney |
| Street Address | 25 Market Street |
| City and County | Brockport, County of Monroe |
| State and Zip Code | New York 14420 |
| Telephone Number | 585 637 2310 |
| E-mail Address *(if known)* | edrileyesq@aol.com |

**Defendant No. 4**

|  |  |
|---|---|
| Name | Kenneth R. Fisher |
| Job or Title *(if known)* | Supreme Court Justice (Retired) 7th Judicial District |
| Street Address | 545 Hall of Justice, 99 Exchange Blvd. |
| City and County | Rochester, County of Monroe |
| State and Zip Code | New York 14614-2184 |
| Telephone Number | 585 371 2148 |
| E-mail Address *(if known)* | kfisher@nycourts.gov |

eror

## II.  Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction?  *(check all that apply)*

☑ Federal question                    ☑ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.  If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

The federal statutes at issue are Titile 18, U.S.C., Section 242 - Deprivation of Rights Under Color of Law and Title 18, U.S.C., Section 241 - Conspiracy Against Rights and more specifically the right to both Substantive and Procedural Due Process guaranteed under the Fourteenth Amendment of the United States Constitution. Further at issue is violation of Title 42, U.S.C., Section 1983 - deprivation of rights. Lastly, Diversity of Juristiction. The Plaintiff is a citizen of the State of Hawaii and  Defendant's are all citizens of the State of New York. The amount in dispute is well in excess of $75,000.00.

### B.  If the Basis for Jurisdiction Is Diversity of Citizenship

1.  The Plaintiff(s)

   a.  If the plaintiff is an individual

   The plaintiff, *(name)*  Michael D Markham                          , is a citizen of the State of *(name)*  Hawaii                          .

   b.  If the plaintiff is a corporation

   The plaintiff, *(name)* _____ , is incorporated under the laws of the State of *(name)* _____ , and has its principal place of business in the State of *(name)* _____ .

   *(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.  The Defendant(s)

   a.  If the defendant is an individual

   The defendant, *(name)*  Bezinque, Morris, Riley, & Fisher        , is a citizen of the State of *(name)*  all of New York                        . Or is a citizen of *(foreign nation)* _____ .

b.     If the defendant is a corporation

The defendant, *(name)* _____ , is incorporated under

the laws of the State of *(name)* _____ , and has its

principal place of business in the State of *(name)* _____ .

Or is incorporated under the laws of *(foreign nation)* _____ ,

and has its principal place of business in *(name)* _____ .

*(if more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.     The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*: $12,000,000.00

## III.    Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.
SEE ATTACHED

## IV.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

For a willful conspiracy to deprive Plaintiff of his lawful rights as a US citizen, that constituted a skillfully waged and orchistrated campaign of terrorism by Defendants against an individual United States citizen and an Honorably separated US militatry veteran, the Plaintiff respectfully seeks the following relief from this Federal Court:

     1) An award of $500,000 from each Defendant for the willful and deliberate harm done to the Plaintiff by conspiring to unlawfully deprive him of his rights Protected under the United States Constitution. The physical, emotional and spiritual harm done to the Plaintiff by this orchestrated targeted act of terrorism cannot be

overstated. Evidence (medical records) will show Plaintiff has suffered greatly and his loss of income and livlihood as a result has left him nearly indigent and a truley broken man.

2) An award of $2,500,000.00 from each Defendant for punitive damages for such willful, and deliberate acts done soley for the purpose of depriving Plaintiff of any due process in a US Court.

## V.   Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.   For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:                02/25/2020

Signature of Plaintiff

Printed Name of Plaintiff        Michael D. Markham

### B.   For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

## III. Statement of Claim

The evidence will show that the Defendants willfully and knowingly conspired to deprive Plaintiff of his Constitutional Right to Due Process in a United States Court of Law (New York State Supreme Court - County of Monroe) by fabricating evidence including Lincoln Hearings and a Trial that the facts will show never actually occurred. This conspiracy laid the foundation for Plaintiff being deprived of any access to his children AND likewise deprived his children of the love and support of their father for over three years. Further the Defendants conspired by way of false affidavit and false testimony to litigate the custody of Plaintiff's minor children in the State of New York rather than the State of Hawaii in a successful attempt to deprive the Plaintiff and his children of their right to have their custody dispute settled in the State of Hawaii which was the undisputed (Exhibit E) legal state of the children's residence at the commencement of litigant's divorce proceedings. Further the Defendants conspired to destroy all of the Court Records including the Monroe County Court House Record, the NYS eRecord, and the judicial chamber file in an attempt to obfuscate their collusion and illegal behaviour that was well outside of the official capacity and duties of officers of the Court. This further resulted in depriving the Plaintiff, a "foreign resident" (Hawaii), of his protected 14th Amendement Constitutional right to due process in a United States Court of law. In spite of a successful motion to vacate of Judge Kennth Fisher's Absolute Judgement of Divorce and his subsequent "early retirement", no relief was ultimately provided by the New York State Supreme Court for the extreme deprivation of rights that occurred there. Having all legal remedies in the New York Courts finally exhausted has resulted in this timely petition for relief in US Federal Court.

The evidence will show that Mark Bezinque (former attorney for Ms Delong) fabricated evidence including Lincoln Hearings and a Trail that the facts will show never occurred. This conspiracy resulted in the Plaintiff being deprived of his Fourteenth Amendment Constitutional right to Due Process in a United States Court of Law. There is no docket record of Lincoln Hearings (of the children) or a Trial ever occurring or evidence of the same in either the Monroe County Court House Record, (Exhibit A - Judgement to Vacate) The New York State eRecord, (NYS eRecord) or the Judge Fisher's Chamber File (Exhibit B - Affidavit of Walter Capell, Esq.) Further Mr. Bezinque admitted to Mr Mott (former attorney for Plaintiff) when questioned as to why there was no Court records or docket entry of Lincoln Hearings, or a Trial ever happening that there is no record because they never actually happened (Exhibit C - Letter from Mott to Sayers). The "testimony" at these hearings that never occurred became the legal basis for the extreme case of parental isolation that followed for years later, commencing with the final scheduled Post Judgement litigation on December 2, 2019 in the New York State Supreme Court.

The evidence will show that Lisa B. Morris (former attorney for children) willfully participated and contributed to the conspiracy against Plaintiff by knowingly submitting false sworn testimony in her "Closing Argument for the Children" (Exhibit D) that gives testimony that she says was given during Lincoln Hearings and a Trial in November of 2016 that she knew never occurred. Her willful participation in this conspiracy deprived the Plaintiff and his 14th Amendment Constitutional Right to Due Process in a United States Court of Law.

The Evidence will show that Edward W. Riley (2nd former attorney for children) conspired with his legal colleagues, the former attorneys representing Ms Delong and the children. The evidence will show that Mr Riley knew that the Lincoln Hearings and Trial that formed the basis for the extreme parental isolation of Plaintiff from his children were fabricated. The evidence will also show that Mr Riley refused to acknowledge the fraud before the Court in an attempt to cover up the fraud on behalf of his colleagues. For his willful part in the conspiracy Edward W. Riley has deprived Plaintiff of his 14th Amendment Constitutional right to both substantive and procedural due process in a United States Court of Law.

The Evidence will show that Kenneth R. Fisher - New York State Supreme Court Justice (Retired) acted well outside the scope of his official judicial duties as a New York State Supreme Court Justice

when he conspired with the other Defendants to rid his official chamber file of any incriminating documents that would have been found within. (Exhibit B - Affidavit of Walter Capell, Esq.). Further, Evidence will show that this purging of his chamber file (and likely the other files pertaining to this case) happened proximate to his leaving the "bench" and were not acts that were done in any official capacity as a sitting judge. Evidence will show that this illegal behavior not only happened outside of Kenneth Fisher's official mandate as a sitting judge, it happened sometime proximate to  his retirement on March 30, 2017. For his willful part in the conspiracy, acting outside of his official mandate Kenneth Fisher has deprived the Plaintiff of his rights protected under the 14th Amendment of the US Constitution and Title 42 U.S.C., Section 1983 for illegal acts that were taken by a judicial officer that were NOT part of such officer's judicial capacity and deprived a US Citizen and military veteran of his rights protected by the United States Civil Code and the US Constitution.

  As a result of a deprivation of rights protected by the U.S.C and the US Constitution the Plaintiff has endured immeasurable pain and hardship. He has been unlawfully evicted from his home, all of his bank accounts have been illegally seized,  he has been continuously terrorized and threatened with false imprisonment, and perhaps most troubling of all, he has been deprived of any access whatsoever to his beloved children for over three years. The pain and stress experienced by  the Plaintiff caused by the deprivation of his rights by the Defendants who conspired to deprive him of  rights is likely something he will never fully recover from, nor will his children. As a result of the Defendant's unlawful and illegal acts the Plaintiff has ongoing major depression, generalized anxiety disorder, and chronic and severe insomnia. He is under the care of at least three physicians and his ability to maintain gainful employment has been severely hindered by the time, expense, and health toll the Defendants acts have had on the Plaintiff through a willful conspiracy to deprive him of his rights granted all citizens under the U.S.C. and the US Constitution.

Clear Form

# In The United States Court of Federal Claims

## Cover Sheet

Plaintiff(s) or Petitioner(s)

Names: __MICHAEL D MARKHAM__

Location of Plaintiff(s)/Petitioner(s) (city/state): __LAHAINA, HAWAII__

(If this is a multi-plaintiff case, pursuant to RCFC 20(a) please use a separate sheet to list additional plaintiffs.)

Name of the attorney of record (See RCFC 83.1(c)): _____

Firm Name: __N/A__

Contact information for pro se plaintiff/petitioner or attorney of record:

Post Office Box: _____

Street Address: __1010 FRONT STREET  B101__

City-State-ZIP: __LAHAINA, HAWAII  96761__

Telephone & Facsimile Numbers: __585 355 - 7896__

E-mail Address: __MICHAEL MARKHAM MD @ GMAIL.COM__

Is the attorney of record admitted to the Court of Federal Claims Bar?   ○ Yes  ○ No  __N/A__

Nature of Suit Code: __516__
Select only one (three digit) nature of suit code from the attached sheet

Amount Claimed: $ __12,000,000.00__
Use estimate if specific amount is not pleaded

Agency Identification Code: _____

Number of Claims Involved: _____

Bid Protest Case (required for NOS 138 and 140):
Indicate approximate dollar amount of procurement at issue: $

Is plaintiff a small business?   ○ Yes  ○ No

Was this action preceded by the filing of a protest before the GAO?   ○ Yes  ○ No    GAO Solicitation No.

If yes, was a decision on the merits rendered?   ○ Yes  ○ No

Income Tax (Partnership) Case:
Identify partnership or partnership group: _____

Takings Case:
Specify Location of Property (city/state): _____

Vaccine Case:
Date of Vaccination: _____

Related Case:
Is this case directly related to any pending or previously filed case(s) in the United States Court of Federal Claims? If yes you are required to file a separate notice of directly related case(s) See RCFC 40.2    ○ Yes  ⊗ No

178

# Exhibit A

# Order to Vacate

At a Special Term of the Supreme Court of the State of New York, held in and for the County of Monroe, at the Hall of Justice in Rochester, New York on the 14th day of September, 2017.

PRESENT:   HON. RICHARD A. DOLLINGER
                    SUPREME COURT JUSTICE

STATE OF NEW YORK
SUPREME COURT   COUNTY OF MONROE

DIANE R. MARKHAM,

                              Plaintiff,                    index #2015/9826

      -vs-                                        ORDER TO VACATE

MICHAEL D. MARKHAM,

_____ Defendant.

Defendant, MICHAEL D. MARKHAM, having applied to this Court by Order to Show Cause, dated August 14, 2017, for relief as more specifically set forth in said Order to Show Cause; and

Plaintiff, DIANE MARKHAM, having submitted a Reply Affidavit in opposition to Defendant's Order to Show Cause, dated September 6, 2017, and Attorney Supplemental Affidavit, dated September 11, 2017, and Defendant's attorney having submitted Supplemental Attorney Affirmation and Defendant's Attorney Affirmation, both dated September 12, 2017; and

The Court having reviewed all the papers and reviewed all the Affidavits, Affirmations and exhibits submitted herewith by respective parties, through their counsel; and

All applications to this Court and opposition papers have been filed in the Monroe County Clerk's Office; and

The Court having heard oral argument at Special Term on September 6, 2017 and again on September 14, 2017 by respective counsel with respect to all applications to the Court on September 14, 2017 at the Hall of Justice in Rochester, New York, Gregory J. Mott, Esq. on behalf of Defendant and Timothy E. Ingersoll, Esq. on behalf of Plaintiff; and

The Court having rendered its decision in open court on September 14, 2017. The transcript of the Court's decision is annexed and incorporated herein as **Exhibit A**; and

NOW, upon motion of Defendant, MICHAEL D. MARKHAM, by and through his attorney, the relief sought in Defendant's Order to Show Cause, dated September 6, 2017, is granted to the following extent; it is hereby

ORDERED that the Judgment of Divorce, **Exhibit B**, is hereby vacated in all respects; and it is further

ORDERED that the Amended Judgment of Divorce, **Exhibit C**, is hereby vacated in all respects; and it is further

ORDERED that the Court hereby reserves on Plaintiff's application for attorney's fees; and it is further

ORDERED that any pendente lite Order in the above entitled divorce action shall remain in effect at this time until further order of this Court; and it is further

ORDERED that attorney Lisa Morris, Esq. shall be reappointed attorney for the two youngest children in this action, to wit: Rowan Mathews Markham d/o/b May 21, 2002 and Rory Patricia Markham d/o/b December 16, 2004; and it is further

2

ORDERED that this matter is hereby scheduled for Trial Day Certain starting March 26, 2018 at 10:00 a.m. and continuing each day thereafter until completion of the trial; and it is further

ORDERED that a copy of this signed and filed Order shall be delivered to Defendant, MICHAEL D. MARKHAM, by his attorney and, further, that Defendant, MICHAEL D. MARKHAM, shall execute an Admission of Service, signed and notarized, and return that to his attorney who, in turn, shall file the same with the Court, acknowledging by which terms Defendant acknowledges receipt of a copy of this Order and exhibits annexed hereto.

Dated: _October 31_ , 2017
      Rochester, New York

                                     HON. RICHARD A. DOLLINGER
                                       SUPREME COURT JUSTICE

E N T E R:

3

# Exhibit B

# Affirmation
# Of
# Walter Capell, Esq.

STATE OF NEW YORK
SUPREME COURT    COUNTY OF MONROE

DIANE R. MARKHAM,

                              Plaintiff,

                                                **ATTORNEY AFFIRMATION**

          -vs-
                                                **Index No.: 2015/9826**

MICHAEL D. MARKHAM,

                      Defendant.
_____

STATE OF NEW YORK)
COUNTY OF MONROE)    SS:

        WALTER R. CAPELL, ESQ., an attorney duly licensed to practice in the Courts of the State of New York, affirms under penalties of perjury as follows:

        1.        I am a partner in the law firm of Davidson Fink LLP, attorneys for Defendant, MICHAEL D. MARKHAM, in the above-entitled action and make this Affirmation with respect to Defendant's, MICHAEL D. MARKHAM, pending Motion to Vacate the Default Judgment of Divorce against him.  The original Judgment of Divorce is dated January 18, 2017 and Amended Judgment of Divorce dated March 20, 2017.

        2.        A motion was made on behalf of Defendant, MICHAEL D. MARKHAM, and granted, copy of Order annexed as **Exhibit** A, by which terms the Monroe County Clerk was ordered to provide Defendant's attorney, Gregory J. Mott, Esq. or Walter R. Capell, Esq. from Davidson Fink LLP, with copies of the following pleadings:

        A.        Copy of Summons with Notice/Summons and Complaint, Consent to Change Attorney Form, Findings of Fact and Judgment of Divorce.

        B.        Notice of Appearance.

3.      In addition and on June 19, 2017, Your Affiant was given the opportunity and did, in fact, review Justice Fisher's file in this case for the purpose of attempting to locate the missing documents listed in the Order, dated May 24, 2017, see **Exhibit A.** Your Affiant found none of those documents in Justice Fisher's file.

4.      Defendant advised that the Monroe County Clerk provided Defendant, via Federal Express, with copies of the following documents:

      A.      Original Judgment of Divorce.

      B.      Application for Index Number Form.

      C.      Only page 3 of the Summons.

      D.      Complaint.

Affirmed this _23rd_ day of June, 2017.

_____
WALTER R. CAPELL, ESQ.

2

# Exhibit C

# Admission of intent to conspire from Bezinque, Esq. to Mott,Esq.

# Davidson | Fink
## Attorneys at Law

Gregory J. Mott
Partner

July 27, 2018

**Via Hand Delivery**
Sharon Kelly Sayers, Esq.
30 West Broad Street, Suite 506
Rochester, NY 14614

　　　　Re:　**Markham vs. Markham**
　　　　　　**Index No. 2015/9826**

Dear Sharon:

Per our attorneys' conference held in my office on Tuesday, July 24, 2018, you will send Michael Markham your Retainer Agreement and you will become the counsel in this case. Since this case is nearly 3 years old, I will remain as second chair to assist you as this case moves forward.

Michael Markham's address is: 1010 Front Street, B101, Lahaina, HI 9676.

His telephone number is: (585) 355-7896.

His email address, which is his preferred way of communicating, is: MichaelMarkhamMD@gmail.com.

Enclosed please find:

1.　　Order to Vacate with Exhibits annexed. Order dated October 31, 2017 and granted at Special Term by Judge Dollinger September 14, 2017.

2.　　Maureen Pineau's July 2, 2018 cover letter with encloses listed, non-party out of court Subpoena Duces Tecums. I sent Maureen an email asking her to send me copies of whatever she receives in response to these Subpoenas which, of course, I will share with you.

3.　　I will send you Ed Riley's AFC Report as soon as I receive a copy from Ed. In the meanwhile, I emailed you, July 26, 2018, Ed Riley's Answering Affirmation of Attorney for the Child affirmed opposition in response to Diane Markham's Order to Show Cause, dated November 6, 2017, seeking to have Michael Markham held in contempt and Michael Markham's Notice of Motion, dated November 13, 2017, requesting visitation and communication rights with his two youngest child. I thought you ought to take a look at this to get an idea where Ed is coming from.

---

28 East Main Street, Suite 1700 | Rochester, New York 14614 | 585-756-5926 | davidsonfink.com
gmott@davidsonfink.com | fax 585-758-5064

4.    Email from Michael Markham to me, dated September 18, 2017, giving a background and listing of experts that have treated Michael Markham during the last 3 years.

5.    Judge Fisher's Decision and Order, dated March 2, 2016 and filed March 7, 2016.  Please note, bottom of page 3, initially Judge Fisher did grant Michael Markham visitation, which he subsequently revoked in a later Order.

6.    Michael Markham's Statement of Net Worth as of October 19, 2015.  Date of commencement September 1, 2015.

7.    Judge Dollinger's Amended Temporary Order granted December 1, 2017, dated January 2, 2018 and filed January 5, 2018.  This includes the appointment of Dr. Coron as psychological evaluator, temporary custody, temporary maintenance, temporary child support, etc.

8.    Michael Markham's October 30, 2017 email to me re 529 Plans and documents attached with respect to those plans and the monies withdrawn.  Also email to me from Tim Ingersoll, Esq. to me, dated October 30, 2017, with respect to the SEP IRA liquidation and the 529 Plans.  These are two issues in dispute.

9.    Emailed you, July 26, 2018, a copy of David Coron's March 19, 2018 email to all attorneys and Justice Dollinger attached to his massive psychological valuation of Michael Markham annexed with information from "collateral/third party date received by him" which was also attached.

10.   Judge Fisher's Decision and Order, signed December 20, 2016, granting:

      a)    Sole custody to Plaintiff/Wife (this is without a hearing) finding that Michael Markham, Defendant, has "effectively abandoned his family…"  Note on page 3, Fisher says he held a Lincoln Hearing. He refers to "Mother's testimony, but there is no transcript in existence and no reference to a default hearing or notice of default hearing.  In talking to Mark Bezinque, Esq. he admitted that there was no hearing.  When Fisher refers to "Mother's testimony", no idea what he is talking about.  This is where Fisher terminates all contact with the children for our client but then says, on page 5, "Defendant is free to, in the future, petition the Court for resumption of visitation without conditions", whatever that means, which we did and were denied.  Also note that Michael Markham has repeatedly raised the issue of whether or not New York had jurisdiction over the issue of custody in as much as the parties sold their house in New York and bought the house in Hawaii.  That fact is not in

dispute. In fact, the 6 months prior to the commencement date, September 1, 2015, all 3 children and the parties were residents of the State of Hawaii. I do not know if Michael wants to raise a jurisdictional issue again, but he may. "Interesting reading" is my comment on Judge Fisher's Decision and Order. Apparently he is not familiar with the phrase Judgment of Divorce.

11.   Condensed version of Michael Markham's deposition testimony, December 14, 2017 by Alliance Court Reporting.

12.   Condensed version of Diane Markham's deposition testimony, December 14, 2017 by Alliance Court Reporting.

13.   Copy of Judge Fisher's January 18, 2017 Judgment of Divorce followed by copy of Judge Fisher's Amended Judgment of Divorce, dated March 20, 2017. These were prepared and submitted by Mark Bezinque, Esq., attorney for Diane Markham, which were subsequently vacated.

14.   Packet of information regarding the Hawaii property.

15.   Packet of information regarding Michael Markham's SEP IRA and Bank of Hawaii funds that were seized, bank statements included. I never did receive anything from Michael Markham's Hawaiian attorney, Mr. Adelman.

16.   Copies of last 2 proposal letters, mine of March 23, 2018 and Tim Ingersoll's responsive letter, dated April 12, 2018.

17.   Michael Markham's July 6, 2018 email to me after I sent him Judge Dollinger's summation of what the Judge thinks the settlement proposal terms should be (see Richard Dollinger's attached Tuesday, June 19, 2018 "a short note to counsel").

18.   May 24, 2017 Order.

19.   August 25, 2016 Order.

Let me know if there is anything else you need.

As soon as I get a copy of Ed's AFC Report, I will send it on to you.

Thank you for accepting position of the lead counsel in this case.  I will notify the Court as soon as your Retainer Agreement is signed and your retainer fee is paid.

Very truly yours,

Gregory J. Mott

GJM/taa
Enclosures
cc:    Michael D. Markham (without enclosures)

# Exhibit D

# Lisa Morris
# Closing Argument for the Children

SUPREME COURT
STATE OF NEW YORK   COUNTY OF NEW YORK

DIANE MARKHAM,
       Plaintiff,

                          CLOSING ARGUMENT OF
Vs.                        ATTORNEY FOR THE
CHILDREN

MICHAEL MARKHAM,           Index No.
2015/9826
       Defendant.

The Plaintiff Diane Markham and Defendant Michael Markham have three children, Aidan Markham born on June 12, 1997, Rowan Markham, born on May 21, 2002 and Rory Markham, born on December 16, 2004. Aidan Markham, who is emancipated, is a sophomore at RIT and lives primarily with his Mother Diane Markham when he is not attending school.

The Plaintiff, Diane Markham filed a complaint requesting joint custody of the unemancipated children, Rowan and Rory. During the pendency of the action, Rowan and Rory became uncomfortable with their Father's conduct while he was residing in the marital residence with the family. At that time, I argued that the children's mental health was being negatively impacted and the Court issued an Order dated January 22, 2016 awarding exclusive possession of the marital residence to the Mother. The parties agreed that the Father would have periods of residency with the children on Wednesdays and Saturdays.

During February, March, and April 2016, Rowan and Rory contacted me about continuing problems with their Father during visitation. On April 22, 2016, I filed an Order to Show Cause on behalf of the children requesting that the Father's periods of visitation be reduced. The affidavit in support of the Order to Show Cause included the children's concerns that their

Father was angry and regularly disparaged their Mother, Mother's attorney, and the children's counselor. The Court issued an Order terminating Father's visitation with Rowan and reducing Rory's visitation to Saturday for a four hour period.

As part of his responsive papers to the Order to Show Cause dated April 22, 2016, Father requested a forensic custodial evaluation of the parties and the children. The Father requested that Dr. David Coron, Ph.D conduct the evaluation and Mother agreed to the request. On May 20, 2016, the Court signed an Order directing that the custodial evaluation be completed by July 25, 2016. Despite the fact that Father requested the evaluation, he failed to retain Dr. Coron or schedule any appointments with Dr. Coron so the custodial evaluation did not go forward.

In July of 2016, Father cancelled two Saturday visits with Rory. Subsequently, Father texted Rory to inform her that he had moved to Hawaii and that he would send her a plane ticket to come to Hawaii any time that she wanted to visit.

The case was set for trial on November 14, 2016. The Father did not appear for the trial and the matter proceeded by default. At the trial, Mother testified and requested sole custody of the children. The attorney for the Plaintiff requested that the pleadings be conformed to reflect the Plaintiff's request for sole custody of the children.

At the time of the trial, Mother was residing in Rochester, New York with the children and Father was residing in Hawaii. The Mother testified that the Father moved to Hawaii in approximately July of 2016 and that the Father has not returned to Rochester, New York since that time. Mother testified that Rowan had no contact with his Father including telephone or electronic contact. The Mother testified that Father sent text messages to Rory periodically but to her knowledge Rory did not respond to the text messages.

Mother testified that she was the parent who was exclusively responsible for caring for the children. Mother testified that she homeschooled the children, took the children to all of their medical appointments, transported the children for all

of their extra-curricular activities, and provided for all of the other daily needs of the children. Mother testified that Father worked long hours and was not engaged with the children when he was home.

Mother testified that when the parties resided together Father argued with her in the presence of the children causing strife in the home and causing the children to be anxious and upset. Mother testified that she was unable to discuss decisions regarding the children with Father because he was continually combative and he refused to engage in civil discussions. Mother testified that Father has had no contact with her since he moved to Hawaii in July of 2016 nor has he inquired in any way about the status or needs of the children. Mother testified that she has not received any financial support for the children since mid-September and that Father took the child Aidan's 529 College Savings Account and did not pay the Fall 2016 tuition bill.

The children specifically requested to meet with the Court so that they could share their opinions with the Court. On November 15, 2016, the Court conducted a Lincoln Hearing wherein each child appeared individually in camera with the Court.

As Attorney for the Children, if a child is capable of knowing, voluntary considered judgment, my ethical obligation is to represent the child's expressed wishes unless I believe that there is a "substantial risk of imminent serious harm to the children". The children in this case have expressed their wishes to me and directly to the Court during the in camera interview. I do not believe that there is any substantial risk of imminent harm to the children.

On behalf of Rowan and Rory Markham, I am requesting their Mother be awarded sole custody of the children and that their Father have no contact with the children until further Order of this Court.

Respectfully Submitted,

Lisa P  Morris

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

# UNITED STATES DISTRICT COURT

for the

Western District of New York ☒

Second Division

**20 CV 6039**

Michael D Markham

Case No. _____

*(to be filled in by the Clerk's Office)*

*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

-v-

Mathew A Rosenbaum
Richard A Dollinger
Adam J. Bello
See Attached....

*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names.)*

Jury Trial: *(check one)* ☑ Yes ☐ No

JURY TRIAL DEMANDED

AMENDED

## COMPLAINT FOR A CIVIL CASE

## I.   The Parties to This Complaint

### A.   The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Michael D Markham |
| Street Address | 1010 Front Street B101 |
| City and County | Lahaina |
| State and Zip Code | Hawaii, 96761 |
| Telephone Number | 585 355 7896 |
| E-mail Address | MichaelMarkhamMD@gmail.com |

### B.   The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

Defendant No. 1

| | |
|---|---|
| Name | Mathew A Rosenbaum |
| Job or Title (if known) | Supervising Judge New York Supreme Court Seventh Judicall Distr |
| Street Address | 99 Exchange Blvd. 545 Hall of Justice |
| City and County | Rochester, County of Monroe |
| State and Zip Code | New York 14614-2184 |
| Telephone Number | 585 371 3754 |
| E-mail Address (if known) | MRosen@nycourts.gov |

Defendant No. 2

| | |
|---|---|
| Name | Richard A Dollinger |
| Job or Title (if known) | Acting Justice Supreme Court New York Seventh Judicial District |
| Street Address | 99 Exchange Blvd. 207 Hall of Justice |
| City and County | Rochester, County of Monroe |
| State and Zip Code | New York 14614-2184 |
| Telephone Number | 585 371 3698 |
| E-mail Address (if known) | rdolling@nycourts.gov |

Defendant No. 3

| | |
|---|---|
| Name | Adam J Bello |
| Job or Title (if known) | Monroe County Clerk |
| Street Address | 101 County Office Building, 39 West Main Street |
| City and County | Rochester, County of Monroroe |
| State and Zip Code | New York 14614 |
| Telephone Number | 585 753 1620 |
| E-mail Address (if known) | mcclerk@monroecounty.gov |

Defendant No. 4

| | |
|---|---|
| Name | See Attached....Defendants No. 4 -11. |
| Job or Title (if known) | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address (if known) | |

## II.   Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction?  *(check all that apply)*

[✔] Federal question            [✔] Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.   If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.
The federal statutes at issue are Title 18, U.S.C., Section 242 - Deprivation of Rights under Color of Law and Title 18, U.S.C., Section 241 - Conspiracy against rights and more specifically the right to both substantive and procedural due process in a US Court of Law guaranteed under the fourteenth amendment of the US Constitution and Title 42, U.S.C., Section 1983.

### B.   If the Basis for Jurisdiction Is Diversity of Citizenship

1.   The Plaintiff(s)

   a.   If the plaintiff is an individual
   The plaintiff, *(name)*  Michael D Markham                          , is a citizen of the
   State of *(name)*  Hawaii                                      .

   b.   If the plaintiff is a corporation
   The plaintiff, *(name)*                                       , is incorporated
   under the laws of the State of *(name)*                                       ,
   and has its principal place of business in the State of *(name)*
                                         .

   *(if more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.   The Defendant(s)

   a.   If the defendant is an individual
   The defendant, *(name)*  All defendants 1-11 are              , is a citizen of
   the State of *(name)*  New York                          . Or is a citizen of
   *(foreign nation)*                                 .

b.   If the defendant is a corporation

The defendant, *(name)* _____ , is incorporated under

the laws of the State of *(name)* _____ , and has its

principal place of business in the State of *(name)* _____ .

Or is incorporated under the laws of *(foreign nation)* _____ ,

and has its principal place of business in *(name)* _____ .

*(if more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.   The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:
The amount of damages is well in excess of $75,000. PLEASE SEE IV. 'RELIEF'
The amount in Controversy is $33,000,000.

## III.   Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.
SEE ATTACHED.

## IV.   Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

SEE ATTACHED.

## V.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:            02/25/2020

Signature of Plaintiff

Printed Name of Plaintiff        Michael D. Markham

### B.    For Attorneys

Date of signing:        _____

Signature of Attorney        _____

Printed Name of Attorney        _____

Bar Number        _____

Name of Law Firm        _____

Street Address        _____

State and Zip Code        _____

Telephone Number        _____

E-mail Address        _____

I.      **The Parties to This Complaint**
        **B. The Defendants Cont.....**

Defendant No. 4
        Name                                    Timothy E Ingersoll
        Job or Title                            Attorney
        Street Address                          2024 W Henrietta Rd Suite 3C
        City and County                         Rochester, County of Monroe
        State and Zip Code                      New York 14623
        Telephone Number                        585 325 4600
        E-Mail Address                          fpilawfirm@aol.com

Defendant No. 5
        Name                                    Maureen A Pineau
        Job or Title                            Attorney
        Street Address                          70 Linden Oaks, 3rd Floor
        City and County                         Rochester, County of Monroe
        State and Zip Code                      New York 14625
        Telephone Number                        585 383 5335
        E-Mail Address                          Pineau@frontiernet.net

Defendant No. 6
        Name                                    Gregory J Mott
        Job or Title                            Attorney
        Street Address                          28 East Main Street, Suite 1700
        City and County                         Rochester, County of Monroe
        State and Zip Code                      New York 14614-1990
        Telephone Number                        585 546 6448
        E-Mail Address                          gmott@davidsonfink.com

Defendant No. 7
        Name                                    Sharon Kelly Sayers
        Job or Title                            Attorney
        Street Address                          30 West Broad Street Suite 506
        City and County                         Rochester, County of Monroe
        State and Zip Code                      New York 14614
        Telephone Number                        585 454 2320
        E-Mail Address                          sayers@frontiernet.net

Defendant No. 8
- Name
- Job or Title
- Street Address
- City and County
- State and Zip Code
- Telephone Number
- E-Mail Address

Cynthia L Snodgrass
Attorney
27 North Main Street, Room 130
Canandaigua, County of Ontario
New York 14424
585 412 5313
csnodgra@nycourts.gov

Defendant No. 9
- Name
- Job or Title
- Street Address
- City and County
- State and Zip Code
- Telephone Number
- E-Mail Address

David Coron
Psychologist
6137 Co Rd 41
Farmington, County of Ontario
New York 14425
585 924 3120
dcoron1@rochester.rr.com

Defendant No. 10
- Name
- Job or Title
- Street Address
- City and County
- State and Zip Code
- Telephone Number
- E-Mail Address

Jennifer Speller
Attorney
45 Exchange Blvd, Suite 1000
Rochester, County of Monroe
New York 14614
585 325 5110
jspeller@bezinque.com

Defendant No. 11
- Name
- Job or Title
- Street Address
- City and County
- State and Zip Code
- Telephone Number
- E-Mail Address

Diane R. Delong
Business Owner – ex spouse
800 N. Winton Road
Rochester, County of Monroe
New York, 14609
585 237 8958
ZeldasHandG@gmail.com
Dianermarkham@gmail.com

## III. Statement of Claim

The evidence will show that the named defendants willfully and knowingly conspired to deprive the Plaintiff of his Constitutional Right of due process in a United States Court of law (New York State Supreme Court - County of Monroe) by fabricating evidence including Lincoln Hearings and an entire Trial that the facts will show never actually occurred. The evidence will show that defendants who came to the case after these acts were committed, actively and knowingly conspired to cover up these crimes to protect their legal colleagues and associates and willfully deprived the Plaintiff of his Constitutional right to due process in a US Court of Law.

The evidence will show that all of the Defendants knew that the Monroe County Courthouse record, the New York State eRecord, and Judge Fisher's Chamber file were all missing and/or destroyed (presumably in an attempt to cover up these crimes) and knowingly deprived the Plaintiff of his Constitutional right to due process in a US Court of law.

The evidence will show that the defendants conspired by way of false affidavit and false testimony to falsely claim a New York jurisdiction to litigate the custody of the Plaintiff's minor children in the state of New York rather than in Hawaii in an attempt to deprive the Plaintiff and his minor children of the right to have the custody issues settled in the state of Hawaii, the undisputed legal residence of the children in the years immediately preceding the commencement of divorce litigation in New York State.

The evidence will show that in spite of such injustices and a successful Motion to Vacate of Kenneth Fisher's Absolute Judgement of Divorce in September of 2017 by the late Judge Elma Bellini, no relief was ultimately provided in the litigation that followed by the New York State Supreme Court. The evidence will show that rather than acknowledging and vitiating everything previously before the Court, the Court chose to 'double down' on the corruption and refused to acknowledge the fabricated trial and Lincoln hearing. This continuous and ongoing refusal of justice and due process in Court has materially harmed the Plaintiff and has formed the basis of the Plaintiff being unimaginably materially harmed physically mentally spiritually and emotionally, leaving him with no access to his children for over three years now.

Having all exhausted all legal remedies in the State Court (New York) and having a diversity of jurisdiction as a long time resident of the State of Hawaii, I the Plaintiff am filing this petition / complaint in US Federal Court, seeking said relief therein.

**Defendant No. 1**                    **Matthew A Rosenbaum**

The evidence will show that Matthew A Rosenbaum, former Supervising Judge, New York State Supreme Court, 7th Judicial District conspired with the other defendants to willfully deprive the Plaintiff of his constitutional right to due process in a US Court of law. Exhibit A clearly shows that Judge Rosenbaum was aware of the falsified hearings, faked default trial and destroyed files yet in his response to the Plaintiff days later, Matthew A Rosenbaum refuses to take any responsibility for the criminal acts and instead works to ignore and cover up the criminal activity happening on his watch (See Exhibit A). In addition, as the Judicial assignment officer for the 7th Judicial Circuit Matthew A Rosenbaum was intimately involved in the very curious circumstances surrounding the assignment of the heavily conflicted Richard A Dollinger to the Plaintiff's matrimonial case in October of 2017. Matthew A Rosenbaum assigned the

conflicted Judge Richard A Dollinger (Exhibit B) to the case less than one month after the late Judge Elma Bellini vacated the Absolute Judgement of Divorce of Kenneth A Fisher . Under a very bizarre set of circumstances the details of which still remain unclear, Elma Bellini refused to sign her own Order to Vacate and was immediately removed from the case by Matthew Rosenbaum in September, 2017. More disturbing yet is the fact that when Judge Bellini refused to sign her own Order to Vacate, the newly assigned Judge Dollinger (by Matthew Rosenbaum) was the person who ultimately signed the now month old Order to Vacate that was ordered by Judge Bellini back in September (Exhibit C). All of these very suspicious and unusual circumstances happened at the direction of and under the direct supervision of Matthew Rosenbaum. A look at Judge Bellini's docket will show that Elma Bellini was very much still on the Bench and working at this time. The evidence will show that Matthew Rosembaum was aware as far back as September of 2018, that the Plaintiff had reported the criminal activity that occurred under Matthew A Rosenbaum's watch (fabricated trial, fabricated Lincoln Hearings, and missing and/or destroyed Court records) to not only him as the supervising Justice, but also to the US Department of Justice, the New York State Attorney General, the New York State Office of Court Administration, the Monroe County District Attorney - Sandra Doorley, the State of New York Attorney Grievance Committee, and the New York State Commission on Judicial Conduct (Exhibit D) and Matthew A Rosembaum still refused to do anything to ensure the integrity of the Court and the preservation of its records. Matthew A Rosenbaum's willful participation in the conspiracy to falsify a trial and through his attempts to ignore and cover up the destruction of all the Plaintiff's Court records has deprived the Plaintiff of his rights under Title 42 U.S.C., Section 1983 for illegal acts that were taken by a Judicial Officer that were not part of said Officer's official brief and/or official capacity. Matthew Rosenbaum has likewise abused his Judicial position to deprive the Plaintiff, a US Citizen and an honorably discharged Military Veteran of his 14th Amendment Right to due process and his rights protected by the United States Civil Code and the US Constitution.

**Defendant No. 2**                    **Richard A Dollinger**

The evidence will show that Richard A Dollinger willfully conspired with Mathew A Rosenbaum and other officers of the Court to deprive the Plaintiff of his 14th Amendment Right to Due Process in a United States Court of Law. In October, 2017 Richard A Dollinger was assigned to the Plaintiff's matrimonial case in a bizarre set of circumstances in which he was installed by Matthew A Rosenbaum and actually signed Judge Bellini's Order to Vacate when she refused to sign it (presumably because she was being asked by Rosenbaum and/or Dollinger to do something unethical?). The record will show that for over a year, Richard A Dollinger would not allow the Plaintiff into his Courtroom during his legal proceedings in spite of the fact that the Plaintiff on multiple occasions had traveled over 6,000 miles from Hawaii under threat of arrest to be there. When the Plaintiff finally fired his attorneys and represented himself Pro Se (in large part due to his lack of Court access and sincere representation) it was immediately apparent that Richard A Dollinger was heavily conflicted and was a lifelong family friend of the Plaintiff's ex-wife, the opposition in the Plaintiff's divorce litigation. When this was formally brought to Richard A Dollinger's attention (and Matthew Rosenbaum) and he was

formally asked to recuse himself by the Plaintiff for conflict in October 2018, Richard A Dollinger refused. (Exhibit B). The evidence will show that Richard A Dollinger further conspired with the Defendants against the Plaintiff by refusing to vitiate or even acknowledge the crimes of the Fisher Court (fabricated trail, Falsified Lincoln Hearings, destroyed records) and in spite of being very aware of these criminal acts Richard A Dollinger unlawfully continued to use them as a substantive basis for all of his rulings going forward including the Kenneth A Fisher NO CONTACT ORDER for the Plaintiff's minor children that had no legal basis whatsoever. This one act of Richard A Dollinger's denial of the Plaintiff's Constitutional right to due process has resulted in the Plaintiff being almost completely isolated from his minor children for over three years and counting. For his spiteful and willful participation in this conspiracy, Richard A Dollinger has deprived the Plaintiff of his 14th Amendment Constitutional Right to due process in United States Court of law.

**Defendant No. 3**                          **Adam J Bello**

The evidence will show that Adam J Bello, when acting as the Monroe County Clerk allowed for the destruction of County Courthouse records and then attempted to cover up the crimes of officers of the court. The evidence will show that Adam J Bello further refused to act when notified of all the missing records and conspired in the cover up that followed. Because Adam Bello failed in his duty to secure the integrity of the County Court Records and then again failed to act accordingly when they were discovered missing, he has willfully and effectively conspired to deprive the Plaintiff of his Constitutional right to due process in a United States Court of law.

**Defendant No. 4**                          **Timothy E Ingersoll**

The evidence will show that Timothy E Ingersoll (2nd attorney for Plaintiff's ex-wife) knowingly and willfully conspired with the other Defendants to deprive the Plaintiff of his right to due process in a United States Court of law. Timothy E Ingersoll conspired with Mark Chauvin Bezinque (1st attorney for the Plaintiff's ex-wife), Lisa Morris (first AFC) and other defendants to hide the crimes his legal colleagues committed under the Kenneth Fisher Court. Timothy E Ingersoll knew the trial and Lincoln Hearings were fabricated and records destroyed but conspired to keep those facts hidden thereby depriving the Plaintiff of any access to his children and depriving him of his Constitutional right to due process in a United States Court of law.

**Defendant No. 5**                          **Maureen A Pineau**

The evidence will show that Maureen A Pineau (3rd attorney for Plaintiff's ex-wife) knowingly and willfully conspired with the other named defendants to deprive the Plaintiff of his right to due process in a United States Court of law. Maureen A Pineau knowingly conspired to hide the crimes of the Fisher Court including the fabricated trial, the falsified hearings, and the destroyed records and thereby willfully and effectively deprived the Plaintiff of his Constitutional right to due process in a United States Court of law. The evidence will show that Maureen A

Pineau repeatedly attempted to defraud both the Plaintiff and the Court with her numerous false affirmations and submissions to the Richard A Dollinger Court. Richard A Dollinger did absolutely nothing to reign in Maureen A Pineau's unethical behaviour.  Maureen A Pineau's first Judgment Roll was such a deceitful and conspicuous fraud on the Court that is alarming that she is allowed to practice Law in New York State at all. Her third version of the Judgement Roll was still such a work of fiction and in spite of multiple ordered revisions, it still so deviated from the original ordered stipulations that on the Plaintiffs continuous objection and insistence, Richard A Dollinger was forced to add, cross out and initial over 20 lines of her fraudulent text (Exhibit E).  Maureen A Pineau has never been held accountable by Richard A Dollinger for her fraudulent and unlawful acts. The evidence will show that  Maureen A Pineau conspired with other Defendants to attempt to  force Richard A Dollinger to issue a Personal Jurisdiction order against the Plaintiff (without any legal basis) despite the Plaintiffs many years long residency at his home State in Hawaii. Maureen A Pineau's demands for the Personal Jurisdiction Order were continuous and ongoing and clearly part of her role in the conspiracy to attempt to unlawfully deprive the Plaintiff of an opportunity to file a lawsuit / complaint in US District Court on the basis of Diversity of Jurisdiction. The evidence will show that Maureen A Pinueau (and the other defendants) knew that a Personal Jurisdiction Order, lawful or not, would allow the Supreme Court of Monroe County and its conspiring Officers to continue to unlawfully abuse and terrorize the Plaintiff without having to trouble itself with an application for reciprocal enforcement to the State of Hawaii.  The evidence will clearly show that Maureen A Pineau willfully and unlawfully conspired with the other Defendants to deprive the Plaintiff of his Constitutional right to due process in a United States Court of law.

**Defendant No. 6**                    **Gregory J Mott**

The evidence will show that Gregory J Mott knowingly and willfully conspired with the other defendants to deprive the Plaintiff of his Constitutional right to due process in a United States Court of Law. Gregory J Mott in his letter to Sharon Kelly Sayers dated July 27, 2018 (Exhibit F) in item 10. a) states, "In talking to Mark Bezinque, Esq. he admitted that there was no hearing". In the same paragraph Gregory J Mott later states, "Fisher says he held a Lincoln Hearing. He refers to "Mother's Testimony", but there is no transcript in existence and no reference to a default hearing or notice of a default hearing".  Clearly Gregory J Mott and Sharon Kelly Sayers were aware that the trial was fabricated, the hearings falsified, and the records destroyed yet Mr Mott refused to take any action in spite of his clients desperate pleas for help. Because he knowingly refused to act and follow a lawful order of his client and instead chose to use his position as an Officer of the Court to cover up the crimes of his law colleagues for his own selfish interests, Gregory J Mott knowingly and willfully conspired against the Plaintiff depriving him of Constitutional Right to due process in a United States Court of Law.

**Defendant No. 7**                    **Sharon Kelly Sayers**

The evidence will show that Sharon Kelly Sayers knowingly and willfully conspired to deprive the Plaintiff of his Constitutional right to due process in a United States Court of law.

Unknown to the Plaintiff at the time he retained her, Sharon Kelly Sayers was a close personal friend of Lisa Morris (the first AFC), an original conspirator under the Fisher Court who put into record a completely fabricated Closing Argument for the Children (Exhibit G). Sharon Kelly Sayers became openly irate and hostile when it became clear that against her wishes the Plaintiff intended to move forward to expose the crimes of her friend and colleague Lisa Morris who was formerly involved as the first AFC in the Plaintiff's divorce case. Rather than follow the Plaintiff's lawful orders and act accordingly, Sharon Kelly Sayers demanded to be immediately discharged as Plaintiff's attorney and threatened that if not immediately discharged, she would maliciously attempt to disparage the Plaintiff before the Court. In her written correspondence with the Plaintiff, Sharon Kelly Sayers threatens, *I will put forth a rational* "which I can assure you will necessarily not put you in a sympathetic light" (Exhibit H). The evidence will show that Sharon Kelly Sayers was well aware of the criminal acts of her colleagues and friends (Exhibit F) including the fabricated trial and the destruction of Court records yet she chose to cover up the crimes for her own selfish interests. The evidence will show that Sharon Kelly Sayers knowingly and willfully conspired with Lisa Morris and other defendants to unlawfully deprive the Plaintiff of his 14 Amendment Constitutional Right to due process in a United States Court of law.

**Defendant No. 8**                                            **Cynthia L Snodgrass**

The evidence will show that Cynthia L Snodgrass knowingly and willfully conspired with the other Defendants to deprive the Plaintiff of his right to due process in a United States Court of law. While working for the Family and Supreme Court in Monroe County New York, Cynthia L Snodgrass was tasked with assigning Attorneys For Children (AFC) as part of her assignment in the Monroe County Courts. According to the Court, this assignment is supposed to be done on a 'random and rotating' basis. Of over 800 potential AFCs in her Judicial district, Cyntial L Snodgrass (along with Dollinger and Rosenbaum) under very suspicious circumstances selected the heavily conflicted Edward W Riley of Brockport NY to represent the children of the Plaintiff after Lisa Morris openly defrauded the Court (with her fabricated trial and Lincoln hearing testimony) and asked to be withdrawn. Of all the gin joints in all the world Edward W Riley (pajama Ed) walks into mine. Edward W Riley happens to be a lifelong personal and childhood friend of the Plaintiff's estranged father, and by another amazing coincidence, the grandfather of Edward W Riley's now new wards, (Exhibit I). Lacking transparency of process, the Plaintiff immediately contacted Cynthia L Snodgrass to notify her of the conflict and demanded to know the circumstances surrounding Edward W Rileys assignment to the Plaintiff's divorce case. Cynthia L Snodgrass refused to comment. The evidence will show that Cynthia L Snodgrass knowingly and willfully conspired with Matthew A Rosenbaum, Richard A Dollinger (also conflicted), Lisa Morris, Edward W Riley and others to unlawfully assign the knowingly conflicted Edward W Riley (pajama Ed) as AFC to the Plaintiff's case and thereby willfully deprived the Plaintiff (and his children) of any due process in a United States Court of law.

**Defendant No. 9**                                    **David Coron**

      The evidence will show that David Coron knowingly and willfully conspired with the other Defendants to deprive the Plaintiff of his Constitutional right to Due Process in a United States Court of law. David Coron working as a Court assigned psychologist (assigned by Richard A Dollinger) was tasked with doing a custody evaluation for use in determining custody for the Plaintiff's two minor children. The Court determined that the first step was completing a parental fitness evaluation of the two parents. I, the Plaintiff was ordered to be evaluated first which resulted in a nearly 200 page document outlining the results of Rorschach Ink Blots and all other manner of pseudo-nonsense. Following the Plaintiff's ordered evaluation, neither a fitness evaluation of the other parent nor a custody evaluation of the children was ever done by David Coron or anyone else. After the Plaintiffs heavily biased evaluation by David Coron was done, Richard A Dollinger refused to order any further evaluations as previously promised by the Court. After it was completed, Richard A Dollinger barred the Plaintiff from seeing the contents of the David Coron evaluation, well aware that David Coron's collusion with the Court would be glaringly obvious to the Plaintiff, a medical expert himself. Only after it became clear that David Coron was being called as an 'expert' witness at the Plaintiff's divorce trial and over his constant protest at its refusal was the Plaintiff (now Pro Se) allowed to read his own evaluation done by David Coron in Judge Dollinger's Chambers under the constant gaze of an armed Monroe County Sheriff Officer. Upon reading the evaluation it was very clear that David Coron had been heavily influenced by the Court to paint the Plaintiff in as negative a light as possible. There was no mention of any parental history or any mention of the large volume of documents collected that all supported the Plaintiff's parental fitness. While there was not one thing in the evaluation that suggested the Plaintiff was anything other than a loving and dedicated father, David Coron did his best to completely omit all of the evidence that the Plaintiff was not only a good parent, but a very involved and devoted father. Further, at every turn David Coron shaded his evaluation against the Plaintiff by qualifying the overwhelming support the Plaintiff received from the information solicited by David Coron (including from medical experts) providing him a huge volume of input outlining the Plaintiff's lifelong history as a loving and dedicated father. In his evaluation David Coron stated, "while Dr Markham's many letters of support may characterize him as a loving and dedicated father, because many are not on an official letterhead, I am forced to question their authenticity". Further, when it was brought to David Coron's attention that the Plaintiff's trial had been fabricated and the Lincoln hearings for his children never actually happened and these crimes were in fact the current stated basis for the Plaintiff being denied any access to his children, David Coron characterized these crimes in his evaluation by writing, "*the Plaintiff* may suffer from delusions of persecution limited to the events surrounding his divorce litigation". It is (and will be) overwhelmingly obvious to anyone reading David Coron's evaluation that he was colluding with the Court and the fix was in. When is was clear at the trial in December of 2018 that the collusion of David Coron with the Court would be easily exposed by the Plaintiff on cross, David Coron was immediately withdrawn as an expert witness and his report was indefinitely sealed by Richard A Dollinger in a hurried attempt to hide David Coron's now conspicuous collusion with the Court. The damage for the Plaintiff however, was already done. The custody evaluation promised by Richard A Dollinger by David Coron was

never completed nor ever ordered in spite of the Plaintiffs ongoing demands for one. The basis of this denial by Richard A Dolliger to order a full custody evaluation was never forthcoming. All of Richard A Dollinger's custody rulings going back to his assignment by Matthew Rosenbaum and going forward to the commencement of litigation continued to be based on the fabricated evidence from the Kenneth Fisher Court resulting in the Plaintiff being completely denied of any access to his two minor children for years. The David Coron 'collusion file' of the Plaintiff was sealed by Richard A Dollinger to hide the conspicuous collusion for the benefit of the Court and not the benefit of the Plaintiff as Richard A Dollinger has disingenuously repeatedly said and would like everyone to believe. Without giving one word of testimony or providing one page of evidence David Coron was thanked for his service to the Court without any other mention and then summarily dismissed. The evidence will clearly show that David Coron knowingly conspired with the Court to willfully and with malice unlawfully defraud the Plaintiff and deprive the Plaintiff of his Constitutional right to due process in a United States Court of law.

**Defendant No. 10**                                  **Jennifer Speller**

The evidence will show that Jennifer Speller willfully participated with Mark Bezinque in a conspiracy to deprive the Plaintiff of his Constitutional right to due process in a United States Court of law. Jennifer Speller co-represented the Plaintiff's ex-wife with along with Mark Bezinque and appeared on her behalf at many her Court hearings. Jennifer Speller, along with Mark Bezinque, Lisa Morris and Kenneth Fisher conspired to fabricate a trial, falsify the existence of Lincoln Hearings and cover up the destruction of court records to hide these crimes. Jennifer Speller's co-counsel Mark Bezinque admitted to Gregory Mott that there was no evidence of a trial on the Fisher docket or in the Court record because according to Gregory Mott, Mark Bezinque told him, "the hearing never happened". (Exhibit E). In doing so Jennifer Speller conspired with her co-counsel Mark Bezinque to deprive the Plaintiff of his 14th amendment Constitutional right to due process in a United States Court of law.

**Defendant No. 11**                          **Diane R DeLong (aka. Diane R Markham)**

The evidence will show that Diane R DeLong conspired with the other Defendant's to deprive the Plaintiff of his Constitutional right to due process in a United States Court of law. The evidence will show that Diane R Delong knowingly and willful along with her attorneys Mark Bezinque and Jennifer Speller, the AFC Lisa Morris and Kenneth Fisher unlawfully conspired to fabricate a trial, falsify the existence of Lincoln Hearings and destroy all of the Court records to attempt to cover up these crimes and deny the Plaintiff of any due process in Court or any access to his children.

The evidence will further show that Diane R Delong admitted in her deposition by Gregory J Mott on December 14, 2017 to conspiring with Mark Bezinque and Jennifer Speller to illegally seizing by secret wire transfer the Plaintiff's bank assets (without a court order or anyone's knowledge) and then proceeded to divide them up in Mark Bezinque and Jennifer Speller's law office (Exhibit J – Deposition of Diane R Delong plates 24 - 28). Further, after the illegal seizures of the Plaintiff's assets in March of 2016, Diane R Delong and Mark Bezinque

filed an Order to Show Cause and marched into the Kenneth Fisher Court and shamelessly accused the Plaintiff of a dissipation of marital assets to account for the now missing funds. Neither Diane R Delong nor her attorneys Mark Bezinque and Jennifer Speller have ever been held accountable for this felonious crime that Diane R DeLong confessed to on record in her Deposition before Gregory J Mott on December 14, 2017. These crimes have been repeatedly reported to both Justices Fisher and Dollinger as well as District Attorney Sandra Doorley who all elected to do nothing.

The evidence will show that Diane R DeLong conspired with Mark Bezinque and Jennifer Speller to defraud the Court about the Hawaii residency of the children prior to the commencement of divorce proceedings. The evidence will show that in her deposition on December 14, 2017, Diane Delong admitted that both she and the children were living in Hawaii for an extended period of time prior to flying back to New York to file for divorce in September of 2015. Further, two years prior, Diane R DeLong admits in her Deposition that she filed legal affidavits with State of Hawaii for both for herself and on behalf of our children applying for and receiving Hawaii state residency status. The evidence will show that Diane R DeLong conspired with her attorneys and admitted in her deposition that she willfully failed to file an "affidavit of custody information" and then repeatedly lied about our minor children's Hawaii residency status denying both the Plaintiff and his minor children the opportunity to have their custody dispute heard in the correct custody jurisdiction of Hawaii. (Exhibit J - plates 35-39). The evidence will show that through her continuous deceit and illegal acts in collusion with her attorneys Diane R Delong has unlawfully and with malice deprived the Plaintiff of his Constitutional right to due process in a United States Court of law.


As a result of a deprivation of protected rights guaranteed US citizens by the U.S.C. and the US Constitution the Plaintiff has endured immeasurable pain and hardship as a result of the unlawful actions of these defendants. Due to an ongoing conspiracy among the defendants and based upon the false evidence of a fabricated trial, falsified hearings that never occurred and destroyed Court records, the Plaintiff has been unlawfully evicted from his home, all of his bank accounts were illegally seized, he has been terrorized and threatened repeatedly with false imprisonment, and most troubling of all, the Plaintiff has been maliciously deprived of any access to his beloved children for over three years and counting all at the hands of this corrupted Court.

The pain and stress experienced by the Plaintiff due to an unlawful deprivation of his Constitutionally protected rights is likely a trauma the Plaintiff will never fully recover from. Nor will his children. As a result of the Defendants unlawful and illegal acts, the Plaintiff suffers from ongoing major depression, generalized anxiety disorder, and chronic and severe insomnia. The Plaintiff is under the care of three physicians and his ability to maintain gainful employment has been severely hindered by the time, expense, and health toll the defendants' illegal actions have had on the Plaintiff through a willful and deliberate conspiracy to deprive him of his rights guaranteed under the U.S.C. and United States Constitution guaranteed to veterans like the Plaintiff and all US citizens alike.

**IV. Relief**

For a willful conspiracy to deprive the Plaintiff of his lawful rights as a US citizen, that constituted a skillfully waged and expertly orchestrated campaign of terror by the defendants against an individual United States Citizen and an Honorably separated US military veteran, the Plaintiff respectfully seeks the following relief from the US District Court.

1) An award of $500,000 from each defendant as compensation for the willful and deliberate harm done to the Plaintiff by conspiring to deprive him of rights protected under the United States Constitution. The physical, emotional, and spiritual harm done to the Plaintiff by this well orchestrated and targeted campaign of terror cannot be overstated. Evidence (medical records) will show that the Plaintiff has suffered terribly and that coupled with his loss of income and livelihood has left him a truly broken man.

2) An award of $2,500,000 from each defendant for punitive damages for such willful and deliberate acts done by defendants soley for spite, personal gain, and for the purpose of depriving the Plaintiff of any access to his children and any due process in the New York State Courts.

# Exhibit A

## Matthew Rosenbaum
## Correspondence

**Michael Markham**
1010 Front Street B101
Lahaina, Hawaii 96761
(585) 355 7896
MichaelMarkhamMD.@GMail.com


16 September 2018
RE: Markham V Markham Index #2015/09826

**Hon. Matthew Rosenbaum**
Supervising Judge, Supreme Court, 7th Judicial District
Hall of Justice
Rochester, NY 14614

Dear Judge Rosenbaum:

I am writing to ask for your assistance in assigning a new Judge to my divorce case. As you may or may not be aware the Default Judgement of Judge Kenneth Fisher entered on December of 2106 was Vacated by the late Judge Bellini in September of 2017. Then in a very curious set of circumstances, Judge Bellini withdrew before even writing up the orders (while still hearing other cases) and Judge Dollinger stepped in to take over the case. I don't believe his assignment of the case was random or his relationship with Plaintiff coincidental.

As you can see from the enclosed letter to Judge Dollinger, I have asked and I expect him to recuse himself due to the newly uncovered overwhelming conflict of interest as a result of the Dollinger family's decades long relationship with the Plaintiff.

My understanding is that the assigning of matrimonial cases to Supreme Court Judge dockets are done on a random and rotating basis. I would be very grateful for any oversight you could provide in bringing some fairness to this process to prevent another situation like the one we presently are confronted with.

As I am certain you are aware fraud perpetrated on the Court vitiates everything before it. I have absolutely no doubt that given a fair and impartial Judge they will recognize exactly that and this matter can finally be put to rest. Find enclosed a copy of my complaint to the federal AAG pointing out the overwhelming extrinsic fraud before this Court, including falsified hearings, a faked default trial, and destroyed files. I would understandably prefer to avoid involving the Appellate Court due to any additional ongoing fraud regarding the assignment of Judges in the Supreme Court if possible.

Your anticipated attention and assistance in this matter is greatly appreciated.

Yours in Justice,

**Michael Markham**



*Supreme Court Chambers*
*545 Hall of Justice*
*Rochester, New York 14614-2185*

*Matthew A. Rosenbaum*
*Supervising Judge*
*Civil Term Courts*
*Seventh Judicial District*

*Phone: (585) 371-3754*
*Fax: (585) 784-4206*

September 21, 2018

Mr. Michael Markham
1010 Front Street B101
Lehaina, Hawaii 96761

Dear Mr. Markham,

The Court is in receipt of your request to remove Justice Dollinger and assign a new Justice to your case, based upon a perceived conflict involving a purported relationship with your ex-spouse. This Court has no authority to remove Acting Supreme Court Justice Dollinger from your case. If you feel there is a legal basis, you or your attorney may file a motion before Justice Dollinger seeking his recusal, and appeal from that decision if you disagree. Additionally, if the time to do so has not expired, you may appeal the prior decision(s).

You may wish to discuss your rights and remedies with an attorney. If you can not afford an attorney or need a referral, you may contact the Bar Association at 585-546-1817; Volunteer Legal Services at 585-232-3051; and/or Legal Aid Society at 585-232-4090.

Truly yours,

Hon. Matthew A. Rosenbaum
Supreme Court Justice

cc: Justice Dollinger

# Exhibit B

# Richard A Dollinger
# Request to Recuse

**Michael Markham**
1010 Front Street B101
Lahaina, Hawaii 96761
(585) 355 7896
MichaelMarkhamMD.@GMail.com

18 September 2018
RE: Markham V Markham Index #2015/09826

**Hon. Richard A. Dollinger**
Presiding Justice, Matrimonial Part, 7th Judicial District
Hall of Justice
Rochester, NY 14614

Dear Judge Dollinger:

While I understand that you are a person of integrity and honor, It has recently come to my attention that your relationship with the Plaintiff (unknown to Defendant) poses a significant conflict of interest in your continuing to preside over our matrimonial dispute.  Due to Plaintiff's decades long relationship with your family, I am of the strong opinion that your continued involvement poses a serious concern for all parties involved  getting a fair and unbiased result in your future rulings on our divorce.

As I am certain you are aware Plaintiff, Diane Markham is decades long friend of your brother Andrew and is a lifelong friend of your sister-in-law Virginia Blackwell. In fact we have several times been the overnight guest at the home of your Mother, at her home on Canandaigua Lake. As you may be aware the Plaintiff also knows your nephew Drew fairly well. Further, the Plaintiff has 'back channel' called on you before when you were the Brighton Town Judge regarding a neighbor dispute we had when we lived on Landing Road South. Until now, I had no idea that you were an Acting Supreme Court Judge and were Andrew Dollinger's brother, Drew's Uncle,  Virginia Blackwell's Brother-In-Law and the departed Robert Wegman's step son.

As you are aware, in spite of flying back from Hawaii several times I have always been excluded from your Courtroom including at my own contempt hearing on December 1, 2017. Had I been allowed in your courtroom I would have immediately know that you were Andrew's brother and asked for a different less conflicted Judge.

I would respectfully ask that you immediately recuse yourself and ask that the Court assign another Judge to hear our case in December.

Thank you for your prompt attention to this matter.

Sincerely,

Michael Markham

cc: Greg Mott, Esq., Sharon Sayers, Esq., Maureen Pineau Esq., PJ Ed Riley Esq., Diane Markham (Plaintiff), Joel Edelman, Esq., NYS Commission on Judicial Conduct.

**STATE OF NEW YORK**
**SUPREME COURT - COUNTY OF MONROE**

Diane R. Markham (DeLong),

                **Plaintiff,**

v

                **ORDER TO**
                **SHOW CAUSE**

Michael D. Markham,

                **Defendant**      **Index No. 2015/9826**

---

    Upon reading and filing the annexed Affidavit of Michael D. Markham, the Defendant in this action, sworn to on *October 9, 2018* together with all other exhibits and papers attached to this Order to Show Cause:

    Let the Plaintiff, Diane Markham, show cause before a Special term of this Court to be held at _am/pm on the _ day of *Nove* 2018, why an Order should not be made and entered granting the following relief: *16th*

  A)  Granting to movant an immediate Order of Divorce with all financial liability to the Plaintiff based on the widespread fraud perpetrated on this Court by the Plaintiff and her Counsel:

  B)  Granting to movant immediate physical custody of the children due to former and ongoing fraud perpetrated on this Court which by law vitiates all prior, current, and future litigation before this Court on this matter:

  C)  Granting to movant immediate visitation of the children during pendency of this action based on Plaintiff's and AFC's fraud before this Court:

  D)  Granting to movant temporary child support pursuant to the guidelines set forth in the Child Support Standards Act:

  E)  Granting to movant temporary spousal support and the return of all spousal support paid since December of 2017 due to the Plaintiff and her Counsel defrauding the Court and movant based on the false testimony of the Plaintiff and Counsel regarding Plaintiff's income and businesses:

  F)  Granting to movant an award for reasonable attorney's fees from Plaintiff based on Plaintiff's fraud and ongoing litigation through no fault of the Defendant:

  G)  Granting to movant an Order for immediate change of venue for determination of custody of the children to the appropropriate jurisdiction of Maui County - Hawaii where the children were undisputed residents at the commencement of these proceedings:

  H)  Granting to movant an Order to move Defendant's stolen Bank of Hawaii disability funds from Mr Ingersoll's trust account to an FDIC insured trust account managed by him. Plaintiff's Counsel has already attempted to place a personal lien on Defendant's stolen trust assets for debts incurred solely by Plaintiff even though they are not her assets:

  I)  Granting to movant such other and further relief as the Court may deem as just and proper:



1

Let the Attorney for the Children (AFC), Edward W. Riley, Esq., show cause before a Special term of this Court to be held at 9:30 am/pm on the 12 day of November 2018, why an Order should not be made and entered granting the following relief: 1 ½

A) Granting movant an immediate Order to *Disqualify*, disqualifying and removing Mr Riley as the AFC for his children due to his long term and significant never disclosed conflict of interest. The recent reveal of Mr Riley's conspicuous conflicting interest to his lifelong friend, the children's grandfather, is clearly subordinating the legal rights, wishes, and interests of the Defendant's children, specifically their legal right to unbiased and unconflicted representation and counsel:

B) Upon his removal, granting to movant an Order for the immediate return of all retained monies Mr Riley has fraudulently received from Defendant provided in good faith to provide fair and unbiased representation to his children prior to the exposure of Mr Riley's deceitful nondisclosure of his significant long term conflict:

Let the Attorneys for the Defendant, Gregory Mott, Esq., and Sharon Sayers, Esq., show cause before a special term of this Court to be held at 9:30 am/pm on the 12 day of November 2018, why an Order should not be made and entered granting the the following relief: 1 ½

A) Granting movant an immediate Order discharging Gregory Mott, Esq., and Sharon Sayers, Esq., as attorneys for the Defendant due to their conspicuous and flagrant breach of their legal duty to their client the Defendant in almost every conceivable way to breach legal agency possible:

Let the Honorable Richard A. Dollinger, show cause before a special term of this Court to be held at_____am/pm on the _____day of _____2018, why an Order should not be made and entered granting the following relief:

A) The movant would humbly and respectfully ask the Honorable Judge Dollinger to recuse himself of any further participation in this case due to a significant conflict of interest that has just come to light by way of the Plaintiff's decades long close relationship with the same Dollinger family. Movant would respectfully ask His Honor to request that the Court assign an alternative less conflicted Judge to hear this case if he is not prepared to immediately rule in favor of Defendant on all issues due to the nullification of all of the Plaintiff's past and future testimony due to Plaintiff's and her Counsel's overwhelming fraud before this Court as required by law:

**SUFFICIENT REASON APPEARING THEREFOR,**

**ORDERED,** that service of a copy of the Order to show Cause, the affixed Affidavit of the Defendant and all attached exhibits be made by personal delivery upon all named parties, including Maureen Pineau, Esq., the Attorney for the Plaintiff on or before _October 22, 2018_____ be deemed good and sufficient service.

Responding Papers Due ENTER, 11/9/18

Hon. Richard A. Dollinger
Justice of the Supreme Court

2

# Exhibit C

# Order to Vacate

At a Special Term of the Supreme Court of the State of New York, held in and for the County of Monroe, at the Hall of Justice in Rochester, New York on the 14th day of September, 2017.

PRESENT:   HON. RICHARD A. DOLLINGER
                      SUPREME COURT JUSTICE

STATE OF NEW YORK
SUPREME COURT   COUNTY OF MONROE

DIANE R. MARKHAM,

                          Plaintiff,                              Index #2015/9826

         -vs-                                                  ORDER TO VACATE

MICHAEL D. MARKHAM,

_____Defendant._____

Defendant, MICHAEL D. MARKHAM, having applied to this Court by Order to Show Cause, dated August 14, 2017, for relief as more specifically set forth in said Order to Show Cause; and

Plaintiff, DIANE MARKHAM, having submitted a Reply Affidavit in opposition to Defendant's Order to Show Cause, dated September 6, 2017, and Attorney Supplemental Affidavit, dated September 11, 2017, and Defendant's attorney having submitted Supplemental Attorney Affirmation and Defendant's Attorney Affirmation, both dated September 12, 2017; and

The Court having reviewed all the papers and reviewed all the Affidavits, Affirmations and exhibits submitted herewith by respective parties, through their counsel; and

All applications to this Court and opposition papers have been filed in the Monroe County Clerk's Office; and

The Court having heard oral argument at Special Term on September 6, 2017 and again on September 14, 2017 by respective counsel with respect to all applications to the Court on September 14, 2017 at the Hall of Justice in Rochester, New York, Gregory J. Mott, Esq. on behalf of Defendant and Timothy E. Ingersoll, Esq. on behalf of Plaintiff; and

The Court having rendered its decision in open court on September 14, 2017. The transcript of the Court's decision is annexed and incorporated herein as **Exhibit A**; and

**NOW**, upon motion of Defendant, MICHAEL D. MARKHAM, by and through his attorney, the relief sought in Defendant's Order to Show Cause, dated September 6, 2017, is granted to the following extent; it is hereby

**ORDERED** that the Judgment of Divorce, **Exhibit B**, is hereby vacated in all respects; and it is further

**ORDERED** that the Amended Judgment of Divorce, **Exhibit C**, is hereby vacated in all respects; and it is further

**ORDERED** that the Court hereby reserves on Plaintiff's application for attorney's fees; and it is further

**ORDERED** that any pendente lite Order in the above entitled divorce action shall remain in effect at this time until further order of this Court; and it is further

**ORDERED** that attorney Lisa Morris, Esq. shall be reappointed attorney for the two youngest children in this action, to wit: Rowan Mathews Markham d/o/b May 21, 2002 and Rory Patricia Markham d/o/b December 16, 2004; and it is further

2

ORDERED that this matter is hereby scheduled for Trial Day Certain starting March 26, 2018 at 10:00 a.m. and continuing each day thereafter until completion of the trial; and it is further

ORDERED that a copy of this signed and filed Order shall be delivered to Defendant, MICHAEL D. MARKHAM, by his attorney and, further, that Defendant, MICHAEL D. MARKHAM, shall execute an Admission of Service, signed and notarized, and return that to his attorney who, in turn, shall file the same with the Court, acknowledging by which terms Defendant acknowledges receipt of a copy of this Order and exhibits annexed hereto.

Dated: _October 31_____, 2017
        Rochester, New York

                                          HON. RICHARD A. DOLLINGER
                                          SUPREME COURT JUSTICE

E N T E R :

# Exhibit D

# Reporting of Judicial Misconduct of Fisher Dollinger & Rosenbaum



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

BARBARA D. UNDERWOOD
ATTORNEY GENERAL

DIVISION OF REGIONAL OFFICES
ROCHESTER REGIONAL OFFICE

September 20, 2018

Dr. Michael Markham
1010 Front Street, B101
Lahaina, Hawaii 96761

Re:     **Complaint about State Judiciary**

Dear Dr. Markham:

I know you are quite concerned that your litigation, specifically the case of Markham v. Markham (as expressed in your letter to me dated September 14, 2018), has not been handled appropriately. You indicate your belief that wrongful activity on the part of the judiciary has obstructed your ability to have your concerns addressed by the courts. With your letter, you enclose materials that you have previously forwarded to the U.S Attorney's Office and the Office of the FBI. You ask our office to intervene on your behalf, as well.

When a claim is made against sitting New York State Supreme Court Justices, the judges are entitled to representation of our office, pursuant to NYS CPLR §7804(i). Accordingly, working for you on this matter would constitute a conflict of interest for us. We are not able to review this matter on your behalf.

Very truly yours,

*Ted O'Brien*

Ted O'Brien
Assistant Attorney General

TO/



**U.S. Department of Justice**

Civil Rights Division

JFF:mh:rc
DJ 144-21-0
1071689

*Criminal Section - PHB*
*950 Pennsylvania Ave, NW*
*Washington DC 20530*

SEP 1 3 2018

Dear Sir/Madam:

Thank you for your correspondence. The Civil Rights Division relies on information from community members to identify potential civil rights violations. The Federal Bureau of Investigation and other law enforcement agencies conduct investigations for the Division. Therefore, you may want to contact your local FBI office or visit www.FBI.gov.

The Criminal Section is one of several Sections in the Civil Rights Division of the U.S. Department of Justice. We are responsible for enforcing federal criminal civil rights statutes. The Criminal Section prosecutes criminal cases involving:

- Civil rights violations by persons acting under color of law, such as federal, state, or other police officers or corrections officers;
- Hate crimes;
- Force or threats intended to interfere with religious activities because of their religious nature;
- Force or threats intended to interfere with providing or obtaining reproductive health services and
- Human trafficking in the form of coerced labor or commercial sex.

We cannot help you recover damages or seek any other personal relief. We also cannot assist you in ongoing criminal cases, including wrongful convictions, appeals, or sentencing. For more detailed information about the Criminal Section or the work we do, please visit our web page: www.justice.gov/crt/about/crm/.

We will review your letter to decide whether it is necessary to contact you for additional information. We do not have the resources to follow-up on or reply to every letter. If your concern is not within this Section's area of work, you may wish to consult the Civil Rights Division web page to determine whether another Section of the Division may be able to address your concerns: www.justice.gov/crt. Again, if you are writing to report a crime, please contact the federal and/or state law enforcement agencies in your local area, such as the Federal Bureau of Investigation or your local police department or sheriff's office.

Sincerely,

/s/

The Criminal Section

SEVENTH JUDICIAL DISTRICT
ROCHESTER

*CHIEF COUNSEL*
GREGORY J. HUETHER

*CHAIRPERSON*
STEVEN V. MODICA

*PRINCIPAL COUNSEL*
DANIEL A. DRAKE

*PRINCIPAL COUNSEL*
ANDREA E. TOMAINO

*INVESTIGATOR*
KELLY A. PAGE

State of New York
Attorney Grievance Committees

September 24, 2018

**CONFIDENTIAL**

Michael D. Markham, M.D.
1010 Front Street, B101
Lahaina, HI 96761

Re:  Complaint against Several Attorneys, Esq.

Dear Dr. Markham:

This will acknowledge receipt of your correspondence dated September 14, 2018, regarding several attorneys.

Please be advised that our confidentiality rules require a separate complaint concerning each individual attorney, rather than a joint complaint concerning several attorneys.  Moreover, your individual complaint letters must explain in detail the alleged improper conduct engaged in by that particular attorney.

Also, please be advised that we do not have the authority to investigate matters concerning judges.

However, if you feel you have a complaint concerning a judge you may wish to contact the **State Commission on Judicial Conduct at 277 Alexander Street, Room 710, Rochester, New York 14607.**

I am sorry we are unable to assist you, but the jurisdiction of the Attorney Grievance Committee is extremely limited.

Based upon the foregoing, Staff Counsel has directed me to advise you that this file will be closed pursuant to 22NYCRR 1240.7(d)(1).

Very truly yours,

GREGORY J. HUETHER
Chief Counsel

By: _____
Kelly A. Page
Investigator

KAP/clp

50 East Avenue, Suite 404  •  Rochester, New York 14604-2206  •  (585) 530-3180  •  Fax (585) 530-3191
www.nycourts.gov/courts/ad4/

SEVENTH JUDICIAL DISTRICT
ROCHESTER

CHIEF COUNSEL
GREGORY J. HUETHER

CHAIRPERSON
STEVEN V. MODICA

PRINCIPAL COUNSEL
DANIEL A. DRAKE

PRINCIPAL COUNSEL
ANDREA E. TOMAINO

INVESTIGATOR
KELLY A. PAGE

State of New York
Attorney Grievance Committees

September 28, 2018

**CONFIDENTIAL**

Michael D. Markham, M.D.
1010 Front Street, B101
Lahaina, HI 96761

<u>Re:  Complaint against Several Attorneys, Esq.</u>

Dear Dr. Markham:

This will acknowledge receipt of your letter dated September 21, 2018.  Staff Counsel has reviewed your correspondence and has determined that no action is warranted.

Please refer to our prior letter sent to you dated September 24, 2018, advising that our confidentiality rules require a separate complaint concerning each individual attorney. Your most recent letter does not set forth a sufficient basis to initiate an investigation.

Based upon the foregoing, Staff Counsel has directed me to advise you that this file will be closed pursuant to 22NYCRR 1240.7(d)(1).

Very truly yours,

GREGORY J. HUETHER
Chief Counsel

By: Kelly A. Page
Investigator

KAP/kp

415 Dairy Road, STE E-334

Kahului, Hawaii 95732

October 25, 2016

NYS Commission on Judicial Conduct

400 Andrews Street, Suite 700

Rochester, NY 14604

Re: Markham V. Markham          Index No. 2015/9826

Dear Commission on Judicial Conduct,

I feel it necessary to bring to your attention the gross Judicial corruption and repeated violations of my own and my children's civil rights due to overt gender discrimination in Judge Fisher's court. In addition, I believe Judge Fisher has colluded with the Plaintiff's attorney Mark Bezinque and made his rulings based on his relationship with Mr. Bezinque and his ridiculous misapplication of case law rather than any standards of fairness or justice.

Please find attached a copy of my most recent correspondence with Judge Fisher regarding my dissatisfaction with the integrity of the proceedings over the past year in his court. The following is just the highlights of the misapplication of Justice I have had to endure in Judge Fisher's Court.

In December of 2015 I was unlawfully evicted from my home via an ex-parte motion giving exclusive use and occupancy of our marital home to the Plaintiff. The case law the Judge used to justify his decision did not apply. There was never any history of domestic issues of any kind nor did the Judge ever suggest that there was, making his use of an ex-parte motion suspect. His decision was rather justified by him citing a false affidavit submitted by the Plaintiff's attorney Mark Bezinque stating that I, the Defendant left the marital property voluntarily and set up a residence elsewhere. When the Judge was notified that the Defendant was evicted without clothing or even a toothbrush he arrogantly ignored the protest and refused to give any additional consideration to the fact that his initial ruling was based solely on false testimony. It should be noted that this not only left the Defendant, a disabled veteran homeless it left him without notice with no access to his personal possessions or his beloved children.

Judge Fisher's rulings regarding the imputing of financial resources reeks of gender bias and has left the Defendant without the ability to meet even his most basic needs. The financial

obligations imputed by the Judge exceed by a considerable measure the income realized by the disabled Defendant while the responsibility imputed to the able-bodied Plaintiff is minimal. Funds have been overtly stolen out of the Defendant's bank accounts by the Plaintiff's attorney Mark Bezinque and the Judge has refused to take any action. Presently all of the Defendant's accounts are frozen by the Judge (in collusion with the Defendant's attorney Mark Bezinque) leaving the Defendant with no accommodation to take care of his most basic needs of himself, or his children. This has most recently resulted in the family Excellus BC/BS health care plan being cancelled for nonpayment leaving the Defendant's dependant children without health care coverage. Again the checks were written and mailed by the Defendant but were not paid by the bank because ALL of the Defendant's financial resources have been restricted by an order issued by Judge Fisher.

The circumstances regarding the custody arrangement can be found in the attached Defendant's correspondence with the court. The Defendant would like to note however the ridiculous amount of overt gender bias in the Judge's rulings. The Judge has repeatedly showed extreme favoritism to the Plaintiff and her attorney and done so without any justification. At one point in May of 2016 when the Plaintiff refused to comply with the court ordered visitation the Defendant's asked that the Plaintiff be held in contempt of court. At the court hearing for the Plaintiff's contempt the Judge bewilderingly never even addressed the Plaintiff's contempt and again showing an extreme amount of gender bias further restricted the Defendant from access to his children. This left the Defendant with no visitation with one of his children and only a paltry four hours per week with the other. Again the Judge showed an alarming amount of gender bias in the ruling and gave no explanation for such an extreme Judgment. Presently the Defendant has no access to his dependant children at all due to actions of Judge Fisher and his court.

After the Defendant fired his attorney Jonathan Trotto for incompetence and collusion (see attached) Judge Fisher at the prompting of the Plaintiff's attorney Mark Bezinque issued an arrest warrant for the Defendant for Contempt of Court. You will find the details of the contempt charge in the attached but again I do not believe there was any legal basis for the incarceration order and I believe it was purely punitive rather to attempt to force compliance with any order. The Judge neither established defiance of any order or the ability of the Defendant to comply before issuing the order again pointing to his overt collusion with the Plaintiff's attorney Mark Bezinque.

Perhaps most damning of all of the Judges corruption is an order issued by the Judge on August 22, 2016. At the urging of the Plaintiff's attorney with full knowledge that the Defendant was now without representation Judge Fisher issued a order (#6) 'precluding the Defendant from offering any proof on any disputed issue of fact and resolving all factual issues in favor of the Plaintiff'. For any sitting American Judge to write such an order that virtually ensures to deprive a citizen of any fairness, justice or due process is profoundly disturbing on many levels. It represents the unapologetic level arrogance and corruption the Defendant and his children have been victimized by throughout these proceedings.

The Defendant is a permanent resident of the State of Hawaii (as are the Plaintiff and dependants), however he will make himself available to this Commission at any time for the purpose of deposition or testimony. In addition the Defendant will make every effort to provide supporting documents requested to support the factual basis of these allegations.

Thank you for your attention to this matter. Find enclosed attached supporting documents.

Respectfully Yours,

Michael D. Markham, MD



## NEW YORK STATE
## COMMISSION ON JUDICIAL CONDUCT

JOSEPH W. BELLUCK, CHAIR
PAUL B. HARDING, VICE CHAIR
HON. ROLANDO T. ACOSTA
JOEL COHEN
JODIE CORNGOLD
RICHARD D. EMERY
HON. THOMAS A. KLONICK
HON. LESLIE G. LEACH
RICHARD A. STOLOFF
HON. DAVID A. WEINSTEIN
MEMBERS

JEAN M. SAVANYU, CLERK

400 ANDREWS STREET, SUITE 700
ROCHESTER, NEW YORK 14604

585-784-4141    585-232-7834
TELEPHONE        FACSIMILE
www.cjc.ny.gov

ROBERT H. TEMBECKJIAN
ADMINISTRATOR & COUNSEL

JOHN J. POSTEL
DEPUTY ADMINISTRATOR

M. KATHLEEN MARTIN
DAVID M. DUGUAY
SENIOR ATTORNEYS

STEPHANIE A. FIX
STAFF ATTORNEY

## CONFIDENTIAL

November 2, 2016

Michael D. Markham, MD
415 Dairy Road
Suite E-334
Kahului, Hawaii  95732

Re:  File No. 2016/R-0308

Dear Dr. Markham:

This is to acknowledge receipt by the State Commission on Judicial Conduct of your complaint dated October 25, 2016.

Your complaint will be presented to the Commission, which will decide whether or not to inquire into it.  We will contact you after the Commission has reviewed the matter.

For your information, we have enclosed some background material about the Commission, its jurisdiction, and its limitations.

Very truly yours,

Kathryn Trapani
Assistant Administrative Officer

Enclosure



## NEW YORK STATE
## COMMISSION ON JUDICIAL CONDUCT

JOSEPH W. BELLUCK, CHAIR
PAUL B. HARDING, VICE CHAIR
HON. ROLANDO T. ACOSTA
JOEL COHEN
JODIE CORNGOLD
RICHARD D. EMERY
HON. THOMAS A. KLONICK
HON. LESLIE G. LEACH
RICHARD A. STOLOFF
HON. DAVID A. WEINSTEIN
AKOSUA GARCIA YEBOAH
MEMBERS

JEAN M. SAVANYU, CLERK

61 BROADWAY, SUITE 1200
NEW YORK, NEW YORK 10006

646-386-4800   646-458-0037
TELEPHONE        FACSIMILE
www.cjc.ny.gov

ROBERT H. TEMBECKJIAN
ADMINISTRATOR & COUNSEL

## CONFIDENTIAL

January 4, 2017

Michael D. Markham, M.D.
415 Dairy Road
Suite E-334
Kahului, Hawaii 95732

Re: File No. 2016/R-0308

Dear Dr. Markham:

The State Commission on Judicial Conduct has reviewed your letter of complaint dated October 25, 2016. The Commission has asked me to advise you that it has dismissed the complaint.

Upon careful consideration, the Commission concluded that there was insufficient indication of judicial misconduct to justify judicial discipline. The Commission is not a court of law and does not have appellate authority to review the merits of matters within a judge's discretion, such as the rulings or decision in a particular case. Judges by law have broad discretion in such matters, and the law precludes the Commission from interfering in that discretion.

The Commission cannot provide legal advice or otherwise assist you with respect to your case. Only an attorney can advise you as to your legal rights and the remedies available in a court of law.

Very truly yours,

Jean M. Savanyu

Jean M. Savanyu

JMS/ja



# NEW YORK STATE
## COMMISSION ON JUDICIAL CONDUCT

JOSEPH W. BELLUCK, CHAIR
PAUL B. HARDING, VICE CHAIR
JODIE CORNGOLD
HON. JOHN A. FALK
TAA GRAYS
HON. LESLIE G. LEACH
HON. ANGELA M. MAZZARELLI
MARVIN RAY RASKIN
RICHARD A. STOLOFF
AKOSUA GARCIA YEBOAH
MEMBERS

JEAN M. SAVANYU, CLERK

400 ANDREWS STREET, SUITE 700
ROCHESTER, NEW YORK 14604

585-784-4141   585-232-7834
TELEPHONE   FACSIMILE
www.cjc.ny.gov

ROBERT H. TEMBECKJIAN
ADMINISTRATOR & COUNSEL

JOHN J. POSTEL
DEPUTY ADMINISTRATOR

M. KATHLEEN MARTIN
DAVID M. DUGUAY
SENIOR ATTORNEYS

STEPHANIE A. FIX
STAFF ATTORNEY

## **CONFIDENTIAL**

August 30, 2018

Dr. Michael D. Markham
1010 Front Street, B101
Lahaina, Hawaii  96161

Re:  File No. 2018/R-0276

Dear Mr. Markham:

This is to acknowledge receipt by the State Commission on Judicial Conduct of your complaint dated August 22, 2018.

Your complaint will be presented to the Commission, which will decide whether to inquire into it.  We will contact you after the Commission has reviewed the matter.

For your information, we have enclosed some background material about the Commission, its jurisdiction, and its limitations.

Very truly yours,

Kathryn Trapani
Senior Administrative Assistant

Enclosure

# Exhibit E

# Richard A Dollinger
# Judgement of Divorce
# Prepared by Pineau

At a Trial Term of the Supreme Court held in and for
The County of Monroe at the Hall of Justice, Rochester
New York on the 6th day of December 2018.

PRESENT:    Hon. Richard A Dollinger, A.J.S.C.

Supreme Court
County of Monroe         State of New York

——————————————————————

Diane R Markham
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
n/k/a Diane R Delong
54 Faraday Street
Rochester, New York 14610,
                              Plaintiff


                    v.                 *Judgment of Absolute Divorce*
                                       *Index No.: 2015-9826*
                                       *IAS:   Dollinger/J*


Michael D Markham
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
B101
1010 Front Street
Lahaina, Hawaii 96761
                         Defendant

——————————————————————

### NOTICE

**PLEASE TAKE NOTICE THAT THE WILLFUL FAILURE OF THE CHILD
SUPPORT PAYOR TO OBEY THIS ORDER MAY, AFTER A COURT HEARING,
RESULT IN THE CHILD SUPPORT PAYOR'S COMMITTMENT TO JAIL FOR A TERM
NOT TO EXCEED SIX MONTHS FOR CONTEMPT OF COURT**

PLEASE TAKE FURTHER NOTICE THAT THE PARTIES HAVE A RIGHT TO SEEK
A MODIFICATION OF THE CHILD SUPPORT ORDER UPON A SHOWING OF:

A.    A SUBSTANTIAL CHANGE IN CIRCUMSTANCES:

B.    THAT THREE YEARS HAVE PASSED SINCE THE ORDER WAS ENTERED,
      LAST MODIFIED OR ADJUSTED; OR

C.    THERE HAS BEEN A CHANGE IN EITHER PARTY'S GROSS INCOME BY

15% OR MORE SINCE THE ORDER WAS ENTERED, LAST MODIFIED OR ADJUSTED

**PLEASE TAKE FURTHER NOTICE THAT:**

(1)     THIS ORDER OF CHILD SUPPORT SHALL BE ADJUSTED BY THE APPLICATION OF A COST OF LIVING ADJUSTMENT AT THE DIRECTION OF THE SUPPORT COLLECTION UNIT NO EARLIER THAN 24 MONTHS AFTER THIS ORDER IS ISSUED, LAST MODIFIED OR LAST ADJUSTED, UPON THE REQUEST OF ANY PARTY TO THE ORDER OR PURSUANT TO PARAGRAPH TWO BELOW. UPON APPLICATION OF A COST OF LIVING ADJUSTMENT AT THE DIRECTION OF THE SUPPORT COLLECTION UNIT, AN ADJUSTED ORDER SHALL BE SENT TO THE PARTIES WHO, IF THEY OBJECT TO THE COST OF LIVING ADJUSTMENT, SHALL HAVE 35 DAYS FROM THE DATE OF MAILING TO SUBMIT A WRITTEN OBJECTION TO THE COURT INDICATED ON SUCH ADJUSTED ORDER. UPON RECEIPT OF SUCH WRITTEN OBJECTION, THE COURT SHALL SCHEDULE A HEARING AT WHICH THE PARTIES MAY BE PRESENT TO OFFER EVIDENCE WHICH THE COURT WILL CONSIDER IN ADJUSTING THE CHILD SUPPORT ORDER IN ACCORDANCE WITH THE CHILD SUPPORT STANDARDS ACT.

(2)     A RECIPIENT OF FAMILY ASSISTANCE SHALL HAVE THE CHILD SUPPORT ORDER REVIEWED AND ADJUSTED AT THE DIRECTION OF THE SUPPORT COLLECTION UNIT NO EARLIER THAN 24 MONTHS AFTER SUCH ORDER IS ISSUED, LAST MODIFIED OR LAST ADJUSTED WITHOUT FURTHER APPLICATION BY EITHER PARTY. ALL PARTIES WILL RECEIVE A COPY OF THE ADJUSTED ORDER.

(3)     WHERE ANY PARTY FAILS TO PROVIDE AND UPDATE, UPON ANY CHANGE THE SUPPORT COLLECTION UNIT WITH A CURRENT ADDRESS AS REQUIRED BY SECTION 240-B OF THE DOMESTIC RELATIONS LAW, TO WHICH AN ADJUSTED ORDER CAN BE SENT, THE SUPPORT OBLIGATION AMOUNT CONTAINED THEREIN SHALL BECOME DUE AND OWING ON THE DATE THE FIRST PAYMENT IS DUE UNDER THE TERMS OF THE ORDER OF SUPPORT WHICH WAS REVIEWED AND THE ADJUSTMENT OCCURRING ON OR AFTER THE EFFECTIVE DATE OF THE ADJUSTED ORDER, REGARDLESS OF WHETHER OR NOT THE PARTY HAS RECEIVED A COPY OF THE ADJUSTED ORDER.

(4)     NOTHING HEREIN SHALL BE DEEMED IN ANY WAY TO LIMIT, RESTRICT OR IMPAIR THE RIGHTS OF ANY PARTY TO MOVE FOR MODIFICATION OF CHILD SUPPORT AS OTHERWISE PROVIDED IN THE LAW.

The above action having been commenced on the 1st day of September 2015 by the filing

of a Summons with Notice and Verified Complaint with the Office of the Monroe County Clerk, said

Summons with Notice bearing the caption "Action for a Divorce" in the required size bold print and

bearing the index number on the face thereof, and the complaint having been verified by plaintiff on

the 31st day of August 2015; defendant having been served pursuant to §308(1) of the Civil Practice

Law and Rules on the 10th day of September 2015 as is evidenced by the Affidavit of Service of

Marie F Wilcox as sworn to by her on the 14th day of September 2015 and as filed with the Office

of the Monroe County Clerk on the 21st day of September 2015, Defendant having failed to interpose

an Answer, and

The parties' children having initially been represented by Lisa B Morris, Esq., and

subsequently by Edward W Riley, Esq.

Plaintiff initially having appeared by Mark Chauvin Bezinque, Esq., then substituted by Fero

& Ingersoll, Esq., LLP, Timothy E. Ingersoll, Esq., of counsel, and then by Maureen A Pineau, Esq.,

Defendant having initially appeared by Jonathan C Trotto, Esq., then Davidson Fink LLP,

Gregory Mott, Esq., of counsel, and, Sharon K Sayers, Esq., and then *pro se*,

A Request For Judicial Intervention having been filed with the Office of the Monroe County

Clerk on the 29th day of September 2015, and initially assigned to the Hon. Kenneth R Fisher, J.S.C.,

then reassigned ~~upon Justice Fisher's retirement~~ to the Hon. Elma A Bellini, J.S.C., ~~and upon her~~ ~~passing~~ AND THEN ASSIGNED TO /to the Hon. Richard A Dollinger, A.J.S.C.,

A Note of Issue having been filed with the Office of the Monroe County Clerk on the 10th

day of November 2016,

The Court having received written sworn testimony from plaintiff on the issue of grounds,

said Testimonial Affidavit having been submitted to the Court on November 14th, 2016,

3

The Hon. Kenneth R Fisher, J.S.C., having rendered a written decision and order dated the 20th day of December 2016 and a Judgment of Divorce dated the 18th day of January 2017 and as filed with the Office of the Monroe County Clerk on the 20th day of January 2017, and, on the 20th day of March 2017 having signed an Amended Judgment of Divorce as filed with the Office of the Monroe County Clerk on the 29th day of March 2017,

Defendant having moved by way of Order to Show Cause dated August 14, 2017 as signed by the Hon. Elma A Bellini, J.S.C., to amongst other things, vacate the Judgement of Divorce and Amended Judgment of Divorce, and, the Hon. Elma A Bellini, J.S.C., having heard oral argument on said application and having rendered a decision in open court on September 14th, 2017 vacating the Judgment of Divorce and Amended Judgment of Divorce as signed by the Hon. Kenneth R Fisher, J.S.C., ~~but maintaining all interim orders previously issued by the Hon. Kenneth R Fisher, J.S.C.,~~

The matter having come on to be heard before the undersigned on the 6th day of December 2018 for trial, plaintiff present in person and by counsel, Maureen A Pineau, Esq., defendant present, *pro se*, and the parties' children by Edward W Riley, Esq.

The parties having reached a stipulation in open court resolving all issues between them, and,

Plaintiff and defendant having each executed an acknowledged an Affidavit of Appearance and Adoption of Oral Stipulation, executed with the same degree of formality as that required of a deed to be recorded regarding custody dated December 6th, 2018, and, a second separate Affidavit of Appearance and Adoption of Oral Stipulation, executed with the same degree of formality as that required of a deed to be recorded, also dated the 6th day of December 2018, the originals of which

4

both being filed simultaneously with this Judgment with the Office of the Monroe County Clerk,

The original transcript of said oral stipulation of December 6th, 2018 having been filed with the Office of the Monroe County Clerk on the 22nd day of January 2019,

The Court having searched the statewide registry of orders of protection, the sex offender registry and the Family Court's warrant and child protective records, and having notified the attorneys for the parties and for the child, and having considered the same in approving the custody provisions of the within order,

*Now Therefore*, on application of Maureen A Pineau, Esq., counsel for the plaintiff, it is

Ordered, plaintiff is granted a Judgment of Absolute Divorce from defendant pursuant to §170(7) of the Domestic Relations Law; and it is further

Ordered, plaintiff shall have sole custody and primary residency of the parties' two unemancipated children, Rory Markham [DOB 12/16/2004 ssn 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] and Rowan Markham [DOB 05/21/2002 SSN 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]; and it is further

Ordered, that Dr Dennis Boike shall be the reunification therapist for defendant and the parties' children, and that defendant shall execute HIPAA releases so that defendant's providers Dr. Asimus, Joan Maloney, Jeffrey Chester, Westfall Associates and Talbot may release all of their records and notes to Dr. Dennis Boike so he can understand the issues and so that Dr Dennis Boike may speak with all of the named individuals and agencies and anyone in the agencies who treated defendant so that Dr. Dennis Boike can understand the background upon which this family comes to him; and it is further

Ordered, that defendant shall permit Dr. Boike and all of defendant's treatment providers to speak with the therapists for Rory and Rowan; and it is further ORDERED THAT PLAINTIFF WILL ~~also~~ ALSO PARTICIPATE AS DR. BOIKE REQUESTS OF HER (PG. 35, LINE 11-12 OF STIPULATION TRANSCRIPT); AND IT 5 IS FURTHER

Ordered, that Dr Boike shall consult with the therapists for Rory and Rowan and determine with the therapists for Rory and Rowan, when Rory and Rowan are emotionally capable to sit down and meet with defendant and Dr. Dennis Boike; and it is further

Ordered, plaintiff and defendant shall follow the recommendations of Dr Dennis Boike; and it is further

Ordered, defendant has the right to communicate with the parties' children by any means available, by way of example and not limitation, email, telephone, text, facetime, mail, and he may send them gifts; and it is further

Ordered, there shall be no communication by plaintiff or defendant with the parties' children regarding the economic problems encountered during the divorce process or any problem that was encountered during the divorce process; and it is further

Ordered, upon successful completion of the therapeutic process with Dr. Dennis Boike, and Dr Boike reports to the parties that the process has been successful, defendant can apply to the Court for modification of the custody provisions of the oral stipulation and of this Judgment without having to establish any other change in circumstance to warrant a hearing; and it is further

Ordered, should the parties' children express a desire to visit with defendant, that desire would constitute a change in circumstance sufficient to warrant a hearing; and it is further

Ordered, should the children express during a therapy session that they would like to engage in an activity with defendant outside of therapy, such activity shall be permitted; and it is further

Ordered, that neither party shall engage in any conduct, nor permit a third party to engage in conduct, be it extended family or others, to engage in any conduct that places at risk the psychological, emotional or physical well-being of the children, and such prohibited conduct shall

pursuant to the prior Judgments of Divorce and interim orders shall remain the property of plaintiff and defendant waives any and all right, title or interest he may have had at the time of transfer and at that the time of the oral stipulation; and it is further

Ordered, defendant shall pay to plaintiff the sum of $160,000.00 paid over a period of ten (10) years at the rate of $1333.33 per month and said sum shall be paid by direct assignment of that portion of each disability payment made to defendant. This sum represents spousal maintenance and the same is not subject to any contingency including but not limited to the death of either party, the remarriage of plaintiff, or the cohabitation of plaintiff with any individual. ~~The spousal maintenance shall not be taxable to plaintiff nor deductible by defendant.~~ To the extent there is a death benefit payable, plaintiff shall share in any death benefit paid in proportion to the sums received for spousal maintenance and child support to the whole; and it is further

Ordered, Berkshire Life Insurance Company of America located at 700 South Street, Pittsfield, MA 01201, as a wholly owned stock subsidiary of and administrator for The Guardian Life Insurance Company of America, New York, NY, commencing January 1, 2019, from Policy B BZ0296160 and B BZ9104220 in the name of Michael D Markham, shall pay over to plaintiff at the address indicated on this Judgment, or any other subsequent address, the sum of $1,333.33 per month for a period of ten (10) years as assigned by defendant from each and every monthly payment made to defendant; and it is further

Ordered, defendant assigns all his right, title and interest in Valley Isle Assets LLC to plaintiff ~~and plaintiff is now one of the owners of Valley Isle Assets LLC,~~ and it is further

Ordered, ~~defendant shall continue to pay child support in the sum of $23,649.00 per year at the rate of $1,971.00 per month in accord with that portion of the decision and order of the Hon.~~

8

~~Kenneth R. Fisher, J.S.C., dated the 22nd day of January 2016 and as entered in the Office of the~~

~~Monroe County Clerk on the 25th day of Jan 2016, a copy of which is attached hereto and made a part~~ BEGINNING JANUARY 1, 2019, UNTIL BOTH

~~hereof, regarding child support through December 2018. Beginning January 1, 2019, until both~~

children are emancipated, defendant shall pay the sum of $21,000.00 per year or $1,750.00 per

month. There will be no reduction in basic support when one of the children emancipates in lieu of

arrears in basic child support accrued prior to December 6, 2018. The only basis for a future

modification of child support is if the disability payments are revoked or rescinded; and it is further

Ordered, in the event the parties' children no longer qualify for Medicaid, then the parties

shall divide the cost of a uninsured health care insurance for the unemancipated children of the

marriage, 25% to plaintiff and 75%[1] to defendant; and it is further

MEDICALLY NECESSARY, NON-ELECTIVE

Ordered, plaintiff and defendant shall share in all uninsured health care expense for the

parties' two unemancipated children, 25% to plaintiff and 75%[2] to defendant; and it is further

Ordered, that plaintiff and defendant shall split the cost of college courses and related

50                       50

expenses [books etc] that their children take as high school students, ~~25~~% to plaintiff and ~~75~~%[3] to

defendant. Plaintiff shall provide receipts to defendant by email and defendant must reimburse

plaintiff within thirty (30) days[4]; and it is further

Ordered, to the extent the tax laws of the United States and the State of New York entitle a

parent to claim a child as an exemption for income tax purposes, plaintiff shall be able to claim all

---

[1] Page 144 of the transcript at line 24

[2] Page 144 of the transcript at line 24

[3] Page 144 lines 24 and 25 over to the top of page 145, AND PAGE 139, LINES 5-10.

[4] Page 145 lines 1 and 2

9

three (3) children as exemptions; and it is further

Ordered, the Monroe County Support Enforcement Unit shall continue to collect the child support ~~by deduction order against defendant's disability payments~~, and it is further

Ordered, that the Oral Stipulation entered into by the parties in Open Court on December 6th, 2018 as evidenced by the Adoption of Oral Stipulation executed and acknowledged by the parties on the 6th day of December 2018, shall be incorporated but not merged in the Judgment of Divorce and shall survive the same and be as if each and every term, covenant and condition were set out in full and separate decretal paragraphs, and the parties be and hereby are ordered to obey each and every term, covenant and condition of said oral stipulation as are lawful and capable of specific performance  at all times and places; and the Court retains jurisdiction of the matter concurrently with Family Court for the purpose of specifically enforcing such of the provisions as are capable of specific performance to the extent permitted by law; and it is further

Ordered, that any applications brought in Supreme Court shall retain to enforce the provisions of Said Oral Stipulations to enforce or modify the provisions of this judgment shall be brought in a County wherein one of the parties resides: provided that if there are minor children of the marriage, such applications shall be brought in a county wherein one of the parties or the child or children reside, except that in the discretion of the judge, for good cause.  Good cause applications shall be made by motion or order to show cause.  Where the address of either party and any child or children is unknown and not a matter of public record, or is subject to an existing confidentiality order pursuant to DRL §254 or FCA §154-b, such applications may be brought in the county where the judgment was entered; and it is further

Ordered, that either party may resume the use of any premarriage or former surname.

10

Plaintiff's premarital surname is DeLong.

Dated: ~~March~~ April 3, 2019
Rochester, New York

_____
Hon. Richard A Dollinger, A.J.S.C.

11

# Exhibit F

# Greg Mott Letter
# Confession of Bezinque

.

# Davidson | Fink
## Attorneys at Law

Gregory J. Mott
Partner

July 27, 2018

**Via Hand Delivery**
Sharon Kelly Sayers, Esq.
30 West Broad Street, Suite 506
Rochester, NY 14614

      Re:   **Markham vs. Markham**
           **Index No. 2015/9826**

Dear Sharon:

Per our attorneys' conference held in my office on Tuesday, July 24, 2018, you will send Michael Markham your Retainer Agreement and you will become the counsel in this case. Since this case is nearly 3 years old, I will remain as second chair to assist you as this case moves forward.

Michael Markham's address is: 1010 Front Street, B101, Lahaina, HI 9676.

His telephone number is: (585) 355-7896.

His email address, which is his preferred way of communicating, is: MichaelMarkhamMD@gmail.com.

Enclosed please find:

1.     Order to Vacate with Exhibits annexed. Order dated October 31, 2017 and granted at Special Term by Judge Dollinger September 14, 2017.

2.     Maureen Pineau's July 2, 2018 cover letter with encloses listed, non-party out of court Subpoena Duces Tecums. I sent Maureen an email asking her to send me copies of whatever she receives in response to these Subpoenas which, of course, I will share with you.

3.     I will send you Ed Riley's AFC Report as soon as I receive a copy from Ed. In the meanwhile, I emailed you, July 26, 2018, Ed Riley's Answering Affirmation of Attorney for the Child affirmed opposition in response to Diane Markham's Order to Show Cause, dated November 6, 2017, seeking to have Michael Markham held in contempt and Michael Markham's Notice of Motion, dated November 13, 2017, requesting visitation and communication rights with his two youngest child. I thought you ought to take a look at this to get an idea where Ed is coming from.

---

28 East Main Street, Suite 1700 | Rochester, New York 14614 | 585-756-5926 | davidsonfink.com
gmott@davidsonfink.com | fax 585-758-5064

4.      Email from Michael Markham to me, dated September 18, 2017, giving a background and listing of experts that have treated Michael Markham during the last 3 years.

5.      Judge Fisher's Decision and Order, dated March 2, 2016 and filed March 7, 2016.  Please note, bottom of page 3, initially Judge Fisher did grant Michael Markham visitation, which he subsequently revoked in a later Order.

6.      Michael Markham's Statement of Net Worth as of October 19, 2015.  Date of commencement September 1, 2015.

7.      Judge Dollinger's Amended Temporary Order granted December 1, 2017, dated January 2, 2018 and filed January 5, 2018.  This includes the appointment of Dr. Coron as psychological evaluator, temporary custody, temporary maintenance, temporary child support, etc.

8.      Michael Markham's October 30, 2017 email to me re 529 Plans and documents attached with respect to those plans and the monies withdrawn.  Also email to me from Tim Ingersoll, Esq. to me, dated October 30, 2017, with respect to the SEP IRA liquidation and the 529 Plans.  These are two issues in dispute.

9.      Emailed you, July 26, 2018, a copy of David Coron's March 19, 2018 email to all attorneys and Justice Dollinger attached to his massive psychological valuation of Michael Markham annexed with information from "collateral/third party date received by him" which was also attached.

10.     Judge Fisher's Decision and Order, signed December 20, 2016, granting:

        a)      Sole custody to Plaintiff/Wife (this is without a hearing) finding that Michael Markham, Defendant, has "effectively abandoned his family..."  Note on page 3, Fisher says he held a Lincoln Hearing. He refers to "Mother's testimony, but there is no transcript in existence and no reference to a default hearing or notice of default hearing.  In talking to Mark Bezinque, Esq. he admitted that there was no hearing.  When Fisher refers to "Mother's testimony", no idea what he is talking about.  This is where Fisher terminates all contact with the children for our client but then says, on page 5, "Defendant is free to, in the future, petition the Court for resumption of visitation without conditions", whatever that means, which we did and were denied.  Also note that Michael Markham has repeatedly raised the issue of whether or not New York had jurisdiction over the issue of custody in as much as the parties sold their house in New York and bought the house in Hawaii.  That fact is not in

dispute.  In fact, the 6 months prior to the commencement date, September 1, 2015, all 3 children and the parties were residents of the State of Hawaii.  I do not know if Michael wants to raise a jurisdictional issue again, but he may.  "Interesting reading" is my comment on Judge Fisher's Decision and Order.  Apparently he is not familiar with the phrase Judgment of Divorce.

11.    Condensed version of Michael Markham's deposition testimony, December 14, 2017 by Alliance Court Reporting.

12.    Condensed version of Diane Markham's deposition testimony, December 14, 2017 by Alliance Court Reporting.

13.    Copy of Judge Fisher's January 18, 2017 Judgment of Divorce followed by copy of Judge Fisher's Amended Judgment of Divorce, dated March 20, 2017.  These were prepared and submitted by Mark Bezinque, Esq., attorney for Diane Markham, which were subsequently vacated.

14.    Packet of information regarding the Hawaii property.

15.    Packet of information regarding Michael Markham's SEP IRA and Bank of Hawaii funds that were seized, bank statements included.  I never did receive anything from Michael Markham's Hawaiian attorney, Mr. Adelman.

16.    Copies of last 2 proposal letters, mine of March 23, 2018 and Tim Ingersoll's responsive letter, dated April 12, 2018.

17.    Michael Markham's July 6, 2018 email to me after I sent him Judge Dollinger's summation of what the Judge thinks the settlement proposal terms should be (see Richard Dollinger's attached Tuesday, June 19, 2018 "a short note to counsel").

18.    May 24, 2017 Order.

19.    August 25, 2016 Order.

Let me know if there is anything else you need.

As soon as I get a copy of Ed's AFC Report, I will send it on to you.

Thank you for accepting position of the lead counsel in this case.  I will notify the Court as soon as your Retainer Agreement is signed and your retainer fee is paid.

Very truly yours,

Gregory J. Mott

GJM/taa
Enclosures
cc:    Michael D. Markham (without enclosures)

# Exhibit G

# Lisa Morris
# Closing Argument for
# the Children

SUPREME COURT
STATE OF NEW YORK   COUNTY OF NEW YORK

DIANE MARKHAM,
      Plaintiff,

                                      CLOSING ARGUMENT OF
Vs.                               ATTORNEY FOR THE
CHILDREN

MICHAEL MARKHAM,               Index No.
2015/9826
          Defendant.

The Plaintiff Diane Markham and Defendant Michael Markham have three children, Aidan Markham born on June 12, 1997, Rowan Markham, born on May 21, 2002 and Rory Markham, born on December 16, 2004. Aidan Markham, who is emancipated, is a sophomore at RIT and lives primarily with his Mother Diane Markham when he is not attending school.

The Plaintiff, Diane Markham filed a complaint requesting joint custody of the unemancipated children, Rowan and Rory. During the pendency of the action, Rowan and Rory became uncomfortable with their Father's conduct while he was residing in the marital residence with the family. At that time, I argued that the children's mental health was being negatively impacted and the Court issued an Order dated January 22, 2016 awarding exclusive possession of the marital residence to the Mother. The parties agreed that the Father would have periods of residency with the children on Wednesdays and Saturdays.

During February, March, and April 2016, Rowan and Rory contacted me about continuing problems with their Father during visitation. On April 22, 2016, I filed an Order to Show Cause on behalf of the children requesting that the Father's periods of visitation be reduced. The affidavit in support of the Order to Show Cause included the children's concerns that their

Father was angry and regularly disparaged their Mother, Mother's attorney, and the children's counselor. The Court issued an Order terminating Father's visitation with Rowan and reducing Rory's visitation to Saturday for a four hour period.

As part of his responsive papers to the Order to Show Cause dated April 22, 2016, Father requested a forensic custodial evaluation of the parties and the children. The Father requested that Dr. David Coron, Ph.D conduct the evaluation and Mother agreed to the request. On May 20, 2016, the Court signed an Order directing that the custodial evaluation be completed by July 25, 2016. Despite the fact that Father requested the evaluation, he failed to retain Dr. Coron or schedule any appointments with Dr. Coron so the custodial evaluation did not go forward.

In July of 2016, Father cancelled two Saturday visits with Rory. Subsequently, Father texted Rory to inform her that he had moved to Hawaii and that he would send her a plane ticket to come to Hawaii any time that she wanted to visit.

The case was set for trial on November 14, 2016. The Father did not appear for the trial and the matter proceeded by default. At the trial, Mother testified and requested sole custody of the children. The attorney for the Plaintiff requested that the pleadings be conformed to reflect the Plaintiff's request for sole custody of the children.

At the time of the trial, Mother was residing in Rochester, New York with the children and Father was residing in Hawaii. The Mother testified that the Father moved to Hawaii in approximately July of 2016 and that the Father has not returned to Rochester, New York since that time. Mother testified that Rowan had no contact with his Father including telephone or electronic contact. The Mother testified that Father sent text messages to Rory periodically but to her knowledge Rory did not respond to the text messages.

Mother testified that she was the parent who was exclusively responsible for caring for the children. Mother testified that she homeschooled the children, took the children to all of their medical appointments, transported the children for all

of their extra-curricular activities, and provided for all of the other daily needs of the children. Mother testified that Father worked long hours and was not engaged with the children when he was home.

Mother testified that when the parties resided together Father argued with her in the presence of the children causing strife in the home and causing the children to be anxious and upset. Mother testified that she was unable to discuss decisions regarding the children with Father because he was continually combative and he refused to engage in civil discussions. Mother testified that Father has had no contact with her since he moved to Hawaii in July of 2016 nor has he inquired in any way about the status or needs of the children. Mother testified that she has not received any financial support for the children since mid-September and that Father took the child Aidan's 529 College Savings Account and did not pay the Fall 2016 tuition bill.

The children specifically requested to meet with the Court so that they could share their opinions with the Court. On November 15, 2016, the Court conducted a Lincoln Hearing wherein each child appeared individually in camera with the Court.

As Attorney for the Children, if a child is capable of knowing, voluntary considered judgment, my ethical obligation is to represent the child's expressed wishes unless I believe that there is a "substantial risk of imminent serious harm to the children". The children in this case have expressed their wishes to me and directly to the Court during the in camera interview. I do not believe that there is any substantial risk of imminent harm to the children.

On behalf of Rowan and Rory Markham, I am requesting their Mother be awarded sole custody of the children and that their Father have no contact with the children until further Order of this Court.

Respectfully Submitted,

Lisa B. Morris

# Exhibit H

# Sharon Kelly Sayers Threatening Letter to the Plaintiff

*Sharon Kelly Sayers*

ATTORNEY AT LAW
30 WEST BROAD STREET
SUITE 506
ROCHESTER, NEW YORK 14614
(585) 454-2320
FAX (585) 454-1612
(Fax not to be used for service)

September 20, 2018

Dr. Michael Markham
1010 Front Street
Bldg. 101
LaHaina, Hawaii 96761

Re: Markham v. Markham
    Index No. 2015/9826

Dear Michael:

While I have not yet received a copy of the letter dated September 18th that you wrote to Judge Dollinger, Greg Mott familiarized me with it, and now Judge Dollinger has emailed it to me. I am enclosing a copy of Judge Dollinger's email for your review.

Apparently you believe that you can develop a more effective strategy for seeing your children than can I. In order to free you to carry forward with that strategy, I am terminating any further representation of you.

I am enclosing a Discharge of Attorney form for your signature. Once you have executed and returned the form, I shall request that Judge Dollinger grant you the 30 days allowed under law for you to find new counsel. If you fail to execute the Discharge of Attorney form, I shall move forward with a Motion requesting permission from the Court for withdrawal. That option requires that I set forth the rationale for my request, which I can assure you will necessarily not put you in a sympathetic light.

Sincerely,

SHARON KELLY SAYERS

SKS/jc
Enclosure

# Exhibit I

## Edward Riley
## Conflict

**Michael D Markham, MD**
1010 Front Street B101
Lahaina, Hawaii 96761
(585) 355 7896
MichaelMarkhamMD@Gmail.com
Re: Markham V Markham index #2015/09826

21 September 2018

**Edward W Riley, Esq**

25 Market Street
Brockport, NY 14420

Mr Riley:

I am writing to officially demand the return of the retainer money you were paid to represent my children in acting as the Court appointed AFC in our matrimonial litigation and again demand that you recuse yourself from any further participation in this case.

Mr Riley I allege that you **willfully misrepresented** yourself to my children as a Court appointed 'AFC' when you knew that you were not qualified to represent their interests based on your undisclosed personal conflicts resulting from a nearly lifelong personal relationship with the children's grandfather David Markham. Section 7.2 (b) *Function of the attorney for the child* states that 'The attorney for the child is subject to all the ethical requirements applicable to all lawyers including conflicts of interest'. Likewise, according to rule 1.7 (3) on Client-Lawyer Relationships / Conflict of Interests states 'A conflict of interest may exist before representation is undertaken, in which event the representation must be declined unless the lawyer obtains informed consent to represent the child'. An overwhelming conflict clearly exists and no consent was ever obtained from either the children, or myself their parent. As a result of you being appointed (in an obviously corrupted process) my children have been materially harmed by your representation due to your willful and deceitful failure to disclose your highly conflicting lifelong relationship with their grandfather David Markham. As as result of this non-disclosure and willful misrepresentation, my children have without good reason been deprived of any meaningful access to their loving father for nearly a year now.

At the time of your appointment I felt it very suspicious and knew that you had significant ties to the Village of Brockport and Town of Sweden (where I grew up) but I was unaware of the highly personal lifelong relationship that you had with David Markham, the grandfather of my children, Rowan and Rory Markham. I now know Mr Riley, from discussions with my siblings that you are the childhood friend of the children's grandfather David Markham, and remain very close friends with him to this day. I also know from speaking with your other childhood friend in common, Fred Webster that not only are you longtime personal friends but you have professional offices within sight distance of one another on Market Street in Brockport and are often seen around Brockport attending men's groups and sharing meals together.

At first glance this lifelong friendship may appear trivial and insignificant (as I'm certain you will allege) until it's revealed that David Markham remains close with the Plaintiff Diane Markham and is estranged from both his son - Defendant and his disabled ex-wife Angela whom the Defendant is very close with. Out of bitterness and spite David Markham will and would do anything to keep his ex-wife Angela from seeing her grandchildren and his estranged son from seeing his children.... including enlisting the help of you Mr Riley....his good friend and old childhood buddy. To be very clear Mr Riley, I know as fact, from speaking with my siblings, that you and David Markham (your lifelong friend) schemed to be appointed AFC for my children in what has turned out to be a very successful attempt to deprive Angela Markham of any access to her grandchildren and deny my children any access to their loving father.

The highly curious and suspicious circumstances surrounding your assignment to this case have yet to be fully discovered and I have asked Cynthia Snodgrass for a detailed accounting of exactly how you came to be assigned. I'm confident that in time, this corruption too will come to light and I am certain we will discover that your appointment to this case was not by coincidence

alone. The chances of your assignment being random (the purported system of assignment) is mathematically extremely unlikely and defies any reasonable measure of judgement.  What is known is that as a result of your corrupted representation, my children have had no meaningful contact with their father whom I'm certain they miss terribly. . Contrary to New York State Law, you have done everything to deprive my children of any relationship with their father. As you well know, the law states that  all parents have a right to have a relationship with their children and the Monroe County Court mission statement says that all children deserve the love and support of two parents whenever possible...Yet you Mr Riley acting solely in the interests of your friend David Markham and not the interests of my children, have done everything in your power to prevent us from realizing those clearly articulated sentiments of the Court including insisting that my children never 'engage' in any capacity with the Court to conveniently attempt to hide your corruption.  I should note for the record that David Markham is a Clinical Social Worker with almost 50 years of experience in Monroe County and is very knowledgeable and savvy at manipulating the Court for his own motives in family matters.

For the record, I also know that you are aware Mr Riley, that your colleague Lisa Morris the former AFC and Judge Fisher, the former Judge on this case faked the existence of the children's Lincoln Hearings and Default Trial and there is no record of them ever being done in spite of fabricated testimony from them to the contrary. No one has ever been able to produce them or even show evidence that they took place for discovery to the Defendant's attorneys. Further, Mark Bezinque, the former Attorney for Plaintiff has admitted to Mr Mott (Attorney for Defendant) that the Lincoln Hearings and Default Trial  never happened.... yet in your conspicuous and transparent corruption you fail to bring this to the attention of the Dollinger Court....conveniently  leaving you as the sole arbiter and reporter to the Court of my children's wishes and best interests? I don't think so Mr Riley. Your overtly corrupted representation of my children will not stand. I will do everything  **LEGALLY** in my power to see that you are removed and my children receive the unbiased representation that they are legally entitled to. Your fraud upon this court vitiates everything before it and for want of a small modicum of oversight and justice, any further litigation in this case is now mute and inadmissible (U.S. V Throckmorton). .

Your willful actions construe overt unethical  misconduct  and breach the rules of professional conduct for all New York State Licensed attorneys (22 NYCRR 1240 and 1020). Based on this irrefutable evidence regarding these now exposed conflicts  and your conspicuous willful misrepresentation of my children,  I have referred this matter to the Supreme Court of the State of New York Appellate Division Fourth Judicial Department, Seventh Judicial District,  Attorney Grievance Committee for correction and disciplinary action. Your should  be hearing from them shortly.

To prevent any further harm from your unlawful actions I demand  that you immediately recuse yourself  and return all  retained monies that were obtained through your deliberate  fraud perpetrated on this Court. If you arrogantly choose not to voluntarily recuse yourself as requested, I will  file a *Motion to Disqualify* in the New York State Supreme Court to have you forcefully removed from this case.  If that motion is unsuccessful  in the Supreme Court, I will continue my tireless campaign to expose your extrinsic fraud and use your willful misrepresentation as the basis for an appeal in the Appellate Court that will follow.

This injustice to my children by way of your unethical corruption will not stand Mr Riley. Less I again be falsely accused by this Court of abandoning my children, I will use all of the resources at my disposal to see that you are held accountable and my children are finally reunited with their loving father.

Without Justice, there is no Democracy.

Michael Markham, MD

cc:  Greg Mott, Esq., Sharon Sayers, Esq.,  Joel Edelman, Esq.,(Hawaii), Maureen Pineau, Esq., Diane Markham (Plaintiff), Hon. Richard A. Dollinger, NYS Commission on Judicial Conduct

# Exhibit J

# Deposition
# Of
# Diane R DeLong

**1**

```
 1
 2              SUPREME COURT OF THE STATE OF NEW YORK
 3                          County of Monroe
     - - - - - - - - - - - - - - - - - - - - - -
 4   DIANE R. MARKHAM,
 5                  Plaintiff,
 6   v.                                Index No. 2015/9826
 7   MICHAEL D. MARKHAM,
 8                  Defendant.
     - - - - - - - - - - - - - - - - - - - - - -
 9
10   Deposition Upon Oral Examination of:
11                       Diane R. Markham
12
     Location:       Fero & Ingersoll, LLP
13                   2024 West Henrietta Road, Suite 3C
                     Rochester, New York 14623
14
15
     Date:           December 14, 2017
16
17
     Time:           12:18 p.m.
18
19
20
21   Reported By:    LAUREN E. SHERWOOD
22                   Alliance Court Reporting, Inc.
23                   120 East Avenue, Suite 200
24                   Rochester, New York 14604
25
```

**2**

```
 1
 2              A P P E A R A N C E S
 3   Appearing on Behalf of Plaintiff:
 4   Timothy E. Ingersoll, Esq.
 5      Fero & Ingersoll, LLP
 6      2024 West Henrietta Road, Suite 3C
 7      Rochester, New York  14623
 8      fpilawfirm@aol.com
 9
10   Appearing on Behalf of Defendant:
11   Gregory J. Mott, Esq.
12      Davidson Fink, LLP
13      28 East Main Street, Suite 1700
14      Rochester, New York  14614
15      gmott@davidsonfink.com
16                    *    *    *
17
18
19
20
21
22
23
24
25
```

**3**

```
 1             S T I P U L A T I O N S
 2   THURSDAY, DECEMBER 14, 2017;
 3       (Proceedings in the above-titled matter
 4        commencing at 12:20 p.m.)
 5                    *    *    *
 6       IT IS HEREBY STIPULATED, by and among the
 7   attorneys for the respective parties hereto, that:
 8       All rights provided by the CPLR and Part
 9   221 of the Uniform Rules for the Conduct of
10   Depositions, including the right that all objections
11   to any question, except as to form or to move to
12   strike any testimony at this examination are reserved;
13       And in addition, the failure to object to
14   any question or to move to strike any testimony at
15   this examination shall not be a bar or waiver to make
16   such motion at, and is reserved to, the trial of this
17   action;
18       IT IS FURTHER STIPULATED, that the reading
19   and signing of the testimony be waived;
20       The filing of the original of this
21   deposition is waived;
22       IT IS FURTHER STIPULATED, that the
23   attorneys for the parties are individually responsible
24   for their certified transcript charge, including any
25   expedite or other related production charges in
```

**4**

```
 1       DIANE R. MARKHAM - BY MR. MOTT
 2   accordance with Rochester Rules;
 3       AND IT IS FURTHER STIPULATED, that the
 4   Notary Public, LAUREN E. SHERWOOD, may administer the
 5   oath to the witness.
 6                    *    *    *
 7   DIANE R. MARKHAM,
 8       called herein as a witness, first being sworn,
 9       testified as follows:
10       EXAMINATION BY MR. MOTT:
11       Q.  Ma'am, you are Diane Markham, the
12   plaintiff in this divorce action?
13       A.  Yes.
14       Q.  How would you like me to address you, as
15   Mrs. Markham or Diane?
16       A.  Diane.
17       Q.  Thank you.  And Diane, how old are you?
18       A.  51.
19       Q.  And how would you describe your health?
20       A.  Excellent.
21       Q.  Do you take any mood altering medications?
22       A.  No.
23       Q.  Are you under the care of any therapist,
24   psychiatrist or psychologist?
25       A.  Nope.
```

---

**5**

DIANE R. MARKHAM - BY MR. MOTT

2  Q.  Have you been during the past three years?
3  A.  I was briefly, yes.
4  Q.  When was that?
5  A.  In the fall of 2015, when I was filing.
6  Q.  And was it a therapist or a doctor?
7  A.  It was therapist.
8  Q.  And the name of that therapist?
9  A.  I don't remember. I only saw her for like
10 six weeks or eight weeks. I'd have to look it up.
11 Q.  Okay. During the time that this lawsuit
12 has been pending, and that starts September 1, 2015,
13 the date of commencement, a very important date, have
14 you been under the effect -- taking any mood altering
15 medications?
16 A.  No.
17 Q.  Okay. And what is your education?
18 A.  I have a bachelor's degree in science.
19 Q.  In what?
20 A.  Biology, I guess.
21 Q.  BS?
22 A.  Yeah.
23 Q.  From what school?
24 A.  Plattsburg, SUNY Plattsburg.
25 Q.  Do you have any advanced degrees or

---

**6**

DIANE R. MARKHAM - BY MR. MOTT

2  certifications?
3  A.  No -- well, I mean, I have a certification
4  in histology, but that would be far outdated at this
5  point in time.
6  Q.  Do you have any professional licenses?
7  A.  No.
8  Q.  Any professional certifications?
9  A.  Uh-uh.
10 Q.  You have to answer yes or no.
11 A.  Yeah -- no. Sorry. No.
12 Q.  And where do you currently reside?
13 A.  50 Faraday Street, Rochester 14610.
14 Q.  Faraday?
15 A.  Yeah.
16 Q.  And is that a single-family residence?
17 A.  It's part of a house. It's a partial
18 house, rental.
19 Q.  Rental? And how long have you lived
20 there?
21 A.  Since November of last year, so 13 months.
22 Q.  Do you have a written lease?
23 A.  I do.
24 Q.  And how long -- strike that.
25     When does that lease expire?

---

**7**

DIANE R. MARKHAM - BY MR. MOTT

2  A.  I think August.
3  Q.  Okay. And what's the monthly rent?
4  A.  It's currently 1,100. It's going up to
5  1,200 in January.
6  Q.  And who resides there with you?
7  A.  My -- Rory Markham, Rowan Markham, and
8  Aidan when he's not at school.
9  Q.  Okay. Anyone else?
10 A.  No.
11 Q.  Has anyone else resided there with you
12 since September 1, 2015, or any --
13 A.  No.
14 Q.  Okay. And are you employed?
15 A.  I am self-employed. I own a small
16 business.
17 Q.  And what's the name of that business?
18 A.  Doing business as ZHAG. It's the initials
19 for Zelda's Home and Garden.
20 Q.  Okay. Do you have a business location?
21 A.  It's -- the office is at my house. But we
22 do work at other people's houses, so there's not like
23 a business location.
24 Q.  You say "we." Are you in a partnership?
25 A.  No, my daughter works with me. But we're

---

**8**

DIANE R. MARKHAM - BY MR. MOTT

2  not partners; she's an employee.
3  Q.  Is she paid?
4  A.  Yeah.
5  Q.  What is she paid?
6  A.  $25 an hour.
7  Q.  Okay. How much has she earned so far this
8  year?
9  A.  I looked this up, too. I can't say for
10 sure, but I can provide that.
11 Q.  Okay. Thank you.
12     And what's the nature of your business?
13 A.  We clean houses and do gardening
14 seasonally.
15 Q.  Do you have clients that sign contracts?
16 A.  No.
17 Q.  Do you have a website?
18 A.  Yes.
19 Q.  And what is the name of the website?
20 A.  Zeldashomeandgarden.com.
21 Q.  Do you have any other websites?
22 A.  No.
23 Q.  Do you have any other businesses?
24 A.  No.
25 Q.  Have you had any other business of any

---

**9**

DIANE R. MARKHAM - BY MR. MOTT
1   
2   other kind or nature since September 1, 2015?
3       A.   Not business.  I worked at Wisteria for a
4   while, if that's what you're asking.
5       Q.   Okay.  When did you work at Wisteria?
6       A.   From September -- I don't remember,
7   exactly, when I started, around September 2015.  The
8   last time I worked there was probably April of 2017.
9       Q.   And during this time, did you also have
10  your own business?
11      A.   I had -- I mean, I was -- my business
12  wasn't like official on the record on the books 'til
13  this year.  I was desperately trying to make some
14  money to feed the kids and pay the rent, so I was
15  cleaning houses just like on my own, but before I knew
16  what was entailed in running a business.
17      Q.   So you're saying there was unreported
18  income?
19      A.   Well, it's all -- no, I claimed it.  It
20  was in my taxes.  It's in all the statements that you
21  received.  All the deposits were made into my personal
22  account at the time.
23      Q.   Since this lawsuit started, have you
24  obtained any additional training or education?
25      A.   No.

**10**

DIANE R. MARKHAM - BY MR. MOTT
1   
2       Q.   Since this lawsuit started, have you
3   applied for any employment anywhere else?
4       A.   No.
5       Q.   Have you attempted to start any other
6   business?
7       A.   No.
8       Q.   Have you made any attempts to increase
9   your income since this lawsuit started?
10      A.   Just with the small business I already
11  told you about.
12      Q.   Tell me what efforts you've made to
13  increase your income.
14      A.   By working more.
15      Q.   And when did you start working more?
16      A.   We worked full-time over the summer,
17  because it's a seasonal thing with the gardening.  So
18  my seasonal work from May through September.
19      Q.   Well, are you saying that you started
20  working more this summer?
21      A.   Yeah.
22      Q.   And prior to this --
23      A.   Well, I was working some last summer
24  outside, too, because I needed to.  I mean, it was all
25  out of desperation.  I needed to make some money.

**11**

DIANE R. MARKHAM - BY MR. MOTT
1   
2       Q.   On the date of marriage, July 20, 1996,
3   what was your job?
4       A.   I was working at Roswell Park Cancer
5   Institute.
6       Q.   And what was the --
7       A.   I was the supervisor of the histology lab
8   there.
9       Q.   Do you recall what your income was?
10      A.   No.
11      Q.   Was it more than $25,000?
12      A.   It might have been 30, 35.
13      Q.   How long did you stay working as the lab
14  director?
15      A.   Yeah -- well, supervisor.  I quit working
16  when our son -- we had -- our son Aidan was born.  And
17  once he was making money from his internship, we
18  decided that I would stay home and take care of Aidan.
19      Q.   Okay.  And Aidan's date of birth again is?
20      A.   6/12/97.
21      Q.   And so then, thereafter, you did not work
22  and you lived off the grant money, or the financial --
23      A.   Correct, and loans, I think.  I don't
24  really remember the details of the finances back then.
25      Q.   Okay.  And did there come a time after

**12**

DIANE R. MARKHAM - BY MR. MOTT
1   
2   Aidan's birth that you returned to work?
3       A.   No.
4       Q.   When did you -- when did you -- well, you
5   began working for Wisteria in September of 2015;
6   correct?
7       A.   Correct.
8       Q.   Between Aidan's birth and September of
9   2015, were you employed outside the home?
10      A.   No.
11      Q.   Do you have any plans to get further
12  training or education?
13      A.   No.
14      Q.   Do you have any plans to apply for
15  employment other than your self-employment?
16      A.   No.
17      Q.   How much money do you think you will earn
18  this year?
19      A.   Based on my income, or based on money I've
20  had to take out of the IRA to pay living expenses?
21      Q.   Just income.
22      A.   Probably 30 to $35,000.
23      Q.   Do you expect that to increase, decrease,
24  or stay the same next year?
25      A.   I have no idea.

13

DIANE R. MARKHAM - BY MR. MOTT
2     Q.  Do you have any other employees besides
3 your daughter?
4     A.  My son Rowan works for me part-time, in
5 the summer, mostly.
6     Q.  Okay.  Is he paid?
7     A.  Yeah.
8     Q.  And what's he paid?
9     A.  $15 an hour.
10       Do you want all of the employees?
11     Q.  Well, if you have more.
12     A.  Aidan also worked for me this summer, and
13 Sebastian Kinsler.
14     Q.  Which means they'll get W-2s?
15     A.  Yeah.
16     Q.  And is Sebastian a full-time employee?
17     A.  No.  No.  It's mostly for the summer.
18 It's kids.  They're in school.
19     Q.  Okay.  Would you provide me with the W-2
20 forms for your employees in 2017?
21     A.  When I get them, sure.
22     Q.  Right.  Did you have these employees in
23 2016?
24     A.  No.  Analise (phonetic) was helping me a
25 little bit that summer 2016, but that was -- we

14

DIANE R. MARKHAM - BY MR. MOTT
2 weren't -- you know, it wasn't a business.  It was me
3 trying to figure out how to make it work.
4     Q.  So it's fair to say that, since the summer
5 of '16 until the summer of '17, you've increased your
6 employees by four, three?
7     A.  Perhaps, for the summer work, I needed to.
8     Q.  And during the winter?
9     A.  During the winter, it's very part-time.
10 Analise and I do it.
11     Q.  Do you have a social security statement of
12 benefits?
13     A.  I'd have to go online and get that.  I
14 haven't seen that in -- for me you mean; right?
15     Q.  Yes.
16     A.  Yeah.
17     Q.  Would you produce that to me through your
18 attorney, please?
19     A.  Yes.
20     Q.  Thank you.  And you said your degree is a
21 BS in just biology?
22     A.  Correct.
23     Q.  No subspecialty?
24     A.  No.
25     Q.  And your work was as a lab supervisor?

15

DIANE R. MARKHAM - BY MR. MOTT
2     A.  Correct.
3     Q.  Have you looked into resuming employment
4 for any hospital group?
5     A.  I would have to completely retrain.  My
6 field is dramatically different from when I was
7 working, at the time.  You know, that was 20 years
8 ago, so it's completely different.  So now I really
9 don't have an interest in retraining in that field.
10     Q.  Well, what kind of retraining would you
11 have to undergo?
12     A.  I'd have to go -- I don't even know.  I
13 couldn't tell you.
14     Q.  So you haven't looked into any retraining
15 program?
16     A.  Correct.
17     Q.  And you're not planning to?
18     A.  No.
19     Q.  And does that mean that the money you're
20 earning is adequate to pay your bills?
21     A.  No, it's not.
22     Q.  Then it begs the question why you're not
23 looking for better employment.
24     A.  Because I should be getting child support.
25     Q.  And if you got child support, together

16

DIANE R. MARKHAM - BY MR. MOTT
2 with your income, that would be sufficient to pay your
3 bills?
4     A.  One would hope.
5     Q.  Are you asking the Court to award you
6 maintenance, as well?
7     A.  Perhaps, I haven't decided that yet.
8     Q.  I see.  You heard your husband, Michael,
9 testify that he paid maintenance and child support
10 through September of 2016?
11     A.  I heard that.
12     Q.  Is that accurate?
13     A.  No.
14     Q.  When do you say he stopped paying support?
15     A.  The last support maintenance check was
16 July of 2016.  Then he paid child support in August of
17 2016.  The checks that he sent -- the checks that he
18 sent over the summer were always cashier's checks.
19 The checks that he sent in September for the September
20 payment were on the bank account that was frozen, so
21 they didn't clear.
22     Q.  So he attempted to pay September
23 maintenance and child support; but, because the
24 account was frozen --
25     A.  Correct.

**17**

DIANE R. MARKHAM - BY MR. MOTT

2    Q.   You did get the checks?

3    A.   I did, but they were different than the

4 other checks, being cashier's checks.

5    Q.   The September support checks were received

6 by you but not cashable?

7    A.   Correct.

8    Q.   Because of the seizure?

9    A.   Correct.

10    Q.   Now, we're talking about Bank of Hawaii?

11    A.   No, they were ESL.

12    Q.   So this was an account solely in his name?

13    A.   I don't remember which account he wrote

14 the checks from. There's two accounts. I have copies

15 of them at home.

16    Q.   Okay. While we're on the topic, you're

17 making reference to a seizure of two ES&L accounts?

18    A.   Well, one didn't have any money in it.

19    Q.   And these were accounts solely in your

20 husband's name?

21    A.   I believe so, but they were accounts that

22 were -- yeah, they weren't our joint accounts. They

23 were other accounts.

24    Q.   Can you tell me in what manner they were

25 seized?

**18**

DIANE R. MARKHAM - BY MR. MOTT

2    A.   We filed to have those frozen after he

3 emptied out the -- we discovered the attempting to

4 empty out the SEP IRA and the children's 529. We were

5 trying to capture that money before he -- we were just

6 trying to catch that money. We didn't file to have

7 them frozen until July or August when we --

8    Q.   Of 2016?

9    A.   Correct.

10    Q.   And this was through your then attorney,

11 Mark Bezinque?

12    A.   Correct.

13    Q.   And did he share the paperwork with you as

14 to how he went about seizing these accounts?

15    A.   I'm sure I have the e-mails.

16    Q.   Well, did he actually show you the legal

17 paper?

18    A.   I don't recall.

19    Q.   And the purpose of the seizure was to do

20 what?

21    A.   To try to stop him from taking all the

22 money.

23    Q.   You said that you thought that he was

24 going to take all the money from the ES&L accounts?

25    A.   No. I said that we began the process of

**19**

DIANE R. MARKHAM - BY MR. MOTT

2 freezing the ESL accounts upon learning that he had

3 tried to empty out the SEP IRA and had cashed out the

4 children's 529s. So we were trying to freeze the

5 money that he -- that Michael had withdrawn from those

6 accounts.

7    Q.   How did you find out about this alleged

8 attempt by Michael Markham to take the SEP IRA?

9    A.   I became -- I think I asked Mark to look

10 into it because I was concerned with the status of

11 things when he texted Rory and said he couldn't make

12 visitation because he'd moved to Hawaii.

13    Q.   How did Mark get access to your husband's

14 SEP IRA in the year 2016?

15    A.   I think we must have filed with Scottrade.

16 I don't remember the details of how that went down.

17    Q.   When did you file with Scottrade, a

18 subpoena?

19    A.   It would have been in July, when we were

20 looking to find out what was going on with the SEP

21 IRA.

22    Q.   Wasn't your husband current with the

23 support payments in July?

24    A.   Yes, he was.

25    Q.   So what was your concern if he was current

**20**

DIANE R. MARKHAM - BY MR. MOTT

2 with the support payments?

3    A.   I don't remember. He'd moved. He'd left

4 without telling anybody.

5    Q.   Yeah. What was your concern about support

6 payments if he was current?

7    A.   I don't recall what, exactly, initiated my

8 concern.

9    Q.   And you're telling me that your then

10 attorney found out through Scottrade that there was an

11 attempt by Michael Markham to withdraw SEP IRA money?

12    A.   Correct.

13    Q.   And did he --

14    A.   Well, I had already -- I'm sorry. I just

15 remembered I had already expressed concern over the

16 12,000 that he took out of the ESL back in January.

17    Q.   What did he do with that?

18    A.   I have no idea.

19    Q.   Did he pay Talbott?

20    A.   I don't know. He was supposed to pay

21 Talbott out of the SEP IRA money. He was given

22 permission to pay Talbott from the IRA funds. So I

23 don't remember.

24    Q.   Do you know what, if any, documents or

25 records your attorney, Mark Bezinque, received from

21

DIANE R. MARKHAM - BY MR. MOTT

2 Scottrade that support your claim that Michael Markham
3 attempted to liquidate that fund?
4     A.   We have the withdraw -- withdraw request
5 that he tried to withdraw 500 -- I forget the
6 amount -- $539,000 or whatever, the withdrawal. We
7 submitted that in the...
8     Q.   What we know is that there were
9 withdrawals made by you December 30th, 2016.
10    A.   Well, we have the checks that he got from
11 Scottrade, the canceled checks that he deposited into
12 a Bank of Hawaii account.  So we do know that he took
13 that money out of --
14    Q.   What I'm interested in knowing is, as of
15 July 2016, did your attorney have in his possession
16 documentation of an attempted withdrawal of SEP IRA
17 money by your husband?
18        MR. INGERSOLL:  If you know.
19    A.   I forget exactly when we received the
20 copies of the forms that he put in the withdrawal
21 requests.  I don't know when that happened.  I believe
22 it was in July.  I could go look at the e-mail in
23 my -- to find out.
24    Q.   And he was authorized in July of '16 to
25 withdraw certain monies to pay medical bills, was he

22

DIANE R. MARKHAM - BY MR. MOTT

2 not?
3     A.   Who are we talking about?
4     Q.   Your husband.
5     A.   Michael was authorized by two court orders
6 to take money out of the SEP IRAs:  One was to pay
7 Talbott; and one, to my recollection, was to help pay
8 for attorney's fees that he owed me at the time.
9     Q.   And those orders were prior to July 2016?
10    A.   Correct, yes.
11    Q.   And you're saying that, in July of 2016,
12 your then attorney obtained proof from Scottrade there
13 was an attempt to take out all the money from the SEP
14 IRA?
15    A.   I believe so, yes.  I believe that was in
16 July, July or August.
17    Q.   Even though he was current with his
18 support payments?
19    A.   I presume.
20    Q.   What does SEP IRA have to do with support
21 payments?
22    A.   I don't -- I don't -- I don't know the
23 answer to this, details of what --
24        MR. INGERSOLL:  That's a perfectly valid
25 way to answer.

23

DIANE R. MARKHAM - BY MR. MOTT

2     A.   This was Mark.  I was desperately trying
3 to make things work.
4     Q.   What do you mean?
5     A.   I was just trying to get divorced.
6     Q.   So you thought that seizing the ESL
7 accounts, which was the source of payments of support
8 to you, would be a way to get divorced?
9     A.   Is that a question?
10    Q.   Yeah.
11    A.   No.  I thought seizing the ESL accounts
12 would prevent Michael from making off with the bulk of
13 the SEP IRA money that he withdrew and the children's
14 529s.
15    Q.   When did he withdraw money from the SEP
16 IRA?
17    A.   Which time?
18    Q.   Well, how many withdrawals are you aware
19 of?
20    A.   Three or four.
21    Q.   From the SEP IRA?
22    A.   Correct.
23    Q.   How many were prior to July of 2016?
24    A.   Two or three.  I don't remember if there
25 was two or three.

24

DIANE R. MARKHAM - BY MR. MOTT

2     Q.   And do you know whether or not those
3 withdrawals were authorized by a court order?
4     A.   I believe the ones to pay Talbott were.
5     Q.   And prior to July of 2016, were SEP IRA
6 funds used to pay your support payments, if you know?
7     A.   I have no idea.
8     Q.   Were you getting checks prior to July
9 2016?
10    A.   I received checks in February, March,
11 April, February through August.
12    Q.   2016?
13    A.   2016.
14    Q.   What bank accounts were they drawn upon?
15    A.   They were on cashier's checks.
16    Q.   Do you know whether or not your then
17 attorney put Michael Markham's attorney on notice of
18 the seizure of the ESL accounts?
19    A.   I don't remember.
20    Q.   Did you get copies of the papers, the
21 seizure papers?
22    A.   I don't remember.
23    Q.   Will you give me permission to speak with
24 your attorney under oath, your former attorney, Mark
25 Bezinque?

---

**25**

DIANE R. MARKHAM - BY MR. MOTT

2  You have an attorney-client privilege with
3 Mark Bezinque. I'm asking you if you'll waive your
4 privilege, because I want to question him under oath.
5 Will you do so?
6  MR. INGERSOLL: Are you commencing a
7 proceeding against Mr. Bezinque?
8  MR. MOTT: No.
9  Q. What I'm going to do is call him as a
10 nonparty witness in this proceeding, if you'll give me
11 permission to question him. Because you have an
12 attorney-client privilege, only you can waive that.
13  I'm asking you to waive it, because no one
14 has been able to answer any of these questions,
15 including you.
16  MR. INGERSOLL: Give her time to think
17 about this. Let me talk to her about it.
18  So the answer would be not at present.
19  A. Not at present.
20  Q. But at some point in time, you will
21 respond to me one way or another?
22  A. Sure.
23  Q. Thank you. Sooner than later would be
24 good.
25  With respect to the seizure, do you know

---

**26**

DIANE R. MARKHAM - BY MR. MOTT

2 how much he seized, Mark Bezinque seized?
3  A. From the ESL accounts?
4  Q. Yes.
5  A. I accounted for that in the paperwork you
6 received.
7  Q. You did. It's about $18,000?
8  A. Yes.
9  Q. And my understanding is that he kept it.
10  A. He kept -- he gave me some of it because I
11 needed it.
12  Q. Because support payments had stopped?
13  A. Yeah. Well, it was -- I don't remember
14 what it was.
15  Q. Let me ask you this: He gave you a
16 certain -- you did give me the paperwork --
17  A. I asked him to give me some of the money;
18 though, he was entitled to keep all of it.
19  Q. For attorney's fees?
20  A. Correct.
21  Q. He was entitled to keep every dollar
22 seized, 18,000-odd dollars for his attorney's fees
23 through July of -- or about July --
24  A. Well, it was more than 18, the total
25 amount.

---

**27**

DIANE R. MARKHAM - BY MR. MOTT

2  Q. His attorney's fees or the amount seized?
3  A. The amount seized.
4  Q. And he was entitled to keep all of it for
5 attorney's fees?
6  A. Yeah, because I owed him more than what
7 was seized.
8  Q. And how much did he give you --
9  A. $10,000.
10  Q. And did you give -- strike that.
11  How did you understand the $10,000 to be
12 treated, as child support, maintenance or both?
13  A. Neither.
14  Q. What was it -- why did he -- he gave you
15 $10,000 because you asked for it?
16  A. Because I needed it to live.
17  Q. Right. You weren't getting support checks
18 from Michael Markham anymore; correct?
19  A. Correct.
20  Q. So did you accept the 10,000 in lieu of
21 support checks?
22  A. No.
23  Q. Well, what did you accept it as, just a
24 gift?
25  A. That wasn't made clear.

---

**28**

DIANE R. MARKHAM - BY MR. MOTT

2  Q. It wasn't made clear. Do you know if your
3 attorney, put Jonathan Trotto, who's still counsel of
4 record, on notice of this 10,000 --
5  A. Jonathan Trotto was not on counsel of
6 record.
7  Q. July 2016, he was.
8  A. No, I didn't get -- the money from the ESL
9 accounts, I didn't get until...
10  Q. Fall of '16?
11  A. No.
12  Q. When?
13  A. I have that. Where's my chart?
14  Q. Okay. Well, let me ask you this: Was
15 the --
16  MR. INGERSOLL: If you don't know, just
17 say you don't know.
18  A. I don't know. It was way after that.
19  Q. Was it after -- let me rephrase. Was it
20 during the year 2016?
21  A. No, I don't believe so.
22  Q. It was in 2017?
23  A. Correct.
24  Q. After the default inquest?
25  A. Correct.

29

DIANE R. MARKHAM - BY MR. MOTT
2    Q.  Okay.  When did the Bank of Hawaii seizure
3  take place?
4    A.  You mean like when were they frozen?
5    Q.  Yeah.  Well, frozen -- did you receive any
6  money from Bank of Hawaii?
7    A.  The only money I received from Bank of
8  Hawaii -- I haven't received any money from Bank of
9  Hawaii.  That check is --
10       MR. INGERSOLL:  Currently in my trust
11  account.
12    Q.  Correct.  And originally that check was
13  written to Mark Bezinque?
14    A.  Correct.
15    Q.  And that's about 14,000?
16       MR. INGERSOLL:  Yes, sir.
17    Q.  Do you know what year that seizure took
18  place?
19    A.  The check just came through in September
20  or October.
21    Q.  Of 2017?
22    A.  Correct.
23    Q.  Okay.  And do you know if that was
24  pursuant to an order of the Court?
25    A.  It was pursuant to the judgment.

30

DIANE R. MARKHAM - BY MR. MOTT
2    Q.  The default judgment?
3    A.  Yes.
4    Q.  And do you know what that was for, what it
5  was supposed to be used for?
6    A.  No.
7    Q.  It was never paid to you, though, was it?
8    A.  No.
9    Q.  In the year 2016, did you obtain funds
10  from Michael Markham's SEP IRA?
11    A.  No -- well, the funds were transferred to
12  my account that I had already there at the end, I
13  guess, the end of the year.  Scottrade --
14       MR. INGERSOLL:  What year?
15       THE WITNESS:  2016.
16    Q.  On or about December 30th?
17    A.  Correct.
18    Q.  How much was that?
19    A.  210.
20    Q.  And do you know if there was a court order
21  directing that transfer?
22    A.  Scottrade did that based on the judgment
23  of divorce.  That's my understanding.  Because the
24  judgment of divorce was signed on December 22nd.
25    Q.  And then there was an amended judgment of

31

DIANE R. MARKHAM - BY MR. MOTT
2  divorce after that, wasn't there?
3    A.  There was because the kids' date of birth
4  weren't -- the only reason it was amended was for the
5  date of births to be put in so I could file with child
6  support collection unit.
7    Q.  Are you currently -- do you currently have
8  an account at CSCU?
9    A.  No.
10    Q.  So you never did file?
11    A.  They closed it when the judgment of
12  divorce was vacated.
13    Q.  Okay.  But there had been an account?
14    A.  Yeah.
15    Q.  Okay.  Can you tell me, from September 1,
16  2012, to September 1, 2015, in chronological order
17  where you lived starting September 1, 2012?
18    A.  In September of 2012, I lived at South
19  Landing Road.
20    Q.  With whom?
21    A.  My family.
22    Q.  Okay.  And how long did you live there?
23    A.  We had lived there for probably around
24  eight years.
25    Q.  From September 1, 2012, until when?

32

DIANE R. MARKHAM - BY MR. MOTT
2    A.  We decided to pursue this part-time Hawaii
3  thing, and we moved to a rental property in May of
4  2014.
5       MR. INGERSOLL:  Rental property where?
6       THE WITNESS:  36 Darwin Street.
7    Q.  So South Landing was sold?
8    A.  It was on the market.
9    Q.  When did you sell it?
10    A.  Not until 2015.  Took a year.
11    Q.  And was that property titled in joint
12  names?
13    A.  No, it was in his name.
14    Q.  Did you object to the sale of South
15  Landing?
16    A.  No.
17    Q.  And what happened to the sale proceeds of
18  South Landing?
19    A.  What Michael said, we put money towards
20  the property in Paia and got things squared away.
21    Q.  Did you pay any bills or debts here?
22    A.  I presume, yeah.  I don't remember,
23  exactly, the breakdown of the finances.
24    Q.  And then you moved to 36 Darwin Street, a
25  rental?

---

**33**

DIANE R. MARKHAM - BY MR. MOTT

1
2    A.   Correct.
3         MR. INGERSOLL:   When was that?
4         THE WITNESS:   In May.
5    Q.   Of 2014?
6    A.   May or June of 2014.
7    Q.   Okay.
8    A.   June, actually.  I think it was June 1st.
9    Q.   Family's intact, everyone's there;
10   correct?
11   A.   Correct.
12   Q.   And how long did you live at 36 Darwin
13   Street?
14   A.   Well, we had -- we rented that even when
15   we were in Hawaii.  We were in Hawaii from September
16   of '14 to December of '14.  We still had the house
17   in -- you know, on Darwin Street, but we were in
18   Hawaii for those three months.
19   Q.   Prior to moving from South Landing to
20   Darwin Street, did you and your husband come up with a
21   residential plan?
22   A.   There was -- we were moving forward with
23   pursuing this Hawaii thing, and nothing was set in
24   stone.  It was kind of a "let's try it."  It was to be
25   three months at a time, initially.

---

**34**

DIANE R. MARKHAM - BY MR. MOTT

1
2    Q.   So initially, it was to be three months in
3    New York, three months in Hawaii --
4    A.   Correct.
5    Q.   -- three months in New York, et cetera, et
6    cetera?
7    A.   Correct.
8    Q.   And where did the children go to school?
9    A.   We homeschool.
10   Q.   And you heard Michael testify that there
11   was a purchase of property in the LLC with Vito
12   Potenza in Hawaii; correct?
13   A.   Yes.
14   Q.   And you knew about that?
15   A.   I did.
16   Q.   And that was part of the plan, was it not?
17   A.   Correct.
18   Q.   And that was to function as a home office?
19   A.   It was to function as a place for us to
20   live when we were in Hawaii.
21   Q.   And was Michael to practice out of that
22   location, as well?
23   A.   He was to practice at a surgical center,
24   yes.
25   Q.   And so, when you -- from September 2014

---

**35**

DIANE R. MARKHAM - BY MR. MOTT

1
2    forward, you lived three months in Hawaii and three
3    months in New York?
4    A.   No, we only ended up going to Hawaii
5    twice.
6    Q.   When was that?
7    A.   We were in Hawaii from September of 2014
8    to December of 2014.  And then we were in -- the kids
9    and I were in Hawaii from May of 2015 to August of
10   2015.  That was the only time we lived in Hawaii.
11   Q.   And you filed for divorce on September 1,
12   2015?
13   A.   I did.
14   Q.   Did you advise the Court in any way, shape
15   or form that you had resided with your children in
16   Hawaii from May through August 2015?
17   A.   I did not.
18   Q.   Have you -- did you file what's called a
19   custody -- an "affidavit of custody information,"
20   advising the divorce court as to the periods of
21   residency of your children for the prior three years?
22   A.   I did not.
23   Q.   Did you testify to the residency of your
24   children at the default inquest as to where they lived
25   during the prior three years leading up to

---

**36**

DIANE R. MARKHAM - BY MR. MOTT

1
2    September 1, 2015?
3    A.   I don't recall.
4    Q.   Did you testify to anything at the default
5    inquest?
6    A.   I did testify.
7         MR. INGERSOLL:   Off the record for a
8    second.
9         (There was a discussion off the record.)
10   Q.   And you were in Hawaii through August of
11   2015 and -- and --
12   A.   We came home on the 5th of August.
13   Q.   The 5th of August, and did not return to
14   Hawaii again?
15   A.   No.
16   Q.   Did you make any application or attempt to
17   qualify yourself as a Hawaiian resident?
18   A.   We pursued receiving the Hawaiian
19   residency so we could get discounts at restaurants,
20   was the only reason we did the residency thing.
21   Q.   Discount at restaurants?
22   A.   Yeah.
23   Q.   And how do you apply for Hawaiian
24   residency?
25   A.   There was a whole -- you had to provide

---

---

**37**

DIANE R. MARKHAM - BY MR. MOTT

1  DIANE R. MARKHAM - BY MR. MOTT
2  your social security number and prove where you lived.
3  You had to claim you were going to be there half the
4  year; though it was understood to be the defendant, or by
5  Michael and I that, you know, we weren't sure,
6  exactly, if we'd be there half the year.
7      Q.  You weren't sure?
8      A.  No.  It was still very much in the
9  infancy, the Hawaii thing.  Like I said, we only went
10 two times.
11     Q.  Was the plan to eventually increase the
12 length of --
13     A.  There was no plan, because it was after
14 the first time we there that he was fired -- or, you
15 know, let go at the hospital.
16     Q.  When did you apply for your Hawaiian
17 residency?
18     A.  I don't remember.
19     Q.  Was it during the period May through
20 August 2015?
21     A.  I'm not sure if it was the first time or
22 the second time.
23     Q.  And did you fill out a form and --
24     A.  Yep.
25     Q.  And did you represent to the state of

---

**38**

1  DIANE R. MARKHAM - BY MR. MOTT
2  Hawaii that you would be there six months or more
3  every year?
4      A.  I do believe that that's what we were
5  intending to say, yeah.
6      Q.  Did you qualify for your Hawaiian
7  residency?
8      A.  I did, yeah.
9      Q.  And in turn, did you make any effort to
10 qualify your children as Hawaiian residents?
11     A.  I do believe we got the boys their
12 residencies; but Rory's, we never did.
13     Q.  Because?
14     A.  We didn't have the proper paperwork.
15     Q.  Did Michael --
16     A.  She was -- there was different rules for
17 her age that -- what you needed.
18     Q.  I see.  How about Michael?  Did he get his
19 Hawaiian residency?
20     A.  I believe so.
21     Q.  Did you make a note to the divorce court
22 that you had obtained Hawaiian residency?
23     A.  No, because the residency was for
24 discounts.
25     Q.  Did you get a card?

---

**39**

1  DIANE R. MARKHAM - BY MR. MOTT
2      A.  Yeah.
3      Q.  And what did it say on the card?
4      A.  I don't remember.
5      Q.  Do you still have your Hawaiian residency?
6      A.  No, I don't.
7      Q.  What did you do with it?
8      A.  I think I threw it away.  It was to get
9  discounts at restaurants.
10     Q.  I understand.  I heard you three times --
11     A.  It wasn't like we were --
12     Q.  I get it.  I heard what you said.
13     A.  It was kind of fun to have.
14     Q.  Yeah.  I get it.  But it said you were an
15 official Hawaiian resident, did it not?
16     A.  Yeah.
17     Q.  Yeah.  And it had your photo ID on it?
18     A.  Yeah.
19     Q.  So you had it, Michael had one, and the
20 two oldest children?
21     A.  I believe so, yeah.
22     Q.  When the lawsuit for divorce started, was
23 Michael residing with you?
24     A.  Yes.
25     Q.  And how long -- where were you residing

---

**40**

1  DIANE R. MARKHAM - BY MR. MOTT
2  together?
3      A.  We were on Darwin Street.
4      Q.  On September 1, 2015, you were at Darwin
5  Street?
6      A.  Yep.
7      Q.  And this is a half a house?
8      A.  Correct.
9      Q.  The children, of course, were there;
10 right?
11     A.  Yep.  Yes.
12     Q.  Did there come a time when Michael was
13 ordered out of Darwin Street?
14     A.  Yes.
15     Q.  Do you remember when that was?
16     A.  It was in December of 2015.
17     Q.  And do you know how that came about?
18     A.  The children had, you know, been
19 expressing to their law -- their AFC the extreme
20 discomfort of having us in the same house and that it
21 was a toxic environment for them to live in.
22     Q.  And was there any physical violence?
23     A.  There was no physical violence, no.
24     Q.  Was there any threats of violence?
25     A.  Not physical, no.

---

41

DIANE R. MARKHAM - BY MR. MOTT

2  Q.   So you say that Michael was excluded from
3  Darwin Street in December of 2015?
4      A.   Yep.
5      Q.   Was that by court order?
6      A.   Correct.
7      Q.   Was there an order of protection?
8      A.   I'm not sure.
9      Q.   Was there a hearing in court?
10     A.   I don't remember.
11         MR. INGERSOLL:  Did you testify?
12         THE WITNESS:  No, I -- I think it was the
13  AFC.  It was Lisa and the kids.
14     Q.   Do you know if Judge Fisher, who had the
15  case at the time, issued an order ordering Michael out
16  of the house before a court appearance?
17     A.   I don't remember.
18     Q.   But you do recall there was no testimony
19  given in court at any time by you or Michael?
20     A.   I don't remember.
21     Q.   And did Michael have someplace to live in
22  New York State?
23     A.   He could stay with his mother.
24     Q.   And where does she live?
25     A.   In Brockport.

42

DIANE R. MARKHAM - BY MR. MOTT

2      Q.   Do you know if he did?
3      A.   I don't know what he did for a fact.
4      Q.   Did he have visitation?
5      A.   He did.
6      Q.   Did he exercise it?
7      A.   He did.
8      Q.   And did there come a time when his
9  visitation was terminated also?
10     A.   There was a time where it was terminated
11  with Rowan.
12     Q.   Anyone else?
13     A.   No, it was never terminated with Rory.  He
14  left.
15     Q.   Was there a time when Judge Fisher issued
16  a no contact order between Michael and all the
17  children?
18     A.   There was.
19     Q.   When was that?
20     A.   I think with the judgment of divorce.
21     Q.   But not prior to the judgment?
22     A.   I can't say for certain.  There was a lot
23  of documents flying back and forth.  I wouldn't be
24  able to say for sure.
25     Q.   Let me ask you a very general question.

43

DIANE R. MARKHAM - BY MR. MOTT

2  Did you ever testify in open court?
3      A.   I did.
4      Q.   When?
5      A.   At the judgment of divorce.
6      Q.   The default inquest?
7      A.   At default trial.
8      Q.   November of 2016?
9      A.   Correct.
10     Q.   And Mark Bezinque was your attorney?
11     A.   Correct.
12     Q.   Judge Fisher was the judge in charge of
13  the case?
14     A.   Correct.
15     Q.   And Michael Markham was not there and no
16  attorney was there for him?
17     A.   Correct.
18     Q.   Okay.  Was there ever any other time that
19  you can recall that you were asked to testify other
20  than the default inquest?
21     A.   No.  I know the kids testified to the
22  judge.  The kids did on camera.
23     Q.   How was Michael's medical school education
24  paid for?  Did somebody give him money, his mother
25  or --

44

DIANE R. MARKHAM - BY MR. MOTT

2      A.   No.
3      Q.   Did you pay for it?
4      A.   There was loans.
5      Q.   Loans?
6      A.   But we paid them back.
7      Q.   Did Michael pay the loans back with his
8  earnings?
9      A.   Well, I wasn't working, so the family's
10  earnings paid back his medical school.
11     Q.   Otherwise known as Michael's salary; fair
12  to say?
13         MR. INGERSOLL:  It is what it is.
14     A.   I guess since I wasn't paid for my job,
15  yes.
16     Q.   Right.  Prior to September 1, 2015, did
17  Michael Markham participate in any activities with any
18  of the children?
19     A.   Prior to September of 2015?
20     Q.   Yes.
21     A.   In general?  No.
22     Q.   No?
23     A.   No.
24     Q.   What kind of activities, prior to
25  September 1, 2015, did your three children participate

---

45

1              DIANE R. MARKHAM - BY MR. MOTT
2   in?
3        A.   Well, they're homeschooled; and Rowan
4   played tennis; and Rory at the time, I believe, was
5   doing Irish dance and gymnastics. I mean, it changes.
6   The kids' activities change throughout a period of
7   time. You're talking about a lengthy period of time
8   there, prior to 2015.
9        Q.   Bicycle trips?
10       A.   There were occasional bicycle trips, yes.
11       Q.   Did Michael participate?
12       A.   Yes, that was probably the only time that
13  he really spent time with the kids, was on the bicycle
14  trips, once a year.
15       Q.   Prior to --
16       A.   Not every year, but...
17       Q.   Okay. Did Michael work long hours?
18       A.   Yes.
19       Q.   Did he work weekends?
20       A.   Yes.
21       Q.   Nights?
22       A.   Yes.
23       Q.   How many hours during weekdays did he
24  work?
25       A.   I couldn't say for sure, anywhere between

---

46

1              DIANE R. MARKHAM - BY MR. MOTT
2   40 and 70.
3        Q.   And prior to this whole divorce thing, how
4   would you describe Michael's relationship with his
5   three children?
6        A.   That's a hard thing to summarize.
7        Q.   Well, did they love him?
8        A.   That's a hard --
9        Q.   I know it's a subjective --
10       A.   Yeah.
11       Q.   Did they express love to their father?
12       A.   He was there. You know, they knew he
13  worked hard so we could be where we were. But their
14  relationship -- each kid's different.
15       Q.   Did Michael --
16       A.   He wasn't home much to have much of a
17  relationship with the kids.
18       Q.   Because of his job hours?
19       A.   Correct, and because of his choice to work
20  as much as he did.
21       Q.   It was his choice to work as much? Did
22  you encourage him to work less?
23       A.   Yes, frequently.
24       Q.   Then you would have less money to live on;
25  right?

---

47

1              DIANE R. MARKHAM - BY MR. MOTT
2        A.   I didn't even want to move to the house on
3   South Landing. I wanted to stay at our small house in
4   Brockport.
5        Q.   Did Michael express love and affection for
6   his children when he was around?
7        A.   Sometimes.
8        Q.   Would you say he was a good father?
9        A.   No.
10       Q.   Why not?
11       A.   Because he was disengaged, at least for
12  the last 10 years.
13       Q.   Disengaged in the sense of --
14       A.   When he was home, he just was -- he'd eat
15  dinner sometimes with us, and then he'd be in his
16  room. He was rarely a part of the family, except on
17  those bike trips.
18       Q.   Take vacations as a family?
19       A.   We did take some vacations as a family,
20  yes.
21       Q.   Did Michael participate in the
22  homeschooling at all?
23       A.   Not really, no.
24       Q.   How did the children like living in Hawaii
25  part of the time?

---

48

1              DIANE R. MARKHAM - BY MR. MOTT
2        A.   Some of them liked it, some of them did
3   not like it.
4        Q.   With respect to Aidan's college education,
5   you heard Michael testify that both of you paid for
6   your own college educations. Is that accurate?
7        A.   Well, my parents helped me some, but yeah.
8        Q.   Did you and Michael agree that Aidan
9   should pay for his college?
10       A.   No.
11       Q.   No? Did you think you and Michael should
12  pay for it?
13       A.   My feeling on it was that we should
14  offer -- we should be able to pay for at least half of
15  it.
16       Q.   And was -- were 529 funds used for Aidan's
17  education?
18       A.   The first year.
19       Q.   How much was that?
20       A.   Around 40,000.
21       Q.   And you heard Michael testify that Aidan
22  had a full ride to Utah?
23       A.   That's not true.
24       Q.   That's not true? Did he have any offer
25  from Utah?

---

---

**49**

DIANE R. MARKHAM - BY MR. MOTT

A.   No.  I mean, he was accepted at Utah.
Their tuition's much cheaper.  It's a state school.

Q.   So he was not offered any scholarship to
your knowledge?

A.   No, because we -- no.  Scholarships aren't
really determined until after you accept, and then --
so no.

Q.   But it was a lot cheaper than RIT?

A.   It was, and we were -- and part of the
discussion was it was cheaper tuition, but the
transporting back and forth would have potentially
eaten up the difference in savings.

Q.   Did you and Michael agree that everything
over the cost of a SUNY education should be borne by
Aidan?

A.   I don't recall there being such a specific
description of any agreement.

Q.   In your net worth statement, you have a
small retirement fund?

A.   There was $4,000 in my retirement fund
because we only funded his.

Q.   Yeah.  Okay.  It's an IRA; correct?

A.   It was.

Q.   Is it used up?

---

**50**

DIANE R. MARKHAM - BY MR. MOTT

A.   It's — I transferred it into the account
that I put the other money that I got in from the SEP
IRA.

Q.   What account is that?

A.   It's a new account.  I opened a new IRA in
a different --

Q.   Oh.  So you still have an IRA?

A.   I do.

Q.   How much is there now?

A.   About 140.

Q.   Thousand?

A.   Yeah.

Q.   And that includes some of Michael's SEP --
how much of that comes from your prior IRA?

A.   Four.

Q.   Okay.  And that's at Scottrade; right?

A.   No, it's not anymore at Scottrade.

Q.   Where is it?

A.   I'd have to look at the statement to know
the name of the bank.

Q.   Do you draw upon it?

A.   I have, yeah.

Q.   During the year 2017, how much have you
drawn out?

---

**51**

DIANE R. MARKHAM - BY MR. MOTT

A.   50 to $60,000.

Q.   How about during -- well, you didn't draw
anything out in 2016.
          And what did you do with the 50 to
$60,000?

A.   I paid attorneys and used it as living
expenses.

Q.   How much did you pay for attorney's fees?

A.   Without looking at my chart, I couldn't
say, exactly.

Q.   More than 20?

A.   Yes.

Q.   More than 30, if you know?

A.   I don't know, exactly.

Q.   Would you provide me with some
documentation?

A.   I did.  I mean I have that.  That was in
the stuff I sent.

Q.   So that's all --

          MR. INGERSOLL:  I think my retainer
agreement is attached to the statement of net worth.

          MR. MOTT:  Yeah.  I'm just asking her how
much of that was SEP IRA money.

Q.   Have you received any other money from

---

**52**

DIANE R. MARKHAM - BY MR. MOTT

anyone else during the year 2017?

A.   I'm trying to remember if anybody's loaned
me money.  I got some loans from friends for starting
up the business, but I -- exactly when that came in,
without looking at my bank statements, it's hard to
remember, exactly.

Q.   So you got some startup money from friends
in the form of loans?

A.   Friends gave me money.

Q.   Gift?

A.   Not clearly established.  To be paid back,
if I can.

Q.   Anything in writing?

A.   No.

Q.   How much did your friends give you?

A.   Over just in 2017?

Q.   Yes.

A.   Maybe $5,000.

Q.   Was that used for your business?

A.   Yeah.

Q.   How about in 2016?  Anyone give you money?

A.   Yeah, I had lots of people giving me
money.

Q.   How much?

53

DIANE R. MARKHAM - BY MR. MOTT
2  A.  I don't know.
3  Q.  More than 10?
4  A.  Probably.
5  Q.  Were these gifts?
6  A.  It was the understanding that, if I can
7  pay them back, I should and I will.
8  Q.  Any money in 2015?
9  A.  Yeah.
10  Q.  How much?
11  A.  I don't remember, exactly.
12  Q.  Same arrangement?
13  A.  Yes.
14  Q.  Did you pay income taxes on the money that
15  you withdrew from Michael's SEP IRA in December of
16  2016?
17  A.  Yeah, I presume I did.
18  Q.  And where did you --
19  A.  You have a copy of my taxes.
20  Q.  Yeah.  And where did you get the money for
21  the taxes?
22  A.  I was given large -- my refund covered
23  anything I owed.
24  Q.  Your refund covered everything you owed?
25  A.  Well, I didn't pay taxes on anything that

54

DIANE R. MARKHAM - BY MR. MOTT
2  went right into the IRA, though.  Is that what you're
3  asking?
4  Q.  Well, to the extent you took money out.
5  A.  Oh.  Yeah.  You mean this year?
6  Q.  Well, 20 -- yeah.
7  A.  I only got that, yeah.
8  Q.  That was the direct transfer from one IRA
9  to another?
10  A.  Correct.
11  MR. INGERSOLL:  Just to be clear, you said
12  2015 the first time.  That's why she said "no."
13  MR. MOTT:  Thanks.
14  MR. INGERSOLL:  No problem.
15  Q.  Michael Markham was asked questions about
16  life insurance policies on your children's lives.  Are
17  you aware of any policies on the children's lives?
18  A.  Yeah, we had life insurance policies on
19  all three children.
20  Q.  Do you know what the death benefit was?
21  A.  He handled that.
22  Q.  Do you know the name of the company?
23  A.  Northwestern Mutual, David Urban was
24  the...
25  Q.  Do you know if these policies still exist?

55

DIANE R. MARKHAM - BY MR. MOTT
2  A.  I don't know.  He won't talk to me.  He
3  won't will give me no information, Dave Urban, because
4  all the accounts are in Michael's name.  So I know
5  nothing about them.
6  Q.  Same thing with respect to the Guardian
7  policies that he testified to, the policies on
8  Michael's life?
9  A.  Yeah.  Yeah.  My name's not on any of that
10  stuff, so I can't get any of that information.
11  MR. INGERSOLL:  Perhaps you can, Mr. Mott.
12  MR. MOTT:  Perhaps.
13  MR. INGERSOLL:  That will be helpful.
14  Q.  Do you know if Michael Markham paid some
15  amount of attorney's fees to Mark Bezinque?
16  A.  He did not pay any attorney's fees to Mark
17  Bezinque.
18  Q.  None?
19  A.  None.  I mean, the money Mark Bezinque
20  received was from joint checking accounts that I paid
21  Mark Bezinque with a check.
22  Q.  ESL?
23  A.  Yeah.
24  Q.  And what was the source of the funds at
25  ESL --

56

DIANE R. MARKHAM - BY MR. MOTT
2  A.  Our marital funds.
3  Q.  Well, would that have been Michael's
4  earnings?
5  A.  I guess so.
6  Q.  So Michael put his earnings into a joint
7  ESL account; correct?
8  A.  Well, at that point, he wasn't even making
9  any earnings.  It was disability money or whatever we
10  had left from savings.
11  Q.  I'm just trying to figure out --
12  A.  I mean, it's money, the content of those
13  accounts.
14  Q.  Prior to September 1, 2015, you hired Mark
15  Bezinque?
16  A.  Right.
17  Q.  And he asked for a retainer fee of how
18  much?
19  A.  The retainer fee was paid with money I
20  borrowed from my brother-in-law.
21  Q.  How much was it?
22  A.  $5,000.
23  Q.  Do you have a promissory note or some
24  document indicating you owe your brother?
25  A.  No.

---

**57**

DIANE R. MARKHAM - BY MR. MOTT

2    Q.  And subsequent to that initial retainer
3 payment that you got, whatever, from your brother, did
4 you make any other payments, you, to Mark Bezinque's
5 business for his attorney's fees?
6    A.  I did.
7    Q.  How many?
8    A.  I don't remember exactly without looking.
9    Q.  And you wrote the checks -- and these were
10 checks, no doubt?
11    A.  Correct.
12    Q.  From joint ES&L account?
13    A.  I believe so.
14    Q.  In the year 2015?
15    A.  Yes, I believe so.
16    Q.  In the year 2016?
17    A.  No.  No, because -- yeah, no.
18    Q.  And the source of funds, was Michael's
19 disability payments going into that joint account?
20    A.  Whatever was the money, the source of the
21 funds from the money.  It would have been leftover
22 savings, would have been -- I can't say, exactly,
23 where the money came from the joint accounts.
24    Q.  Well, where could it have come from?
25    A.  We'd mortgaged money on the house in

---

**58**

DIANE R. MARKHAM - BY MR. MOTT

2 Hawaii, so there was funds from that.  So I don't
3 know.
4    Q.  What do you mean you mortgaged money on
5 the house?
6    A.  When we bought the house in Paia, the
7 Hoku Place, the mortgage that was taken out on that,
8 we received money from that mortgage.  And the details
9 of how that was all -- I didn't have anything to do
10 with that.
11    Q.  Do you have any idea of how much?
12    A.  No.
13    Q.  And you're saying that mortgage money from
14 the Hawaiian purchase of Hoku -- I think it's Hoku; is
15 that right?
16    A.  Hoku, yeah.
17    Q.  -- was in part deposited into an ESL joint
18 savings account?
19    A.  I don't remember, exactly, what happened
20 with the money.
21    Q.  So in addition to whatever you paid Mark
22 Bezinque, Mark Bezinque also kept the lion's share of
23 the seizer funds?
24    A.  Yeah, because I owed him.
25    Q.  Do you know when your husband, Michael,

---

**59**

DIANE R. MARKHAM - BY MR. MOTT

2 was first diagnosed as disabled?
3    A.  Do I know exactly when?  No.
4    Q.  Do you know when he stopped working?
5    A.  In April of 2015, March or April.
6    Q.  And did you have a conversation with him
7 about why he stopped working?
8    A.  Yeah.
9    Q.  Can you tell me the substance of that
10 conversation?
11    A.  He said that his partners realized that he
12 had been stealing fentanyl, and he was injecting
13 himself with it.  So they gave him an opportunity to
14 go to rehab to take care of his drug addiction.
15    Q.  And did he?
16    A.  Yeah, he went to rehab.  I don't know if
17 he took care of his drug addiction.
18    Q.  And was that Talbott?
19    A.  Yes.
20    Q.  T-A-L-B-O-T [sic]?
21    A.  Correct.
22    Q.  And that's in Atlanta?
23    A.  Correct.
24    Q.  And how long was he there?
25    A.  He was there from April through July.

---

**60**

DIANE R. MARKHAM - BY MR. MOTT

2    Q.  Of 2015?
3    A.  Correct.
4    Q.  And do you know when he began receiving
5 his disability checks?
6    A.  I believe it was in June of 2015.
7    Q.  And do you know what account those checks
8 were going into?
9    A.  To one of the ESL accounts.
10    Q.  In joint names?
11    A.  I don't remember.  There was a joint one
12 and there was one that was just in his name.
13    Q.  Did you ever speak to any of Michael's
14 doctors with respect to the diagnosis of his
15 disability?
16    A.  I had a conversation with one of his
17 doctors; though, I don't remember the person's name.
18    Q.  What were you told about his disability?
19    A.  I was told that he -- I was told that he
20 was -- had an extreme addiction to fentanyl, that it
21 took a very long time to wean him off the maintenance
22 drugs, and that he had severe anxiety and severe
23 depression, and there was narcissistic tendencies, is
24 what she told me.  It was a short conversation, maybe
25 a half an hour.  That was a long time ago.

---

**61**

```
1              DIANE R. MARKHAM - BY MR. MOTT
2      Q.   And when did he get out of Talbott?
3      A.   July 2015.
4      Q.   And then he returned to the family home,
5 Darwin Street?
6      A.   He did.  He went there, and then he flew
7 out to Hawaii.
8      Q.   You were in Hawaii?
9      A.   We were in Hawaii.
10     Q.   And you flew back together?
11     A.   No.
12     Q.   Separately?
13     A.   Yes.
14     Q.   And you came back early August?
15     A.   Yes.
16     Q.   And then he came back when?
17     A.   Before us.
18     Q.   Late July?
19     A.   Something like that.
20     Q.   So he's released from Talbott; he flies to
21 Hawaii in July?
22     A.   He went to Rochester, and then he flew to
23 Hawaii.
24     Q.   Okay.  All right.  And then you filed for
25 divorce September 1, 2015?
```

**62**

```
1              DIANE R. MARKHAM - BY MR. MOTT
2      A.   Correct.
3      Q.   Did you discuss with Michael prior to
4 filing that you were going to file for divorce?
5      A.   Yes, we had conversations about...
6      Q.   Did you discuss with Michael any
7 arrangements the two of you might agree upon with
8 respect to your children?
9      A.   No, there was really not much discussing
10 anything with him at that point.  He was extremely
11 erratic and volatile.
12     Q.   Have you discussed with your children any
13 aspects of this divorce case?
14     A.   Only in the effects that it affects them
15 as far as monetary, when I tell them we can't do stuff
16 because I can't afford it.
17     Q.   Well, have you discussed with your
18 children issues of child support?
19     A.   They know that -- I mean, Ed told them
20 that they're getting payment now.  I mean, define
21 when.
22     Q.   Starting September 1 through the time that
23 you -- through the end of December 2016.
24     A.   Uh-huh.
25     Q.   During that period of time, did you
```

**63**

```
1              DIANE R. MARKHAM - BY MR. MOTT
2 discuss child support payments with your children?
3      A.   No.
4      Q.   Did you discuss anything monetarily with
5 your children?
6      A.   No.
7      Q.   How do they know that you weren't getting
8 child support?
9      A.   Because we had to move.
10     Q.   And did you tell the children we had to
11 move because you weren't getting child support?
12     A.   I told the children we had to move because
13 I had no money.  We needed to find a cheaper place to
14 live.  What I was making didn't support us.
15     Q.   And did you mention the money that had
16 been seized from the accounts to your children?
17     A.   Not specifically.  The details of all
18 that, no, they don't know all the details.
19     Q.   Did you mention the money you got from the
20 SEP IRA to your children?
21     A.   I --
22          MR. INGERSOLL:  I think she answered she
23 didn't discuss the details with her children.
24     Q.   Did you tell the children there was a no
25 contact order after that was granted by Judge Fisher?
```

**64**

```
1              DIANE R. MARKHAM - BY MR. MOTT
2      A.   I think so, yeah.  I think they knew that.
3 It directly affected them.  So yeah, I would have told
4 them that.
5      Q.   During the period September -- strike
6 that.
7           During the period November -- strike that.
8           During the period September 1, 2015, and
9 December 30, 2016, did Michael make any attempt to
10 contact the children?
11     A.   Tell me the years again?
12     Q.   September 1, 2015, the day you started the
13 lawsuit for divorce, through December 31, 2016.
14     A.   Well, he had visitation.
15     Q.   Up until November of 2016, when you got a
16 no contact order; correct?
17     A.   No, he had visitation with the kids
18 through -- he had visitation with both kids through
19 March of 2016.  Then the visitation with Rowan was
20 ceased.  And then he continued visitation with Rory,
21 that he didn't follow through on because he moved back
22 to Hawaii.
23     Q.   Did Michael contact the children, e-mail,
24 text, phone, from September 2015 through December
25 2016?
```

---

65

DIANE R. MARKHAM - BY MR. MOTT

1
2    A.   Well, yeah.
3    Q.   Did he have contact with them?
4    A.   Yeah, he still had visitation during that
5    time period. You're talking about a year and a half;
6    right?
7    Q.   Right. Yeah.
8    A.   Okay. So while he still had visitation,
9    obviously, he was in communication with them. And he
10   had communication with Rory until she blocked him from
11   his phone -- her phone, when she received a text that
12   upset her from him.
13   Q.   Did you speak to Michael during that
14   period of time with respect to communications with the
15   children?
16   A.   No, our -- we -- no.
17   Q.   Did you have any correspondence or any
18   communications during that time?
19   A.   No, he was off the grid. He wasn't
20   communicating with anybody. Or I didn't even know
21   where he was living.
22   Q.   Did you encourage the children to contact
23   their father during that period of time?
24   A.   During which period of time?
25   Q.   September 1, '15, through December 31,

---

66

DIANE R. MARKHAM - BY MR. MOTT

1
2    '16.
3    A.   I encouraged the children to be in contact
4    with their father during their visitations.
5    Q.   Did Michael send any cards or gifts to the
6    children from September 1, 2015, through the present?
7    A.   Not to my house, not to where we were
8    living.
9    Q.   Well, to someplace else?
10   A.   He sent Valentine's Day cards to my oldest
11   child. But that was in February of 2017.
12   Q.   This year?
13   A.   Yes. So that was after the no contact
14   order.
15   Q.   He sent them where?
16   A.   To my oldest daughter's house.
17   Q.   Oldest daughter? Who's that?
18   A.   Analise. She's not his child.
19   Q.   Oh. That's from a prior marriage?
20   A.   Uh-huh.
21   Q.   And was it a card --     :
22   A.   I don't know. I didn't see them. She
23   took care of that. She opened them and decided that
24   it was not in the children's interest to move them
25   forward.

---

67

DIANE R. MARKHAM - BY MR. MOTT

1
2    Q.   So Analise did not forward them onto the
3    children?
4    A.   No, she did not. But there was a no
5    contact order at that time. According to her, it was
6    just cards and -- it was just a card, from what I
7    recall.
8    Q.   Do you have a leased vehicle?
9    A.   I do.
10   Q.   When did you lease it?
11   A.   In August of 2015.
12   Q.   And how many months?
13   A.   Three years, I think. I still have it.
14   Q.   Okay. What's the lease payment?        :
15   A.   265.
16   Q.   What kind of car is it?
17   A.   A Honda Accord.
18   Q.   Did you fill out an application for
19   obtaining the lease?
20   A.   Yeah, I guess. I don't -- I mean, it was
21   at Honda. There's really not an application. I mean,
22   I guess there is, but the guy does it for you.
23   Q.   And what did you tell them your income was
24   back then?
25   A.   My Wisteria income, and we were putting me

---

68

DIANE R. MARKHAM - BY MR. MOTT

1
2    as an employee of the Valley Isle. I don't know. We
3    fudged it, I gather. He was with me.
4    Q.   When was this?
5    A.   August of 2016 -- '15.
6    Q.   Okay. So right before the divorce action,
7    you and Michael went to the Honda dealership to lease
8    your vehicle?
9    A.   Right, because I didn't have a car at that
10   time. My leased vehicle was in an accident and was
11   totaled out, so I didn't have any transportation.
12   Q.   Do you recall what you put on your
13   application as the amount of your income?
14   A.   I don't remember. I have no recollection
15   of that.
16   Q.   But you claimed to be an employee of
17   Wisteria and Valley Isle?
18   A.   I forget, exactly. I couldn't say for
19   certain what I claimed as my income on that car.
20   Q.   Was it accurate?
21   A.   I doubt it.
22   Q.   At the time this lawsuit for divorce was
23   started, the assets were property in Hawaii; correct?
24   A.   Yes.
25   Q.   Your small IRA?

---

**Page 69**

```
1            DIANE R. MARKHAM - BY MR. MOTT
2      A.   Yes.
3      Q.   Michael's SEP IRA?
4      A.   Yes.
5      Q.   Anything else?
6      A.   The 529s.
7      Q.   Anything else?
8      A.   No.  There was the money at the ESL that
9   was probably less than -- I mean, there was money in
10  those accounts at the commencement of the divorce,
11  yes.
12     Q.   How much?
13     A.   I couldn't say for certain.
14     Q.   Less than 10,000?
15     A.   No, more than that.
16     Q.   Did you have any -- besides the Hawaiian
17  mortgage on the day the lawsuit started, was there any
18  other outstanding debts, credit card debts, personal
19  loans, home equity loans?
20     A.   No, I don't believe so.
21          MR. MOTT:  Thank you.
22          (TIME:  1:27 p.m.)
23               *    *    *
24
25
```

**Page 70**

```
1
2               W I T N E S S
3   Name      Examination by        Page
4   ----------------------------------------
5   Diane R. Markham Mr. Mott          4-69
6
                 *    *    *
7
8
```

**Page 71**

```
1
2               E X H I B I T S
3   Exhibit    Description      Marked
4   ----------------------------------------
5   EXH
6            (No Exhibits Marked)
             *    *    *
7
8        EXHIBITS PREVIOUSLY MARKED
9   Exhibit   Description       Page
10  ----------------------------------------
11  EXH
12       (No Previously Marked Exhibits Presented)
             *    *    *
```

**Page 72**

```
1
2         D O C U M E N T   R E Q U E S T S
3   Request                     Page
4   ----------------------------------------
5   Rory's earnings at ZHAD in 2017 (Mr. Mott) 8
6   2017 W-2s for ZHAG employees (Mr. Mott) 13
7   Diane Markham's social security statement of
    benefits (Mr. Mott)              14
8
9              *    *    *
10
11      C E R T I F I E D   Q U E S T I O N S
12  Question                    Page
13  ----------------------------------------
14
15         (No Certified Questions)
             *    *    *
```

73

```
1
2              C E R T I F I C A T I O N
    STATE OF NEW YORK:
3   COUNTY OF GENESEE:

4           I, LAUREN E. SHERWOOD, do hereby certify
5   that I reported in machine shorthand the above-styled
6   cause; and that the foregoing pages were typed by
7   computer-assisted transcription under my personal
8   supervision and constitute a true record of the
9   testimony in this proceeding;
10          I further certify that I am not an
11  attorney or counsel of any parties, nor a relative or
12  employee of any attorney or counsel connected with the
13  action, nor financially interested in the action;
14          WITNESS my hand in the City of Batavia,
15  County of Genesee, State of New York.
16
17
18
19

21  _____
    LAUREN E. SHERWOOD
22  Freelance Court Reporter and
    Notary Public No. 01SH6252644
23  in and for Genesee County, New York
24
25
```

# Exhibit K

## Vacated Judgements
## Of
## Kenneth Fisher

STATE OF NEW YORK
SUPREME COURT        COUNTY OF MONROE
_____

DIANE R. MARKHAM,

             Plaintiff,

             v.                                    NOTICE

                                          Index #2015/09826
MICHAEL D. MARKHAM,

             Defendant.
_____


        PLEASE TAKE NOTICE OF AN ORDER signed on December 20, 2016.

        Please file the original and serve opposing counsel.




                              KENNETH R. FISHER
                              JUSTICE SUPREME COURT



Original to:   Mark C. Bezinque, Esq.   (for filing)

Copy to:       Lisa B. Morris, Esq.

               Michael D. Markham, Pro Se
               415 Dairy Road, STE E-334
               Kahului, Hawaii 95732

STATE OF NEW YORK
SUPREME COURT      COUNTY OF MONROE

2016 DEC 23  PM 12: 24

DIANE R. MARKHAM,

                    Plaintiff,                    DECISION AND ORDER

          v.
                                                  Index #2015/09826
MICHAEL D. MARKHAM,

                    Defendant.

_____

     The motion to conform the pleadings to the proof, especially

to accommodate wife's request for sole custody, made in her

testimony at trial, is granted.  The request, made at the outset

of trial, to effectuate the preclusion order issued last

September, is denied as academic.  Defendant/husband defaulted in

his required appearance at the trial, and otherwise offered no

proof except via inadmissible unsigned and unsworn letters (with

attachments) submitted to the court.

     Divorce is granted in accordance with the complaint (Exhs.

#1 and #2).  Sole custody is awarded to plaintiff/wife.

Defendant has, effectively, abandoned his family, and moved to

Hawaii.  Plaintiff was the stay-at-home parent, was solely

responsible for home schooling the children, which she continues

to this day, was given deference (by defendant/husband until the

divorce action) in all child rearing decisions, was subject to

defendant's repeated barrage of insults after the divorce began

while in the presence of the children, and otherwise qualifies as

1

a good and fit parent.  Defendant, on the other hand, was rarely
at home before the divorce action, given his work and profession,
indulged in illicit drug use causing his license suspension,
emptied the vast bulk of the marital and 529 accounts leaving the
mother virtually pennyless (in relative terms), made all
communication with the plaintiff and children a source of extreme
angst and acrimony, only texts the children now, one of which
displayed a medical marijuana business logo (upsetting the
daughter greatly), and does not at all get along with the mother,
thus making an award of joint custody inappropriate.[1]  Janecka v.
Franklin, 143 A.D.2d 732, 732 (2d Dept. 1985)(acrimony which
undermines the parents' ability to cooperate in raising the child
may render joint custody unworkable).

     The court "[i]s required to consider the best interests of
the child by reviewing such factors as maintaining stability for
the child, . . . the home environment with each parent, each
parent's past performance, relative fitness, ability to guide and
provide for the child's overall well-being, and the willingness
of each parent to foster a relationship with the other
parent." Chilbert v. Soler, 77 A.D.3d 1405 (4th Dept.
2010)(quoting Kaczor v. Kaczor, 12 A.D.3d 956, 958 (3d Dept.
2004)). See generally, Matter of Goossen v. Goossen, 72 A.D.3d

_____

     [1] An incident during a beach visit in Hawaii while the
parties were still together clearly foreshadowed defendant's
current relationship with the mother.

2

1591 (4th Dept. 2010); <u>Fox v. Fox</u>, 177 A.D.2d 209, 210 (4th Dept. 1992).

Insofar as visitation is concerned, defendant's track record was woefully inadequate.  According to the mother's testimony, in 50% of the visits, when they occurred, husband was not on time according to the schedule, and 75% of the time he brought the children, or child visiting with him at the time, home some 2-3 hours early.  To protect their peace of mind, the children stopped seeing him in March 2016, for reasons clearly and cogently explained in the <u>Lincoln</u> hearing.  Defendant repeatedly discussed the divorce during visits, usually in his car while driving around aimlessly.  Plaintiff testified that she encouraged the children to engage in visitation and communication with their father, but that the children simply laughed at her, effectively pointing out the futility of meaningful parenting time with a bitter and irritated father.  In short, mother asked in her testimony for a complete restriction of visitation and other contact with father, and the court agrees.

"A non-custodial parent is entitled to meaningful visitation, and denial of that right is so drastic that it must be based on substantial evidence that visitation would be detrimental to the welfare of the child." <u>Lane v. Lane</u>, 68 A.D.3d 995, 996-97 (2nd Dept. 2009). <u>See</u> <u>Fox v. Fox</u>, 93 A.D.3d 1224, 1225 (4th Dept. 2012)("'[t]he denial of visitation to a non-

3

custodial parent constitutes such a drastic remedy that it should
be ordered only when there are compelling reasons, and there must
be substantial evidence that such visitation is detrimental to
the child [ ]'s welfare'")(quoting <u>Vasile v. Vasile</u>, 116 A.D.2d
1021 (4th Dept. 1986)).  That is the applicable standard for
evaluating the evidence in this proceeding against defendant's
ultimate prayer for relief.

In short, the court finds from the above described
compelling and substantial evidence that defendant is not
equipped either in inclination or in his current emotional/mental
condition, to have contact with the children that is not
antithetical to their best interests and well being.  <u>See also</u>,
<u>In re Cheyenne S.</u>, 11 A.D.3d 362 (1st Dept. 2004)("visitation was
properly suspended upon a showing that such was causing the
children emotional distress and otherwise not in their best
interests"); <u>J.F. v. L.F.</u>, 181 Misc.2d 722, 732-33 (Fam. Ct.
West. Co. 1999), <u>aff'd</u>, 270 A.D.2d 489 (2d Dept. 2000)(upholding
suspension of all visitation).  The court points out that, while
not determinative, the Law Guardian's position is the same, and
she has consistently done excellent and incisive work for the
court.

In accordance with <u>Roskwitalski v. Fleming</u>, 105 A.D.3d 1432
(4th Dept. 2013); <u>Matter of Hameed v. Alatawaneh</u>, 19 A.D.3d 1135,
1136 (4th Dept. 2005), the court imposes no conditions on

4

resumption of visitation.  Thus, defendant is free to, in the
future, petition the court for resumption of visitation without
conditions imposed by this court, <u>Shuchter v. Shuchter</u>, 259
A.D.2d 1013 (4th Dept. 1999)(improper to condition future
visitation petition on successful therapy treatment, but it is
permissible to "terminat[e] [visitation] at this time subject, as
always, to modification in the event of a change of
circumstances"), thereby vesting in that court, upon presentation
of a future petition, with the discretion to, on a temporary or
other basis, order therapy as part of a visitation plan, if so
indicated. <u>Zafran v. Zafran</u>, 28 A.D.3d 753, 756-67 (2d Dept.
2006)("therapy requirement was imposed as a component of the
court-ordered program of temporary visitation, which is perfectly
permissible")("its legitimate directive that the father
participate in therapy as part of a visitation program"); <u>Harder
v. Phetteplace</u>, 93 A.D.3d 1199, 1200 (4th Dept. 2012).  To aid
that court on any future petition, defendant is ordered to submit
to a mental health evaluation timely with presentation of the
future petition, <u>Smith ex rel. Hunter I. v. Dawn F.B.</u>, 88 A.D.3d
729, 730 (2d Dept. 2011)("Family Court properly directed the
mother to submit to a mental health evaluation for use in any
future determination of visitation"), and, consistent with this
court's view that any therapist or other professional engaged by
defendant must have full access to the history of this case,

defendant must supply the mental health evaluator he engages with a copy of this Decision and Order.

**Equitable Distribution**

In determining equitable distribution the court considers the factors found in Domestic Relations Law §236(B)(5)(d). Defendant is a medical doctor and Anesthesiologist, licensed to practice in New York and Hawaii. No evidence was provided as to the income and property of the parties at the time of marriage. Defendant's statement of net worth, submitted to the court in pre-trial proceedings, attached his 2012 and 2013 income tax returns. His 2013 income was $387,688. His 2012 income was $355,220.

Previous proceedings in this matter revealed that defendant's New York license was suspended on August 18, 2015 for at least 12 months, and additional terms and conditions were imposed, including: (1) reviews of medical records and charting; and, (2) alchohol/drug screening and treatment. No evidence was submitted as to the current status of defendant's New York license. On February 19, 2016, the Hawaii Department of Commerce and Consumer Affairs placed defendant's medical license on probation for 5 years and imposed a fine of $2,500 as a consequence of the action regarding defendant's New York license.

The property of the parties is discussed below. The parties were married July 20, 1996 and this action was commenced on

6

September 1, 2015, making a 19 year marriage.  Plaintiff is 50
years old and defendant is 49.  Plaintiff is in good health.
Previous proceedings before the court indicated that defendant
was receiving disability payments under an insurance policy and
that he received addiction treatment.  No evidence was submitted
concerning defendant's current health status.

The parties sold the marital residence well prior to the
commencement of this action and invested the proceeds in property
in Hawaii, as discussed below.  Defendant cancelled the parties'
health insurance during the pendency of this action and against
the orders of this court.  Plaintiff is currently on Medicaid.

In 2014, the parties sold the marital residence on Landing
Road in Rochester, New York.  The proceeds, $305,500, were
invested in residential real estate, 29 Hoku Place, Paia, Hawaii.
The other investor, Dr. Vito J. Potenza, also provided $305,500
toward the purchase of the single family home.  Dr. Potenza and
defendant formed Valley Isle Assets, LLC, a Hawaii limited
liability company, each taking a 50% interest.  Valley Isle
Assets sole asset is 29 Hoku Place.  Thereafter, Valley Isle
Assets took out a mortgage against the property for $367,250, of
which defendant received $183,625.  The parties used $100,000 of
that money for general living expenses.  Plaintiff maintains that
defendant kept the remaining $83,625 and she does not know what
became of it.  It is noted that defendant was found, in pre-trial

7

proceedings, to have refused to comply with plaintiff's discovery
requests which may have revealed what happened to the $83,625.

No current value of 29 Hoki Place was submitted into
evidence. The 50% interest in Valley Isle Assets, currently
titled in defendant's name, shall remain with him. Defendant
shall pay to plaintiff, as and for her interest in Valley Isle
Assets, $102,650, as explained below.

Defendant seeks one half the equity the parties placed in
the purchase of 29 Hoku Place, or $152,650. This request fails
to consider that the parties spent, by plaintiff's own admission,
$100,000 of that equity in the form of mortgage proceeds for
living expenses during the marriage. That is, the parties
received $183,625 of their investment of $305,300 in the form of
mortgage proceeds. This left $121,675 in equity in the property.
Of the $183,625 received as mortgage proceeds, the parties spent
$100,000 on general living expenses. Thus, plaintiff is awarded
50% of their original investment in the property that remains
with the property, or $121,675 x 50% = $60,837.50. In addition,
plaintiff is also awarded 50% of the $83,625 defendant kept, or
$41,812.50. Because of defendant's actions during the pendency
of this action, discussed below, which lead the court to conclude
that defendant is unlikely to voluntarily comply with the
equitable distribution orders of this court, plaintiff may have a
money judgment and execution thereon for $102,650. Plaintiff may

8

submit a separate order if necessary.

The parties also maintained SEP-IRA accounts with Scottrade. Scottrade statements submitted to the court with Defendant's sworn statement of net worth show defendant's SEP-IRA, account ending 7315, had a value of $528,152.04 as of October 22, 2015 and plaintiff's SEP-IRA, account ending 7525, had a value of $4,066.44 as of that date. The court will utilize these values as the value of each account. No evidence or argument was presented to the court that any part of either account is the separate property of either party and the presumption that both accounts are entirely marital property governs. 1 Timothy Tippins, New York Matrimonial Law and Practice §3:7 ("There has emerged from the judicial decisions a presumption that assets acquired during the marriage and before an agreement is executed or an action is commenced are marital property. Certainly, the presumption is not conclusive. It simply casts the burden of proof on the party who claims that assets acquired during the marriage are separate property").

Plaintiff is awarded 100% of her SEP-IRA account. Plaintiff is also awarded 50% of the value of defendant's SEP-IRA, that is $264,076. Because of defendant's actions taken during the pendency of this matter, further discussion is necessary.

"It is beyond cavil that the wasteful dissipation of marital assets and other economic fault related to marital assets is a

9

relevant factor in equitable distribution and maintenance awards." <u>Owens v. Owens</u>, 107 A.D.3d 1171, 1174 (3d Dept. 2013); DRL §236(B)(5)(d)(12).   In pre-trial proceedings, the court found that defendant made large unauthorized withdrawals from his SEP-IRA account.   Decision and Order, August 25, 2016, p. 6 (Fisher, J.).   Defendant withdrew $14,163.13 on March 21, 2016, $13,200 on June 22, 2016, and $532,000 on July 14, 2016.[2]  The first two withdrawals were deposited in defendant's account at Eastman Savings and Loan, and the last withdrawal was deposited in the Bank of Hawaii, according to the cancelled checks."   Decision and Order (Fisher, J.), August 25, 2016, p.5.   The court found defendant in contempt of court and reserved plaintiff's right to seek remedies for the withdrawals and finding of contempt at trial.   Defendant has requested at trial that the remaining balance of the SEP-IRA account be directed to her.

The court finds that defendant's unauthorized withdrawal of his SEP-IRA, and the 529 plan funds, discussed below, constituted wasteful dissipation of marital assets.   <u>Altieri v. Altieri</u>, 35 A.D.3d 1093, 1095 (3d Dept. 2006)("defendant failed to adequately explain his withdrawals or account for these marital assets, the

---

[2]     The latter withdrawal request of $532,000 resulted in a check to defendant of $281,960 as he requested that 40% be withheld for federal income tax.   Plaintiff's Exhibit 10 is a withdrawal slip showing the deposit of check in the amount of $281,960 to defendant's Bank of Hawaii account, ending 600, on July 20, 2016.

finding of wasteful dissipation was appropriate"). Defendant's withdrawal of funds was a blatant attempt to deny plaintiff her share of the marital assets. This is especially apparent given defendant's conversion of a substantial part of those funds into precious metals, discussed below. As a result of the unauthorized withdrawals, the court froze defendant's bank accounts to prevent further dissipation and now justifies the turn over to plaintiff of the remaining part of those funds, part of which were traced to out-of-state bank accounts controlled by defendant. This includes the remainder of the funds left in defendant's SEP-IRA held by Scottrade.

Records submitted at trial show defendant's SEP-IRA account held $210,824.85 as of October 31, 2016. Because of defendant's unauthorized withdrawal of funds, for which the court previously found defendant in contempt, those funds, plus or minus any investment losses after October 31, 2016, shall be transferred to plaintiff forthwith in partial satisfaction of the equitable distribution award as to defendant's SEP-IRA. Plaintiff may submit to the court any orders necessary to effectuate this transfer.

Plaintiff is also granted a money judgment, with execution thereon, for the remaining balance of equitable distribution due her from the SEP-IRA, roughly $53,251.15. Plaintiff may submit an order.

11

Although not listed on either party's statement of net worth submitted to the court in pre-trial proceedings, defendant also maintained three New York 529 accounts for the benefit of the parties' children as proven at trial. Admitted into evidence at trial, were account statements from each of the three 529 accounts showing withdrawals in July of 2016, in the amounts of $48,682.42, $53,716.74, and $53,616.06, leaving a zero balance in each of the accounts. Plaintiff's Exhibits 3,4,5. Also in evidence was a deposit slip to defendant's account at the Bank of Hawaii, account ending 600, showing checks deposited on July 20, 2016 in the amounts of $48,682.42, $53,716.74, and $53,616.06. Plaintiff's Exhibit 10. These funds are marital savings set aside for the college education of the parties' children. Control of these funds is awarded to plaintiff.

The court recognizes, given defendant's actions during the pendency of this matter, that he is unlikely to comply with an order to return the 529 funds. The evidence at trial indicated that defendant has converted on August 1, 2016, at least $349,981.89 of the $437,975.22 he secreted in his Bank of Hawaii account to precious metals. Plaintiff's Exhibit 11. On August 2, 2016 he withdrew $10,000, $9,900 on August 11, and $6,500 on August 17, all for unknown purposes. Given this, the court awards a further money judgment in the amount of $156,015.22, the total amount of 529 funds withdrawn by defendant and deposited in

his Bank of Hawaii account, with execution thereon.

Plaintiff also made mention of a life insurance policy defendant may have with Northwestern Mutual Life. However, insufficient evidence of this alleged policy was presented for the court to make any finding or distribution.

The debt of $25,000 to defendant's mother listed on his statement of net worth is distributed to defendant.

**Maintenance**

This case was commenced on September 1, 2015, prior to the effective date of the amendments to the matrimonial law providing for a formula to determine the presumptively correct post judgment maintenance amount. In determining maintenance, the court has considered the property distribution as set forth above and the age and health of the parties, as noted above. Defendant provides home schooling to the two youngest children and works part-time cleaning houses and at a florist shop. During the parties' marriage she was a homemaker and home schooled the children. Although plaintiff has a college degree, she stopped working upon the parties' marriage and her job skills are out of date. The children will reside with plaintiff.

Defendant is, as noted above, a medical doctor and Anesthesiologist licensed in New York and Hawaii. Roughly 18 months ago, his New York licence was suspended for at least 12 months. No evidence was presented as to the current status of

13

his New York license.  Defendant, however, appears to now be

living in the state of Hawaii, where his license to practice is

on probation.  In the absence of any information regarding his

employment in Hawaii as practicing physician, the court assumes

that he is practicing his profession given the evidence presented

that his Hawaii license is on probation and not suspended.  The

court will impute income to defendant of $218,000 given his

qualifications, employment history, past income and demonstrated

earnings potential.  Lauzonis v. Lauzonis, 105 A.D.3d 1351 (4th

Dept. 2013)(court did not abuse its discretion when imputing

income for maintenance and child support purposes "based upon her

education, qualifications, employment history, past income, and

demonstrated earning potential").  The United States Bureau of

Labor Statistics, United States Department of Labor, Annual Mean

Wage for "Physicians and Surgeons, All Other" in the state of

Hawaii is $218,000.  The court will utilize this figure as

defendant's income for maintenance and child support purposes.

United States Bureau of Labor Statistics,

https://www.bls.gov/oes/current/oes_hi.htm, May 2015 State

Occupational Employment and Wage Estimates, accessed December 13,

2016; Sharlow v. Sharlow, 77 A.D.3d 1430, 1431 (4th Dept.

2010)(imputing income to defendant for child support and

maintenance purposes based on his earnings history and the New

York Department of Labor statistics for average salary in

14

defendant's profession).

The maintenance ordered by the court is to be tax deductible to plaintiff and included in taxable income to defendant.

The court has considered plaintiff's income needs as set forth in her statement of net worth and testimony.  In addition, the court is mindful of "the wasteful dissipation of family assets by [defendant] her spouse" . . . in fixing an award of maintenance." Blickstein v. Blickstein, 99 A.D.2d 287, 293 (2d Dept. 1984); DRL 236(B)(6)(a)(17).  Considering the above factors, and in accordance with those other factors the court is required to consider pursuant to DRL §236(B)(6)(a), the court finds that maintenance shall be in the amount of $48,000 annually, or $4,000 per month, or $1,846.15, or $923.08 per week, for a period of 120 months, or until the death of either party, or remarriage of plaintiff or cohabitation by plaintiff with an unrelated adult male, which ever shall occur sooner.  As plaintiff requested maintenance in her complaint, this order is effective from the date of commencement of this action, August 5, 2015, with credit to defendant for maintenance paid during the pendency of this action.  Relations Law §236(B)(6)(a(a maintenance award "order shall be effective as of the date of the application therefor").

**Child Support**

The court's child support order contained herein shall be

15

recalculated should the maintenance provided here terminate. Smith v. Smith, 1 A.D.3d 870, 872-73 (3d Dept. 2003);  Domestic Relations Law §240(1-b)(b)(5)(vii)(C).

"Income" for child support purposes means income as defined in the child support standards act, codified at §240 of the Domestic Relations Law.   That statute begins with the total income as should have been reported in the most recent federal income tax return.   DRL §240(1-b)(b)(5)(I).  As noted above, defendant's income is 218,000, minus FICA of $10,508, minus maintenance of $48,000 per year is $159,000.  See Belkhir v. Amrane-Belkhir, 118 A.D.3d 1396 (4th Dept. 2014)(FICA taxes are properly deducted from imputed income).  Plaintiff's income is $12,000 per year, minus FICA of $918 is $11,082.

Plaintiff is the residential parent having been awarded sole custody.  Combined parental income is $170,082.  Plaintiff's pro rata share of this amount is 6.5% and defendant's share is 93.5%. The statutory child support percentage of combined parental income for 3 children is 29%.  DRL §240(1-b)(b)(3)(iii).  Child support on the first $143,000 of combined income is calculated as follows.

Twenty-nine percent times $143,000 is $41,470.  Defendant's pro rata percentage of that number and defendant's presumptive basic child support amount is $38,774.45.

The court is required to order this amount of child support,

16

apply the child support for percentages to income above $143,000 of income").

The child support order herein is effective as of commencement of this action with credit to defendant for child support paid during the pendency of this action.

Plaintiff shall maintain insurance coverage for the children.  The children currently receive coverage through Healthy New York.

The court shall require that defendant maintain a life insurance policy for the benefit of the children in the amount $250,000 until such time as the last child is emancipated.

Given the educational achievements of the parents, plaintiff's desire that the children attend college, the oldest is currently a student at Rochester Institute Technology, and testimony regarding the children's aptitude and desire, the parties shall provide for the children's college tuition and expenses in the pro rata percentage found above.

The court's ordered freezing of defendant's bank accounts and other financial accounts shall continue in place until further order of this court to prevent further dissipation of marital funds and to facilitate plaintiff's enforcement of various money judgments awarded herein.

**<u>Attorneys Fees</u>**

The award is made considering the equities of the case, the

18

respective financial circumstances of the parties, and the relative merit of each party's position.  The father's conduct has caused mother to bring "[what would be in the absence of such conduct] unnecessary litigation and caused mother to incur an additional attorney's fee." State ex rel. Gerstein v. Gerstein, 302 A.D.2d 447, 449 (2d Dept. 2003). See Rodman v. Friedman, 33 A.D.3d 400, 401 (1st Dept. 2006).  The court awards attorney fees to plaintiff, payable by defendant, of $15,670.

Plaintiff's counsel is directed to submit the Judgment Roll within 60 days of the date of this decision and order.


SO ORDERED.

KENNETH R. FISHER
JUSTICE SUPREME COURT

DATED:      December 20, 2016
            Rochester, New York


ATTORNEY'S CERTIFICATION
Pursuant to Section 2105 of the New York
Civil Practice Law and Rules. I, an attorney
admitted to practice in the courts of the
State, hereby certify that this copy has
been compared by me with the original
and is a true and complete copy thereof.

Attorney at Law

19